**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PERFORADORA ORO NEGRO, S. DE R.L. DE C.V., *et al.* | Case No. 18-11094 (SCC) (Jointly Administered) |
| Debtors in a Foreign Proceeding. | |
| GONZALO GIL-WHITE, PERSONALLY AND IN HIS CAPACITY AS FOREIGN REPRESENTATIVE OF PERFORADORA ORO NEGRO, S. DE R.L. DE C.V. AND INTEGRADORA DE SERVICIOS PETROLEROS ORO NEGRO, S.A.P.I. DE C.V. | Adv. Pro. No. _____ |

Plaintiff,

-against-

ALP ERCIL; ALTERNA CAPITAL
PARTNERS, LLC;
AMA CAPITAL PARTNERS, LLC;
ANDRES CONSTANTIN ANTONIUS-
GONZÁLEZ; ASIA RESEARCH AND
CAPITAL MANAGEMENT LTD.; CQS
(UK) LLP; FINTECH ADVISORY, INC.;
DEUTSCHE BANK MÉXICO, S.A.,
INSTITUCIÓN DE BANCA MÚLTIPLE;
GARCÍA GONZÁLEZ Y BARRADAS
ABOGADOS, S.C.; GHL INVESTMENTS
(EUROPE) LTD.; JOHN FREDRIKSEN;
KRISTAN BODDEN; MARITIME
FINANCE COMPANY LTD.; NOEL BLAIR
HUNTER COCHRANE, JR; ORO NEGRO
PRIMUS PTE., LTD.; ORO NEGRO
LAURUS PTE., LTD.; ORO NEGRO
FORTIUS PTE., LTD.; ORO NEGRO
DECUS PTE., LTD.; ORO NEGRO
IMPETUS PTE., LTD.; PAUL MATISON

LEAND, JR.; ROGER ALAN BARTLETT;
ROGER ARNOLD HANCOCK; SEADRILL
LIMITED; SHIP FINANCE
INTERNATIONAL LTD.; and DOES 1-100

Defendants.

**COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................2

PARTIES ........................................................................................................................7

I.      Plaintiffs .............................................................................................................7

II.     Defendants .........................................................................................................7

    A.      The Ad-Hoc Group Defendants ..............................................................7

        1.      Alterna ...........................................................................................7

        2.      AMA ..............................................................................................8

        3.      Leand .............................................................................................8

        4.      Antonius .........................................................................................8

        5.      ARCM ............................................................................................9

        6.      Ercil ............................................................................................10

        7.      CQS .............................................................................................10

        8.      GGB .............................................................................................11

        9.      GHL .............................................................................................11

        10.     MFC .............................................................................................12

        11.     Bodden .........................................................................................13

        12.     SFIL .............................................................................................13

        13.     Fredriksen ....................................................................................14

    B.      The Seamex Defendants ........................................................................16

        1.      Fintech Advisory ..........................................................................16

        2.      Seadrill .........................................................................................16

    C.      The Singapore Defendants .....................................................................17

        1.      The Five Singapore Rig Owners ...................................................17

        2.      The Singapore Directors ...............................................................18

    D.      Deutsche México ...................................................................................19

JURISDICTION AND VENUE ......................................................................................19

FACTS ..........................................................................................................................21

PART I:  CORPORATE STRUCTURE AND KEY CONTRACTS ...............................21

I.      Overview ...........................................................................................................21

II.     Oro Negro's Corporate Structure .....................................................................21

    A.      Integradora ...........................................................................................21

B.    The Rigs, Oro Negro Drilling and the Singapore Rig Owners .............................22

C.    Perforadora.......................................................................................................22

D.    Employees .......................................................................................................23

III.    The Bonds .................................................................................................................23

A.    Overview .........................................................................................................23

B.    Security Rights.................................................................................................24

C.    The Bond Agreement's Events of Default........................................................25

D.    The Ad-Hoc Group's Control of the Bonds ....................................................25

E.    Bond Amendments...........................................................................................26

IV.    The Bareboat Charters ..............................................................................................27

A.    Overview .........................................................................................................27

B.    Charter Period .................................................................................................27

C.    Charter Hire ....................................................................................................28

D.    The Singapore Rig Owners' Payment Obligations .........................................28

1.    Expenses to Maintain the Rigs "in Class" ...........................................29

2.    Costs to Maintain the Impetus Prior to the Charter Period....................29

V.    The Oro Negro Contracts ..........................................................................................30

A.    Overview .........................................................................................................30

B.    Original Terms .................................................................................................30

C.    Termination .....................................................................................................31

D.    Amendments ....................................................................................................32

E.    Performance and Payment ...............................................................................32

F.    Seamex ............................................................................................................33

G.    Pemex's Pattern of Corruption........................................................................34

H.    Oro Negro was a Victim of Pemex's Pattern of Corruption.............................34

VI.    The Mexican Trust....................................................................................................35

PART II: EVENTS FROM MARCH 2017 TO SEPTEMBER 11, 2017....................................36

I.    2017 Proposed Pemex Amendments..........................................................................36

II.    The Ad-Hoc Group ..................................................................................................37

A.    Formation and Members ..................................................................................37

B.    The Ad-Hoc Group's Advisors........................................................................37

1.    AMA and Leand ..................................................................................37

2.    Aagaard ...............................................................................................39

C.    The Coordinated Activities of Pemex and the Ad-Hoc Group ............................41

PART III: EVENTS AFTER SEPTEMBER 11, 2017 ............................................................45

I.    The *Concurso* Proceeding.................................................................................................45

A.    *Concurso* Request .....................................................................................................45

B.    Injunctions Protecting Oro Negro ........................................................................46

C.    Disputed *Concurso* of Oro Negro Drilling and the Singapore Rig Owners .........48

D.    The Defendants' Actions in Contravention of the *Concurso* Proceeding.............49

1.    Pemex and the Ad-Hoc Group Collude to Terminate the Oro Negro Contracts on October 3, 2017 ...................................................................49

2.    Pemex and the Ad-Hoc Group Collude to Ignore *Concurso* Court Orders...............................................................................................................56

3.    The Ad-Hoc Group's Efforts to Unlawfully Terminate the Bareboat Charters........................................................................................58

4.    The Ad-Hoc Group's Illegal Seizure of Control of the Singapore Rig Owners and Misuse of Estate Cash....................................................58

5.    The Mexican Trust Fails to Comply with *Concurso* Court Orders, at the Ad-Hoc Group's Direction................................................................60

II.    The Defendants Again Interfere with the Oro Negro Contracts .....................................63

PART IV: LITIGATION OUTSIDE OF MÉXICO .................................................................65

I.    The Ad-Hoc Group Unleashes Litigation Around the World...........................................65

A.    The Singapore Litigation ......................................................................................65

B.    The New York Litigation.......................................................................................66

C.    The Norway Lawsuit...............................................................................................67

II.    The Chapter 15 Proceeding.............................................................................................67

A.    The Ad-Hoc Group's Discovery Misconduct .....................................................68

B.    Seadrill's and Fintech Advisory's Discovery Misconduct ..................................69

PART V: THE MEXICAN CRIMINAL PROCEEDINGS.......................................................71

I.    Overview............................................................................................................................71

II.    Mexican Criminal Counsel ..............................................................................................72

III.    The Four Criminal Proceedings .....................................................................................73

A.    First Criminal Complaint ......................................................................................74

B.    Second Criminal Complaint..................................................................................78

C.    The Sham Companies Investigation .....................................................................79

1.    Fabrication of Evidence .........................................................................79

2.    Seizure Order ..................................................................................82

3.    The Rigs Take-Over Order ..............................................................83

D.    The Fourth Criminal Proceeding ...............................................................88

PART VI:  INTERFERENCE WITH ORO NEGRO'S KEY CONTRACTS, BUSINESS
RELATIONSHIPS AND RESTRUCTURING EFFORTS ..............................................90

I.    Interference with the Oro Negro Contracts and Perforadora's Relationship With
Pemex .........................................................................................................................90

A.    March 2017 – September 18, 2017 .............................................................90

1.    Background ......................................................................................90

2.    The Defendants Place a Mole in Oro Negro ...................................90

3.    Seadrill Analyzes Taking over Oro Negro .....................................91

4.    The Ad-Hoc Group's Communications with Pemex .......................91

5.    Outcome of the Ad-Hoc Group's Interference ...............................92

6.    Pressure on Perforadora to Accept the 2017 Proposed Pemex
Amendments ....................................................................................92

B.    September 19, 2017 – October 11, 2017 .....................................................93

1.    Plan against Oro Negro ...................................................................93

2.    Interference with Pemex .................................................................93

3.    Seizure of the Singapore Rig Owners .............................................94

4.    Conspiracy with Seadrill and Fintech Advisory .............................94

5.    Outcome of the Plan ........................................................................95

6.    Aagaard's Assistance ......................................................................95

7.    The *Concurso* Court's Injunctions .................................................96

C.    October 2017 – February 2018 ...................................................................96

1.    Common Interest Agreement with Pemex .......................................96

2.    Interference with the Reactivation of the Oro Negro Contracts .....97

3.    Attempt to Interfere with the *Afores* .............................................97

II.    Interference With the Bareboat Charters and Perforadora's Relationship With the
Singapore Rig Owners ...............................................................................................97

A.    Interference with the Bareboat Charters ....................................................97

B.    Interference with Perforadora's Relationship With the Singapore Rig
Owners .........................................................................................................98

III.    Acts to Sabotage Integradora's and Perforadora's Reorganization Efforts .............98

IV.    The Defendants Profited from Interfering with Oro Negro's Contracts and
Business ....................................................................................................................99

PART VII:  DAMAGES ....................................................................................................100

CAUSES OF ACTION .....................................................................................................101

COUNT ONE (Tortious Interference and Conspiracy to Tortiously Interfere with
the Oro Negro Contracts against the Ad-Hoc Group Defendants (Except
GGB) and the Seamex Defendants)...................................................................101

COUNT TWO (Aiding and Abetting Tortious Interference with the Oro Negro
Contracts against the Seamex Defendants)........................................................103

COUNT THREE (Tortious Interference and Conspiracy to Tortiously Interfere
with Perforadora's Business Relationship with Pemex against the Ad-Hoc
Group Defendants (Except GGB) and the Seamex Defendants ).......................103

COUNT FOUR (Aiding and Abetting Tortious Interference with Pemex's
Business Relationship with Perforadora against the Seamex Defendants).........105

COUNT FIVE (Alternative to Counts One to Four) (Intentional Torts Under
Mexican Law against the Ad-Hoc Group Defendants (Except GGB) and
the Seamex Defendants) ...................................................................................106

COUNT SIX (Alternative to Count Five) (Negligent Torts Under Mexican Law
against the Ad-Hoc Group Defendants (Except GGB) and the Seamex
Defendants)........................................................................................................107

COUNT SEVEN (Intentional Torts under Mexican Law in Connection with
Integradora's and Perforadora's Reorganization Efforts against All
Defendants) .......................................................................................................108

COUNT EIGHT (Alternative to Count Seven) (Negligent Torts under Mexican
Law in Connection with Integradora's and Perforadora's Reorganization
Efforts against All Defendants) ........................................................................109

COUNT NINE (By Gil Personally and as the Foreign Representative) (Abuse of
Process and Conspiracy to Commit Abuse of Process against the Ad-Hoc
Group Defendants (Except Antonius) and the Singapore Defendants )..............111

COUNT TEN (Alternative to Count Nine) (By Gil Personally and as the Foreign
Representative) (Intentional Torts under Mexican Law in Connection with
the Mexican Criminal Proceedings against the Ad-Hoc Group Defendants
(Except Antonius) and the Singapore Defendants)............................................112

COUNT ELEVEN (Alternative to Ten) (By Gil Personally and as the Foreign
Representative) (Negligent Torts under Mexican Law in Connection with
the Mexican Criminal Proceedings against the Ad-Hoc Group Defendants
(Except Antonius) and the Singapore Defendants).............................................113

COUNT TWELVE (Violation of the Implied Covenant of Good Faith and Fair
Dealing in the Bareboat Charters against the Singapore Rig Owners)...............114

COUNT THIRTEEN (Tortious Interference and Conspiracy to Tortiously Interfere in the Bareboat Charters against the Ad-Hoc Group Defendants (Except GGB and Antonius), the Seamex Defendants and the Singapore Directors) ...........................................................................................115

COUNT FOURTEEN (Tortious Interference and Conspiracy to Tortiously Interfere in Perforadora's Business Relationship with the Singapore Rig Owners against the Ad-Hoc Group Defendants (Except Antonius) and the Singapore Directors)...........................................................................116

COUNT FIFTEEN (Alternative to Counts Sixteen and Seventeen) (Intentional Torts under Mexican Law in Connection with the Bareboat Charters and the Singapore Rig Owners against the Ad-Hoc Group Defendants (Except Antonius), the Seamex Defendants and the Singapore Directors).....................117

COUNT SIXTEEN (Alternative to Count Fifteen) (Negligent Torts under Mexican Law in Connection with the Bareboat Charters and the Singapore Rig Owners against the Ad-Hoc Group Defendants (Except Antonius), the Seamex Defendants and the Singapore Directors)...............................................119

COUNT SEVENTEEN (Breach of the Bareboat Charters for Failure to Pay the Reimbursement Costs against the Singapore Rig Owners) ................................121

COUNT EIGHTEEN (Declaratory Judgment and Damages against the Ad-Hoc Group Defendants and the Singapore Defendants for Violations of 11 U.S.C. § 1520(a)(1) and the Comity Order) .........................................................121

COUNT NINETEEN (Prima Facie Tort against All Defendants)..................................123

COUNT TWENTY (Negligence against the Ad-Hoc Group and the Singapore Rig Owners)...........................................................................................................125

COUNT TWENTY-ONE (Unjust Enrichment and Conspiracy to Commit Unjust Enrichment against the Ad-Hoc Group and the Singapore Rig Owners) ............126

Gonzalo Gil-White ("Gil"), personally and in his capacity as the foreign representative of Integradora de Servicios Petroleros Oro Negro, S.A.P.I. de C.V. ("Integradora") and Perforadora Oro Negro, S. de R.L. de C.V. ("Perforadora" and, together with Integradora, "Oro Negro") (the "Foreign Representative")[1] files this complaint (the "Complaint") against the following entities and individuals (together, the "Defendants"):

- The Ad-Hoc Group Defendants:  Alp Ercil ("Ercil"); Alterna Capital Partners, LLC ("Alterna"); AMA Capital Partners, LLC ("AMA"); Andres Constantin Antonius-González ("Antonius"); Asia Research and Capital Management Ltd. ("ARCM"); Kristan Bodden ("Bodden"); CQS (UK) LLP ("CQS"); García González y Barradas Abogados, S.C. ("GGB"); GHL Investments (Europe) Ltd. ("GHL"); John Fredriksen ("Fredriksen"); Maritime Finance Company Ltd. ("MFC"); Paul Matison Leand, Jr. ("Leand"); and Ship Finance International Ltd. ("SFIL");

- The Singapore Rig Owners:  Oro Negro Primus Pte., Ltd. ("Oro Negro Primus"); Oro Negro Laurus Pte., Ltd. ("Oro Negro Laurus"); Oro Negro Fortius Pte., Ltd. ("Oro Negro Fortius"); Oro Negro Decus Pte., Ltd. ("Oro Negro Decus"); and Oro Negro Impetus Pte., Ltd. ("Oro Negro Impetus");

- The Singapore Directors:  Roger Alan Bartlett ("Bartlett"); Roger Arnold Hancock ("Hancock"); and Noel Blair Hunter Cochrane, Jr. ("Cochrane") (together, the Singapore Rig Owners and the Singapore Directors, the "Singapore Defendants");

---

[1]    *See* ECF 189.

-1-

- The Seamex Defendants: Fintech Advisory, Inc. ("Fintech Advisory") and Seadrill Limited ("Seadrill");

- Deutsche Bank México, S.A., Institución de Banca Múltiple ("Deutsche México"); and

- The Doe Defendants: Jane and John Does 1-100;

and, on information and belief, alleges as follows:

## INTRODUCTION

1.      This is an egregious tortious interference case in which a company's creditors and its only customer colluded to drive the company out of business and take over its only assets. The victim is Oro Negro, a Mexican oil services company with five state-of-the-art jack-up rigs used for offshore drilling in the Gulf of México (the "Rigs"). The creditors are a group of investors owning the majority of Oro Negro's bonds (the "Ad-Hoc Group"). Oro Negro's only customer is Petróleos Mexicanos ("Pemex"), México's oil company and the largest company in the country.

2.      The Ad-Hoc Group and México, including through Pemex, destroyed Oro Negro because the Ad-Hoc Group wanted to, and eventually did, take over Oro Negro's only assets, the Rigs. The Rigs are valuable assets—according to the Ad-Hoc Group's own estimates, even without the Oro Negro Contracts, each Rig is worth approximately $150 million.

3.      Oro Negro was founded in 2012 by well-known entrepreneurs; it was, at the time, the only Mexican oil services company to raise equity capital from large international investors, including prominent United States investors. Further, in 2014, it raised $900 million in debt from international investors (collectively, the "Bondholders") by issuing bonds (the "Bonds").

4.      Oro Negro's five Rigs are among the best jack-up rigs in México, including because they extract oil in deeper water; few other Mexican oil companies own comparable rigs. Oro Negro leased the Rigs to Pemex under five contracts (the "Oro Negro Contracts").  Oro Negro had the best performance, including safety record, of any company in the industry.

5.      Pemex is owned and controlled by the Mexican government; indeed, it is part of the government and by far México's largest source of revenue.  Pemex had a monopoly over oil production until 2015; since then, although others may participate in the market, Pemex continues exercising monopoly-like power.  As Pemex is a monopoly, Oro Negro could only provide services to Pemex, which was thus Oro Negro's only client.

6.      During prior administrations, Pemex demonstrated to be a highly corrupt company.  For example, Emilio Lozoya ("Lozoya"), Pemex's Chief Executive Officer ("CEO") from 2012 to 2016, is currently at the center of one of the largest corruption scandals in the world for allegedly receiving over $10 million in bribes from Odebrecht, S.A., a large Brazilian construction company.  México's new administration has been carrying out commendable and historic efforts to prosecute the corruption and "pay-to-play" bribery system that for decades was pervasive within México, including Pemex.

7.      The Ad-Hoc Group is comprised of investment funds based in the United States, Europe and Asia.  The Ad-Hoc Group holds approximately 60% of Oro Negro's Bonds.  The Bonds are secured by the Rigs.  The Ad-Hoc Group is led by Fredriksen, a Norwegian-born billionaire and one of the most powerful businesspersons in the oil industry.  The Ad-Hoc Group's financial advisor is AMA, one of the most well-known offshore and maritime financial advisors, owned by Leand, a powerful industry insider.

8.      Oro Negro's primary competitor is Seamex Limited ("Seamex"), a joint venture between Seadrill and Fintech Investments Limited ("Fintech Investments"), an offshore shell company managed by Fintech Advisory and owned by David Martínez Guzman ("Martínez"), a controversial Mexican billionaire who appears to be under investigation by the United States government for financing Venezuela's dictatorship.  Seamex has the industry's best contracts with Pemex, including in that they have superior prices, longer duration and do not contain unilateral termination clauses, in contrast to the contracts of all of Seamex's competitors, including the Oro Negro Contracts.

9.      Indeed, the core of this case involves the efforts by the Ad-Hoc Group, advised by AMA, and Pemex, to purport to terminate the Oro Negro Contracts so that the Ad-Hoc Group could take over the Rigs and hand them over to Seamex for Seamex to lease the Rigs to Pemex. These efforts began with Pemex demanding to dramatically amend the Oro Negro Contracts, including by reducing its payments to Oro Negro, and refusing to pay Oro Negro over $100 million in past due invoices.  The efforts by Pemex and the Ad-Hoc Group culminated in Pemex purporting to cancel the Oro Negro Contracts, which led to Oro Negro's financial distress and the Ad-Hoc Group successfully taking over the Rigs.  Oro Negro was forced to file for reorganization in bankruptcy court in México and later commenced a Chapter 15 proceeding before this Court.

10.     Throughout 2017 and 2018, the Ad-Hoc Group and Pemex closely coordinated and strategized—colluded—on how best to cancel the Oro Negro Contracts, what to do with the Contracts after their termination and what to do with the Rigs.  And throughout, Pemex and the Ad-Hoc Group and its advisors and co-conspirators, including AMA, Seadrill and Fintech, likewise coordinated to have the Oro Negro Contracts assumed by Seamex.

11.    To force Oro Negro to capitulate, in 2018, the Ad-Hoc Group and México, initiated criminal cases seeking to seize Oro Negro's cash and the Rigs and to imprison Oro Negro's management based on false and fabricated evidence. And they resorted to movie-like sensational efforts to seize the Rigs including by illegally hiring a squadron of helicopters under the protection of the Mexican government to forcibly board and seize the Rigs. They did so while flagrantly violating numerous orders of the Mexican bankruptcy court and this Court prohibiting the cancellation of the Oro Negro Contracts and any efforts by the Ad-Hoc Group to seize the Rigs and while the Ad-Hoc Group systematically misrepresented to this Court that it did not want the Rigs. Seadrill and Fintech similarly misrepresented to the Court that they had no interest in Oro Negro.

12.    The Ad-Hoc Group's intention has been to extract as much cash as it can from Oro Negro via interest payments and eventually take over the Rigs. On information and belief, none of the members of the Ad-Hoc Group purchased the majority of their Bonds at 100% of the Bonds' value and, instead, purchased them at prices ranging from 45% to 65% of the Bonds' value—i.e., they have paid from $243 million to $351 million for their Bonds. As such, given that the Rigs (even without the Oro Negro Contracts) are each worth at least approximately $150 million (for a total of approximately $750 million), the Ad-Hoc Group stood to substantially profit simply by taking over the Rigs. Seadrill and Fintech similarly stood to gain in eliminating from the market Seamex's largest competitor, while absorbing the Rigs and the Oro Negro Contracts.

13.    Because Pemex would continue leasing the Rigs from the Ad-Hoc Group through Seamex, this arrangement also benefited Pemex. More importantly, the Mexican government gladly yielded to the Ad-Hoc Group's influence for its own reasons—an overt intention from the

prior administration to retaliate against Oro Negro because Oro Negro persistently refused to pay bribes to Mexican government officials, including Pemex officials. México's acts of retaliation against Oro Negro are the subject of a claim by Oro Negro's United States shareholders against México under the North American Free Trade Agreement ("NAFTA").

14.    Oro Negro now brings this case as the only avenue available to obtain redress from the Defendants for colluding with the prior Mexican administration to illegally purport to terminate its only contracts, the Oro Negro Contracts, and seize its only assets, the Rigs.

15.    The factual background of this Complaint (paragraphs 16 to 447) is divided into the following sections:

- **Part I**: Oro Negro's corporate structure and key contracts;

- **Part II**: events from March 2017 to September 11, 2017;

- **Part III**: events after September 11, 2017, which include the commencement of Oro Negro's bankruptcy proceedings, Pemex's attempted termination of the Oro Negro Contracts and the Ad-Hoc Group's acts of collusion with Pemex;

- **Part IV**: the proceedings outside of México including the New York Litigation, proceedings initiated in Singapore and Norway at the direction of the Ad-Hoc Group, the commencement of Oro Negro's Chapter 15 proceeding in New York and the Ad-Hoc Group's extraordinary resistance to discovery;

- **Part V**: the Mexican criminal proceedings initiated by the Ad-Hoc Group;

- **Part VI**: the Defendants' interference with Oro Negro's key contracts, business relationships and reorganization efforts; and

- **Part VII**: the damages caused to Oro Negro.

## PARTIES

### I.    Plaintiffs

16.    Plaintiff Gil is the Foreign Representative of Integradora and Perforadora in the Chapter 15 proceeding captioned: *In re: Perforadora Oro Negro, S. de R.L. de C.V., et al.*, Case No. 18-11094 (SCC) (Jointly Administered) (the "Chapter 15 Proceeding").  Gil is the CEO of Integradora and is authorized to represent Integradora and Perforadora inside and outside of México including to initiate any legal proceedings.

17.    Gil resides in Miami, Florida.

18.    Integradora's and Perforadora's registered office and principal place of business is located at Javier Barros Sierra 540, Office 103, Park Plaza Torre 1, Santa Fe Colony, Álvaro Obregón Delegation, México City, 01210.

### II.    Defendants

#### A.    The Ad-Hoc Group Defendants

19.    The Ad-Hoc Group Defendants are (or were at the time of the events described in this Complaint) the members of the Ad-Hoc Group, which are the managers of funds or companies that hold the majority of the Bonds, and three of the Ad-Hoc Group's advisors, specifically, its financial advisor, its Mexican lobbyist and its Mexican criminal law firm.

##### 1.    Alterna

20.    Defendant Alterna is a Delaware limited liability company.  Alterna is an investment manager and financial advisor.  Its principal place of business is in Connecticut.  Its address is 15 River Road, Suite 320, Wilton, Connecticut 06897.

21.    Alterna manages, among other funds, Alterna Core Capital Assets Fund II, L.P., a Delaware limited partnership (the "Alterna Fund").  ███████████████████████████████████

███████████████████████████████

22.     As the Alterna Fund's investment manager, Alterna has been a member of the Ad-Hoc Group since at least May 2017.

23.     The funds that Alterna manages, including the Alterna Fund, raise substantial capital in the United States through private placements (i.e., investment offerings that do not entail selling securities that are registered with the Securities and Exchange Commission, the "SEC").  To raise capital in the United States through private placements, an investment manager and its fund must file a Notice of Exempt Offering of Securities (known as a "Form D") with the SEC, providing general information about the fund, its investment manager and the amount that the fund will raise.  Alterna and its funds have filed numerous Forms D with the SEC since 2009, reflecting private placements totaling approximately $1.4 billion.

        2.     <u>AMA</u>

24.     Defendant AMA is a New York limited liability company that specializes in investing in the shipping and offshore industries and in advising creditors of shipping and offshore companies.  Its principal place of business is in New York.  Its address is 405 Lexington Avenue, 67th Floor, New York, New York 10174.

25.     AMA has been the financial advisor to the Bondholders since approximately 2015.

        3.     <u>Leand</u>

26.     Defendant Leand is AMA's CEO and Managing Director.  He is a United States national and a New York resident.  His address is 152 Stuyvesant Ave, Rye, New York 10580.

        4.     <u>Antonius</u>

27.     Defendant Antonius is a Mexican national and resident.  His address is Paseo de la Reforma, 2654 Despacho 1402, México, D.F. 11950.

28.     He is the CEO of Plan-B, a Mexican lobbying firm.  Antonius is the Ad-Hoc Group's Mexican lobbyist.

5.    ARCM

29.    Defendant ARCM is a Hong Kong-based investment manager and financial advisor.  Its principal place of business is 21/F, Shanghai Commercial Bank Tower, 12 Queens Road Central, Hong Kong.

30.    ARCM manages, among other funds, ARCM Master Fund II, Ltd., ARCM Master Fund III, Ltd. and ARCM Distressed Energy Opportunities Master Fund, Ltd. (the "ARCM Funds").  The ARCM Funds are all established in the Cayman Islands, a tax haven. ███ ██████████████████████████████████████████████ Cayman Islands is a secretive jurisdiction and, as a result, the names of the directors and officers of the ARCM Funds are not public.

31.    As the ARCM Funds' investment manager, ARCM has been a member of the Ad-Hoc Group since at least May 2017.

32.    Funds managed by ARCM were, until December 2018, significant shareholders of Seadrill, a company traded on the New York Stock Exchange ("NYSE").  Additionally, funds ARCM manages invest permanently and significantly in New York.  As an investment manager, ARCM must file quarterly reports (known as a "Form 13F") with the SEC, disclosing the amount of U.S. publicly traded stock that is held by the funds that ARCM manages.  According to its Form 13F for the last quarter of 2018, ARCM-managed funds hold approximately $234 million in stock traded on the NYSE.

33.    The funds that ARCM manages, including the ARCM Funds, raise substantial capital in the United States through private placements.  ARCM and its funds have filed numerous Form Ds with the SEC since 2012, reflecting private placements totaling over $1.6 billion.

-9-

34.     On April 19, 2019, ARCM, together with the other members of the Ad-Hoc Group, made a submission to an arbitration tribunal established under NAFTA to resolve a claim by the United States shareholders of Integradora against México (the "NAFTA Claim").



6.      Ercil

35.     Defendant Ercil is a Turkish national and a resident of Hong Kong. His address is 21/F, Shanghai Commercial Bank Tower, 12 Queens Road Central, Hong Kong.

36.     He is the CEO of ARCM, a member of the Ad-Hoc Group since at least May 2017. Through ARCM and the funds that ARCM manages, Ercil conducts permanent and substantial business in New York.

7.      CQS

37.     Defendant CQS is a London-based investment manager and financial advisor. Its principal place of business is 4th Floor, One Strand, London, WC2N 5HR, United Kingdom.

38.     CQS has had a subsidiary in New York since 2008 and conducts permanent and substantial business through that subsidiary. The United States is a key market for CQS. For example, in April 2019, CQS's CEO stated in an interview, "[i]ncreasing our penetration in the North American market, which accounts for 55 percent of global financial assets, is essential as we broaden and deepen our investment capabilities to better serve our clients' needs."

39.     CQS manages, among other funds, City Natural Resources High Yield Trust, Plc, CQS New City High Yield Fund Limited, BIWA Fund Limited, CQS Directional Opportunities

Master Fund Limited and CQS Alguille du Chardonnet MF SICAV SIF (the "CQS Funds").

40.    As the CQS Funds' investment manager, CQS has been a member of the Ad-Hoc Group since at least May 2017.

41.    Funds managed by or affiliated with CQS invest permanently and significantly in New York.  According to the Forms 13F of CQS and its affiliates for the last quarter of 2018, CQS-managed funds and affiliated funds hold over $1 billion in stock traded on the NYSE.

42.    The funds that CQS manages, including at least one of the CQS Funds, raise substantial capital in the United States through private placements.  CQS and its funds have filed at least one Form D with the SEC (in 2017), reflecting a private placement of approximately $600 million.

### 8.    GGB

43.    Defendant GGB is a small Mexican law firm specializing in criminal litigation. Its address is Prado Norte No. 135, 3° Piso, Lomas de Chapultepec I Sección, Miguel Hidalgo México City, 11000.

44.    GGB is the criminal law firm that represents the Ad-Hoc Group and the Singapore Rig Owners in México.

### 9.    GHL

45.    Defendant GHL is a company established and with its principal place of business in Cyprus.  Its address is John Kennedy, Iris House, Floor 7, Flat 740B, 3106, Limassol, Leymosun, Cyprus.

46.    GHL is ultimately owned and controlled by Fredriksen.  GHL is a personal investment vehicle of Fredriksen to own and control his businesses and investments.

47.     Fredriksen ultimately owns or controls GHL through a web of trusts that he controls. Those trusts own Greenwich Holdings Limited ("Greenwich Holdings"), a company established and with its principal place of business in Cyprus. Greenwich Holdings indirectly owns and controls GHL.

48.

49.     GHL is managed by Seatankers Management Company Limited ("Seatankers Management"), a company established and with its principal place of business in Cyprus that is ultimately owned and controlled by Fredriksen.

        10.     MFC

50.     Defendant MFC is a Bermuda company. It is an investment management company that invests in the shipping and offshore industries. Until around May 2018, MFC's principal place of business was Miami, Florida. Its address was 601 Brickell Key Drive, Suite 510, Miami, Florida 33131.

51.     MFC is owned and controlled by United States-based individuals. Bodden is MFC's CEO and Vadim Vladimirovich Reingevurts ("Reingevurts") is MFC's Chief Financial Officer ("CFO"). They both live in Miami, Florida. Peter Desloge, MFC's Partner and Managing Director until December 2018, also resides in the United States.

52.     MFC conducts permanent and substantial business in New York because its primary business is to invest funds provided from New York by New York-based investment firms. Specifically, MFC manages the investments of Maritime Finance Holdings I Ltd. ("MFCH"). MFCH is an investment vehicle funded by (a) KKR & Co. Inc. ("KKR"), a New York-based investment firm; (b) Omega Advisors, Inc. ("Omega"), a New-York-based investment firm; and (c) Wafra Inc. ("Wafra"), a New York-based investment firm. MFCH's

-12-

Board of Directors is comprised of two KKR executives, one Omega executive and one Wafra executive. MFCH's manager is Gulf Stream Asset Management Ltd. ("Gulf Stream AM"). Gulf Stream AM's directors are Bodden, who is also the CEO, and Reingevurts, who is also the CFO. From March 2017 to March 2019, Gulf Stream AM was an SEC registered financial advisor. Its registered address was the same Miami address that MFC had until May 2018.

53.   ████████████████████████████████████████

54.   As the investment manager of MFCH, MFC was a member of the Ad-Hoc Group since at least May 2017. As discussed below (*infra* ¶ 166), MFC purportedly ceased being a member of the Ad-Hoc Group in December 2018.

11.   Bodden

55.   Defendant Bodden is a resident of Miami, Florida. His address is 1543 SE 12th Ct., Deerfield Beach, Florida 33441.

56.   He is the CEO of MFC and the manager of MFCH. MFC manages MFCH's investments. As manager of MFCH's investments, MFC has been a member of the Ad-Hoc Group since at least May 2017. As the manager of MFC and MFCH, Bodden conducts permanent and substantial business in New York.

12.   SFIL

57.   Defendant SFIL is a company established and with its principal place of business in Bermuda. Its address is Par-la-Ville Place, 14 Par-la-Ville Road, Hamilton HM 08, Bermuda.

58.   SFIL is ultimately owned and controlled by Fredriksen. SFIL's largest shareholder is Hemen Holding Limited ("Hemen"), a company established and with its principal place of business in Cyprus. Hemen owns approximately 26% of SFIL. Fredriksen ultimately

owns or controls Hemen through a web of trusts that he controls.  Those trusts own Greenwich

Holdings and Greenwich Holdings indirectly owns and controls Hemen.

59.    There is no doubt that SFIL is controlled by Fredriksen.  For example ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

60.    SFIL conducts permanent and substantial business in New York and has strong

connections to New York.  Specifically, SFIL trades on the NYSE.  In addition, Leand, who is

based in New York, was a member of the Board of Directors of SFIL from 2003 to August 2018.

Further, SFIL's auditor, including the auditor responsible for reviewing and certifying SFIL's

filings with the SEC, is based in New York.  SFIL has other strong United States connections.

For example, one of the members of its Board of Directors is based in Connecticut.

61.    As of ████████████████████████████████████████ SFIL has been

a member of the Ad-Hoc Group since at least May 2017.

62.    On April 19, 2019, SFIL, together with the other members of the Ad-Hoc Group,

made a submission to the arbitrational tribunal overseeing the NAFTA Claim. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

13.    Fredriksen

63.    Defendant Fredriksen is a billionaire shipping tycoon.  He is Norwegian by birth

but in 2006, to avoid paying Norwegian taxes, he relinquished his Norwegian nationality and

became a national of Cyprus.  He resides in London and his address is 15 Sloane Square, London

SW1W 8ER, United Kingdom.

64.     Fredriksen began making his fortune in the 1980s during the bloody Iran-Iraq war. He was responsible for shipping oil out of Iran, thereby ensuring Iran a steady flow of revenue form oil exports during the war.   Fredriksen became known as the "lifeline to the Ayatollah." Since then, he has amassed a large fortune by being the world's largest owner and operator of vessels, tankers and offshore drilling rigs.

65.     Fredriksen permanently and significantly invests or conducts business in New York.  For example, he (a) ultimately owns and controls approximately 20% of Quintana Energy Services, Inc., a Houston-based and NYSE-traded oil and gas company; (b) ultimately owns and controls approximately 48% of Frontline Ltd. ("Frontline"), a shipping company that trades on the NYSE; (c) ultimately owns and controls approximately 30% of Seadrill, which trades on the NYSE; (d) ultimately owns and controls approximately 22.5% of SFIL, which trades on the NYSE; (e) ultimately owns and controls approximately 35% of Golden Ocean Group Limited ("Golden Ocean"), a shipping company that trades on the NASDAQ; and (f) through Seadrill, co-owns Seamex 50/50 with Fintech Investments, which is managed by New York-based Fintech Advisory.  Cleary Gottlieb Steen & Hamilton, LLP ("Cleary Gottlieb"), a New York-based law firm, advised Seadrill and Fintech Investments in connection with negotiating and establishing Seamex.

66.     Fredriksen closely and directly supervises his businesses, including Seadrill.  For example,

67.     On information and belief, Fredriksen knew of or directed Seadrill, SFIL and GHL to carry out the actions alleged in this Complaint.

### B.     The Seamex Defendants

68.     The Seamex Defendants are the two entities that own and control Seamex, which is Perforadora's primary competitor in México and leases five Rigs to Pemex.

#### 1.     Fintech Advisory

69.     Defendant Fintech Advisory is a Delaware corporation.  Fintech Advisory is an investment manager.  Its principal place of business is in New York.  Its address is 375 Park Avenue, Suite 3804, New York, New York 10152.  Fintech Advisory is owned and controlled by David Manuel Martínez-Guzmán ("Martínez").

70.     Fintech Advisory is the investment manager of Fintech Investments, a British Virgin Islands shell company owned and controlled by Martínez.  Fintech Advisory's sole source of revenue is management fees paid by Fintech Investments.   Fintech Investments co-owns Seamex with Seadrill.[2]

71.     As of October 2017, Fintech Advisory was one of the Bondholders.

#### 2.     Seadrill

72.     Defendant Seadrill is a company established and with its principal place of business in Bermuda.  Its address is Par-la-Ville Place, 14 Par-la-Ville Road, Hamilton HM 08, Bermuda.  However, Seadrill's senior management is provided by Seadrill Management Ltd.

---

[2]     During this Chapter 15 Proceeding, Seadrill and Fintech Advisory misled the Foreign Representative and the Court by misrepresenting and concealing that the owner of Seamex was Fintech Investments, not Fintech Advisory. This prevented the Foreign Representative from seeking discovery into Fintech Investments, including to investigate whether any member of the Ad-Hoc Group has an interest in Fintech Investments or whether Fintech Investments has made any payments, directly or indirectly, to members of the Ad-Hoc Group or other relevant parties such as Pemex officials.  The Foreign Representative learned of Fintech Investments during Fintech Advisory's deposition in mid-April 2019.

("Seadrill Management"), a Seadrill subsidiary located at 2nd Floor, Building 11 Chiswick Business Park, 566 Chiswick High Road, London W4 5YS, United Kingdom.

73.    Seadrill is ultimately owned and controlled by Fredriksen.  Seadrill's largest shareholder is Hemen.  Hemen owns approximately 30% of Seadrill.  Fredriksen ultimately owns or controls Hemen through a web of trusts that he controls.  Those trusts own Greenwich Holdings and Greenwich Holdings indirectly owns and controls Hemen.  Fredriksen is Seadrill's Chairman of the Board of Directors.

74.    Seadrill conducts permanent and substantial business in New York and has strong connections to New York.  Specifically, Seadrill trades on the NYSE.  In addition, two of the current members of its Board of Directors are New York-based.  Leand, who is also based in New York, was a member of the Board of Directors of Seadrill from 2013 to July 2018.  Further, Seadrill conducts business in the United States through Seadrill Americas, Inc., one of Seadrill's United States-based subsidiaries, and through Sevan Drilling, Ltd., a Seadrill subsidiary that conducts significant business in the United States.

75.    In September 2017, Seadrill commenced a Chapter 11 proceeding in the U.S. Bankruptcy Court for the Southern District of Texas (the "Seadrill Restructuring") and successfully emerged from bankruptcy in July 2018.

### C.    The Singapore Defendants

76.    The Singapore Defendants consist of the five Singapore Rig Owners and the individuals who sit on their Boards of Directors.

### 1.    The Five Singapore Rig Owners

77.    Defendants the Singapore Rig Owners are Oro Negro Primus, Oro Negro Laurus, Oro Negro Fortius, Oro Negro Decus and Oro Negro Impetus.

78. The Singapore Rig Owners are companies established and with their principal place of business in Singapore. They all share the same address and are located at: 137 Telok Ayer St. #08-01, Singapore 08602.

79. Each Singapore Rig Owner is a party to a lease agreement with Perforadora, pursuant to which they lease the Rigs to Perforadora (collectively, the "Bareboat Charters"). The Bareboat Charters are governed by United States Maritime law and are subject to the jurisdiction of New York courts.

80. The Singapore Rig Owners were the plaintiffs in the lawsuit against Perforadora filed in the United States District Court for the Southern District of New York (the "New York Litigation").[3] All the Singapore Rig Owners have also appeared in the Chapter 15 Proceeding.

81. The Ad-Hoc Group has been unlawfully purporting to control the Singapore Rig Owners since September 2017 and, as such, all of the Singapore Rig Owners' actions since September 2017 have been at the Ad-Hoc Group's direction. Integradora and Perforadora contest the Ad-Hoc Group's unlawful control of the Singapore Rig Owners.

### 2. The Singapore Directors

*Cochrane*

82. Defendant Cochrane is one of the three directors of the Singapore Rig Owners. In November 2016, he was appointed to the boards of the Singapore Rig Owners by the Bondholders and has been subject to their control since then.

83. Cochrane is a United States citizen and a Florida resident. His address is 2727 North Ocean Blvd. No 6, Delray Beach, Florida 33483.

---

[3] *See Oro Negro Decus, Pte. Ltd., et al. v. Perforadora Oro Negro, S. de R.L. de C.V.*, No. 18-cv-02301 (S.D.N.Y.) (filed March 15, 2018).

*Bartlett*

84.    Defendant Bartlett is one of the three directors of the Singapore Rig Owners.  In September 2017, he was appointed to the boards of the Singapore Rig Owners by the Bondholders, acting under the Ad-Hoc Group's control, and has been subject to the Ad-Hoc Group's control since then.

85.    Bartlett is a resident of Singapore.  His address is 7 Temasek Boulevard #07-08, Suntec Tower One, Singapore 038987.

*Hancock*

86.    Defendant Hancock is one of the three directors of the Singapore Rig Owners.  In September 2017, he was appointed to the boards of the Singapore Rig Owners by the Bondholders, acting under the Ad-Hoc Group's control, and has been subject to the Ad-Hoc Group's control since then.

87.    Hancock is a resident of Singapore.  His address is 7 Temasek Boulevard #07-08, Suntec Tower One, Singapore 038987.

**D.    Deutsche México**

88.    Defendant Deutsche México is a bank established and with its principal place of business in México.  Its address is Av. Pedregal 24-20, Col. Molino del Rey, 11040, Ciudad de México, México.

**JURISDICTION AND VENUE**

89.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

90.    Recognition of foreign proceedings, enforcement of orders of this Court, and other matters under Chapter 15 of the Bankruptcy Code are expressly designated as core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (O), and (P).

91.    Venue is proper in this Court pursuant to 28 U.S.C. § 1410.

-19-

92.    This Court has personal jurisdiction over AMA, Leand and Fintech Advisory pursuant to 18 U.S.C. § 1965 because they are New York residents.

93.    The Court has personal jurisdiction over the Singapore Rig Owners pursuant to Section 19.1 of each of the Bareboat Charters, by which the Singapore Rig Owners expressly and irrevocably agreed to submit to the jurisdiction of this Court.  The Singapore Rig Owners have already availed themselves of the jurisdiction of the federal courts of this District under the Bareboat Charters when they sued Perforadora in the New York Litigation.  In addition, all the Singapore Rig Owners have appeared in the Chapter 15 Proceeding.

94.    This Court has personal jurisdiction over each Defendant because: each Defendant is found or resides in this District, has or had agents in this District, transacted business throughout the United States, including in this District; availed itself of courts in this District in the context of the events giving rise to the claims herein; violated a right in the United States; and a substantial part of the events giving rise to the claims herein arose in this District.

## FACTS

## PART I:  CORPORATE STRUCTURE AND KEY CONTRACTS

### I.    Overview

95.    Oro Negro is a Mexican business that owns and leases five Rigs.  Distilled to its core, Oro Negro's ownership and operations involve the following:

(a)    Oro Negro Drilling Limited ("Oro Negro Drilling"), the Singaporean subsidiary of Integradora that issued the Bonds, and is the parent of the Singapore Rig Owners that own the Rigs;

(b)    the Bareboat Charters between the Singapore Rig Owners and Perforadora;

(c)    the Oro Negro Contracts between Pemex and Perforadora; and

(d)    a Mexican trust (in Spanish, *fideicomiso*) into which Pemex pays the revenue under the Oro Negro Contracts.

### II.    Oro Negro's Corporate Structure

#### A.    Integradora

96.    The ultimate parent company of Oro Negro is Integradora, a Mexican holding company that owns Oro Negro Drilling, the Singapore Rig Owners and Perforadora.

97.    Integradora is owned by a combination of two Mexican pension funds (known in México as *afores*) and investors based in the United States, México and Europe.  Currently, the two Mexican pension funds own approximately 47%; a group of United States-based individual and institutional investors owns approximately 43%; and a group of Mexican individuals and European individual and institutional investors owns approximately 10%.

98.    Between 2012 and 2015, Integradora's shareholders made approximately $590 million in equity investments.

## B.    The Rigs, Oro Negro Drilling and the Singapore Rig Owners

99.    Integradora acquired the five Rigs between 2012 and 2015.  The Rigs are named *Decus*, *Fortius*, *Impetus*, *Laurus* and *Primus*.  The Rigs are superior to rigs of competitors in México because they are more stable, can house larger crews, have larger and more efficient drills and have longer legs (thus permitting deeper water drilling).

100.    Integradora owns the five Rigs through five Singaporean corporate entities. Specifically, Integradora owns 100% of the equity of Oro Negro Drilling, which in turn owns 100% of the equity in each Singapore Rig Owner.  Each Singapore Rig Owner owns one Rig.

101.    Even though each Singapore Rig Owner owns a Rig, no Singapore Rig Owner operates or has the capacity to operate a Rig.

102.    Each Rig, without an associated contract, is worth approximately $150 million.[4] With an associated contract, each Rig can be worth hundreds of millions of dollars.

## C.    Perforadora

103.    Perforadora is the Integradora subsidiary responsible for operating the Rigs. Perforadora leases the Rigs from the Singapore Rig Owners through the Bareboat Charters.  As discussed in detail below (*infra* ¶¶ 140–143), Perforadora, in turn, leases the Rigs to Pemex.

104.    Perforadora has always had only one customer:  Pemex.  It has never invoiced any other entity for services provided.

---

[4]    This value is based on the Ad-Hoc Group's own calculations and on the price that Borr Drilling Limited ("Borr"), a Bermuda offshore drilling company, paid for three almost identical rigs in Singapore in October 2017. These three rigs had been built for Integradora and Integradora had paid $120 million to the Singaporean shipyard as a down payment.  As a result of the facts described in this Complaint, Integradora was unable to complete payment for those rigs, and the shipyard sold them to Borr.

### D.    Employees

105.    By September 2017, when Perforadora filed for bankruptcy protection in México, Integradora and its subsidiaries employed approximately 400 employees, including approximately 40 United States nationals.  Since March 2018, as a result of the Ad-Hoc Group's efforts to interfere with Oro Negro's business and illegally seize the Rigs, Integradora and its subsidiaries have been forced to terminate approximately 380 employees, almost their entire workforce.  Currently, Integradora and its subsidiaries employ approximately 20 employees.

## III.    The Bonds

### A.    Overview

106.    In 2014, to finance the acquisition of the Rigs, Integradora raised capital from its shareholders and through its subsidiaries issued bonds.

107.    Specifically, two Integradora subsidiaries, Oro Negro Drilling and Oro Negro Impetus issued two series of bonds with an aggregate face value of $900 million.  All bonds were later consolidated into a single bond debt with Oro Negro Drilling as the issuer (as defined above, the "Bonds").

108.    The Bonds have a 7.5% annual interest rate and matured in January 2019.  The Bonds were not repaid in January 2019 due to Defendants' unlawful conduct, which this Complaint describes in detail.

109.    The Bonds are governed by a bond agreement between Oro Negro Drilling and Nordic Trustee ASA ("Nordic Trustee"), a Norwegian financial services firm (as amended and restated, the "Bond Agreement").  Nordic Trustee is the trustee under the Bond Agreement and is responsible for acting on behalf of the Bondholders to collect on the Bonds.  The Bond Agreement is governed by Norwegian law.

110.    Oro Negro Drilling is the only issuer of the Bonds.  Integradora provided a limited guarantee under which Integradora guarantees up to $175 million of the Bonds (the "Guarantee").  The Guarantee is governed by English law.

111.    Neither Perforadora nor any Singapore Rig Owner is an issuer or guarantor of the Bonds.

112.    Under the Bond Agreement, neither Nordic Trustee nor any Bondholder has any right to interrupt, disrupt or interfere in Perforadora's contracts, including the Oro Negro Contracts, or to interfere in Perforadora's use of the Rigs.

**B.    Security Rights**

113.    The Bonds are primarily secured by:

(a)    a share charge (equivalent to a pledge of stock) granted by Integradora to Nordic Trustee over Integradora's shares in Oro Negro Drilling, which includes Integradora's authorization to Nordic Trustee to replace, if certain conditions are met, Oro Negro Drilling's directors (the "Oro Negro Drilling Share Charge");

(b)    share charges granted by Oro Negro Drilling to Nordic Trustee over Oro Negro Drilling's shares in the Singapore Rig Owners, which includes Oro Negro Drilling's authorization to Nordic Trustee to replace, if certain conditions are met, each of the Singapore Rig Owners' directors (the "Singapore Rig Owner Share Charges"); and

(c)    mortgages on the Rigs.

114.    The Oro Negro Drilling Share Charge and the Singapore Rig Owner Share Charges are governed by Singaporean law.

115.    The mortgages are governed by Panamanian law.

-24-

C.    **The Bond Agreement's Events of Default**

116.    Under the Bond Agreement, events of default include, *inter alia*, (a) Oro Negro Drilling's failure to pay interest or the principal upon the Bonds' maturity; and (b) Integradora or any of its subsidiaries, including Perforadora, initiating restructuring, insolvency or bankruptcy proceedings.  In such circumstances, Nordic Trustee may declare an event of default, exercise the Bondholders' security rights and demand immediate payment of the entire principal and accrued interest.

117.    Even though the Bond Agreement states that it is governed by Norwegian law, Nordic Trustee's right to declare an event of default under the Bond Agreement is subject to Mexican law.  As further discussed below (*infra* ¶ 208–209), Mexican courts have ruled that Mexican law governs Nordic Trustee's rights under the Bond Agreement to the extent that exercising those rights impacts Integradora and Perforadora.  Mexican law provides that terminating a contract or taking any actions to worsen a debtor's condition, such as declaring an event of default, due to the commencement of insolvency proceedings is unenforceable as a violation of Mexican public policy because it impairs the debtor's ability to successfully reorganize.

D.    **The Ad-Hoc Group's Control of the Bonds**

118.    Nordic Trustee is subject to the Bondholders' control and direction, i.e., it does not act independently, and acts solely at the direction and pursuant to the Bondholders' instructions.  The Bondholders make decisions by voting in meetings or issuing written resolutions.  In either case, decisions are binding on all Bondholders upon the approval of 50%

or more of the Bondholders.[5]  As such, the Ad-Hoc Group, which purports to own over 50% of the Bonds, has controlled every single action and decision of the Bondholders since at least May 2017.

119.    The Bond Agreement allows Nordic Trustee to request indemnification from the Bondholders prior to implementing their decisions.  As described below (*infra* ¶¶ 245, 267-268) the Ad-Hoc Group caused the Bondholders to provide broad indemnities to Nordic Trustee for every single action that Nordic Trustee has carried out in connection with the Bonds since September 2017.  In the words of █████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████

### E.    Bond Amendments

120.    In 2015 and 2016, as a result of amendments of the Oro Negro Contracts in those years (described *infra* ¶¶ 145–147), Oro Negro Drilling and Nordic Trustee amended the Bond Agreement twice (the "Bond Agreement Amendments").

121.    In connection with the Bond Agreement Amendments, the Bondholders conducted detailed and lengthy audits of Integradora and its subsidiaries' finances and operations. The Bondholders were completely satisfied with Integradora and its subsidiaries' finances and operations and made minor recommendations, which Integradora and its subsidiaries accepted and implemented.

---

[5]    The Bondholders need approval of 66.6% of the Bondholders only when they have to decide on amendments of the Bond Agreement or waivers of any rights under the Bond Agreement.

122.     Ole Aagaard Jensen ("Aagaard"), a consultant specializing in rig operations, acted as the Bondholders' consultant on the Rigs, including their status and operations, in connection with the Bond Agreement Amendments.

123.     As further described below (*infra* ¶ 176), in March 2017, following the Bond Agreement Amendments, to ensure a smooth and collaborative relationship with the Bondholders, Integradora and its subsidiaries appointed Aagaard as Chief Operating Officer ("COO").  Unbeknownst to Integradora and its subsidiaries, Aagaard was a mole for Fredriksen, AMA and Leand, whose objective was to report to them on the status of Integradora and its subsidiaries and ensure that Fredriksen's companies and the Bondholders (AMA's clients) could easily take over the Rigs when the time was right.

## IV.   **The Bareboat Charters**

### A.     **Overview**

124.     Each Singapore Rig Owner entered into a bareboat charter with Perforadora (together, as defined above, the "Bareboat Charters").  A bareboat charter is an instrument commonly used in the maritime industry to lease a vessel without a crew or equipment.

125.     The five Bareboat Charters are governed by United States maritime law and are subject to the jurisdiction of New York courts.

### B.     **Charter Period**

126.     A key aspect of the Bareboat Charters is the "Charter Period," which is defined to be from "the commencement of the [Pemex Contract]" to the "termination/expiry of the [Pemex Contract]."  Because, as further described below (*infra* ¶¶ 214–204), Pemex never validly terminated any of the Oro Negro Contracts and has not allowed Perforadora to perform, all the Bareboat Charters remain in effect and are enforceable.

127.    During the Charter Period, pursuant to the terms of the Bareboat Charters, Perforadora has sole and exclusive possession of the Rigs and the Singapore Rig Owners do not have any right to disturb that possession.

### C.    Charter Hire

128.    Perforadora is only obligated to pay the Singapore Rig Owners "Charter Hire," which are the net funds Pemex pays to Perforadora under the Oro Negro Contracts, after accounting for operational and administrative expenses.   The Bareboat Charters expressly provided that Charter Hire is not due unless and until Pemex pays Perforadora while the Rigs are in service.  If the Rigs are not in service, or Pemex fails to pay, no Charter Hire is owed during that period.

129.    Further, under the terms of the Bareboat Charters, Charter Hire does not include any amounts that Pemex must pay to Perforadora as liquidated damages under the Oro Negro Contracts (e.g., anticipated rent payments in the event of unilateral termination).

### D.    The Singapore Rig Owners' Payment Obligations

130.    Under the Bareboat Charters, the Singapore Rig Owners are responsible for certain expenses associated with the Rigs (some of those expenses are explained below) and must reimburse Perforadora if Perforadora pays such expenses ("Reimbursement Costs").

131.    Before the illegal seizure of control over the Singapore Rig Owners (described *infra* ¶¶ 252–256), Perforadora paid expenses but the Singapore Rig Owners did not reimburse Perforadora because the Singapore Rig Owners were under Integradora's control.  But that fact does not change the legal obligation of each Singapore Rig Owner to pay the Reimbursement Costs.  Now under the unlawful control of the Ad-Hoc Group, the Singapore Rig Owners refuse to pay the Reimbursement Costs to Perforadora.

1.      Expenses to Maintain the Rigs "in Class"

132.    Under Mexican law, the Rigs must be "in class" to (a) provide services to Pemex; (b) maintain their insurance coverage; and (c) remain in Mexican waters.  Therefore, it is critical that the Rigs remain "in class."

133.    The American Bureau of Shipping (the "ABS") is a United States-based organization that determines whether vessels such as the Rigs are "in class."  To determine whether a vessel is "in class," every five years the ABS conducts a detailed and comprehensive inspection of the vessel and issues a certification (the "Five-Year Class Certification"). Additionally, the ABS conducts narrower inspections annually to confirm that the vessel should remain "in class" (the "Annual Certifications").

134.    Pursuant to the Bareboat Charters, the Singapore Rig Owners must pay for all expenses necessary for the Rigs to remain "in class," including the costs associated with the Five-Year Class Certification and the Annual Certifications.  Article 7.1 of each Bareboat Charter states that "[a]nnual survey, special survey, major maintenance and major overhaul of the Vessel shall be performed every five years (or any other time as required by the classification society) by Charterer at Owner's expense."

135.    In 2017 and 2018, Perforadora incurred $274,925.29 in expenses to obtain Five Year Certifications and Annual Certifications for the five Rigs.  These are expenses that the five Singapore Rig Owners must reimburse to Perforadora.

2.      Costs to Maintain the Impetus Prior to the Charter Period

136.    Prior to the start of the Charter Period, Perforadora has no obligation to pay for the maintenance of the Rigs or any costs associated with the Rigs.

137.    In the case of the *Impetus* Bareboat Charter, the Charter Period began on May 29, 2016, which is when Perforadora started providing services to Pemex using the *Impetus*.  Thus,

Oro Negro Impetus is responsible for all costs associated with the *Impetus*, including maintenance costs, prior to May 29, 2016, i.e., the *Impetus* Bareboat Charter's Charter Period.

138.    Perforadora incurred numerous expenses prior to the commencement of the Charter Period for the *Impetus* Rig.  Perforadora incurred $7,520,279.88 in expenses for the *Impetus* prior to May 29, 2016, including (a) salaries; (b) maintenance; (c) fuel; and (d) personnel training.  These are funds that Oro Negro Impetus must reimburse to Perforadora.

139.    As of today, the Singapore Rig Owners owe Perforadora a total of $7,795,205.17 in Reimbursement Costs.

## V.    The Oro Negro Contracts

### A.    Overview

140.    From April 2013 to January 2014, Perforadora entered into contracts with Pemex Exploración y Producción ("PEP"), a subsidiary of Pemex, to lease to PEP the *Primus*, *Laurus*, *Fortius* and *Decus*.  After a Pemex restructuring in mid-2015, PEP assigned these contracts to Pemex Perforación y Servicios ("PPS"), another subsidiary of Pemex.  In December 2015, Perforadora entered into a fifth contract with PPS to lease the *Impetus*.

141.    Pemex is the Mexican government's oil and gas company.  Pemex is effectively the only client for high-cost oil and gas services such as offshore drilling because it is the largest company in México and, until around 2015, had a complete monopoly over all oil and gas exploration and production in México, including in Mexican waters in the Gulf of Mexico.

### B.    Original Terms

142.    The original terms of the Oro Negro Contracts were as follows:

(a)    *Primus*:  On April 23, 2013, PEP and Perforadora entered into lease no. 421003823 pursuant to which PEP would lease *Primus* for 1,030 days

(approximately two years and nine months) at a daily rate of approximately $160,000 (the "Primus Contract");

(b)     *Laurus*:   On April 23, 2013, PEP and Perforadora entered into lease no. 421003824 pursuant to which PEP would lease *Laurus* for 1,233 days (approximately three years and four months) at a daily rate of approximately $160,000 (the "Laurus Contract");

(c)     *Fortius*:   On January 13, 2014, PEP and Perforadora entered into lease no. 421004800 pursuant to which PEP would lease *Fortius* for 1,442 days (approximately four years) at a daily rate of approximately $160,000 (the "Fortius Contract");

(d)     *Decus*:   On January 27, 2014, PEP and Perforadora entered into lease no. 421004806 pursuant to which PEP would lease *Decus* for 1,342 days (approximately three years and seven months) at a daily rate of approximately $160,000 (the "Decus Contract"); and

(e)     *Impetus*:   On December 18, 2015, PPS and Perforadora entered into lease no. 641005817 pursuant to which PPS would lease *Impetus* for 1,819 days (approximately five years) at a daily rate of approximately $130,000 (the "Impetus Contract").

143.    Under the original terms of the Oro Negro Contracts, Perforadora's annual revenues from leasing the Rigs were approximately $280 million.  Pemex would have had to pay Perforadora approximately $1.05 billion during the life of the Oro Negro Contracts.

**C.     Termination**

144.    The Oro Negro Contracts may terminate early only if Pemex validly terminates them, or Perforadora and Pemex jointly agree to terminate them.  Pemex may validly terminate

the Oro Negro Contracts only if Perforadora breaches them, for *force majeure*, or for "duly justified reasons" (in Spanish, "*razones debidamente justificadas*").

### D.   Amendments

145.   In 2015 and 2016, citing supposed budget cuts caused by the decline of the price of oil, Pemex forced a "temporary" alteration of the terms of the Oro Negro Contracts by suspending (until mid-2017) two of them and reducing the daily rates on the other three contracts by approximately 27% (the "2015 and 2016 Amendments").

146.   As a result of the 2015 and 2016 Amendments, Perforadora's revenue was reduced by more than 50%.   Pemex induced Perforadora to accept the 2015 and 2016 Amendments by falsely promising that the Oro Negro Contracts would return to their original terms in 2017.

147.   The 2015 and 2016 Amendments did not result in Oro Negro's demise because, as set forth above (*supra* ¶¶ 120–123), the Bonds were themselves amended in 2015 and 2016. Indeed, the 2015 and 2016 Amendments with Pemex were done in conjunction with the Bond Agreement Amendments in the same years, providing debt relief for Oro Negro to survive the daily rate reductions and suspensions of the 2015 and 2016 Amendments.

### E.   Performance and Payment

148.   Under the Oro Negro Contracts, Pemex pays Perforadora the daily rate depending on the amount of time the Rig is available and ready for Pemex to use (i.e., not in repair or malfunctioning), regardless of whether Pemex actually uses it. This means that if the Rig is available and ready for use for 24 hours, Pemex pays 100% of the daily rate; if the Rig is available and ready for use for only 12 hours, Pemex pays 50% of the daily rate.

149.   From the inception of the Oro Negro Contracts until Pemex purported to terminate the Oro Negro Contracts in October 2017 (described *infra* ¶ 214), Pemex paid (or

authorized payment but has not yet paid), on average, 99.5% of the daily rate under each Pemex Contract, meaning that the Rigs were available and ready for use, on average, 99.5% of the time. Perforadora's performance of the Oro Negro Contracts has been almost perfect.

**F.    Seamex**

150.    From around 2011 to 2015, Pemex entered into approximately 26 rig leases with approximately eight companies, including Perforadora.  With the notable exception of Seamex's lease agreements, the original terms of all the rig lease agreements were similar.

151.    Perforadora's primary competitor is Seamex, which also owns five rigs. Seamex's rigs are inferior to Oro Negro's Rigs, including in that they were built by lower quality shipyards.  Seamex leases its five rigs to Pemex (the "Pemex-Seamex Contracts").  Pemex and Seamex entered into the Pemex-Seamex Contracts in 2014.  Seamex is co-owned by Seadrill and Fintech Investments.  Perforadora and Seamex are the companies that lease the largest number of rigs to Pemex.

152.    The Pemex-Seamex Contracts contain significantly more favorable terms for Seamex than any other of Pemex's leases, including: (a) higher daily rates; (b) significant limitations on the ability of Pemex to terminate; (c) longer terms; and (d) virtually no penalties for deficient operation and maintenance of the rigs.

153.    Indeed, the Pemex-Seamex Contracts are so noticeably favorable that Seadrill itself has stated to its investors that it is "confident that [the Pemex-Seamex Contracts] are absolutely secure."

154.    In their depositions in this Chapter 15 Proceeding Leand, the CEO and Managing Director of AMA, Seadrill and Fintech Advisory stated that

-33-

Leand was a member of the Board of Directors of Seadrill when Seamex obtained the Pemex-Seamex Contracts.

155.    Even though the terms of the Pemex-Seamex Contracts are significantly more expensive for Pemex than the Oro Negro Contracts, Pemex targeted only Perforadora in 2017 with draconian amendments and actually withheld payments; Pemex did not treat Seamex similarly.

### G.    Pemex's Pattern of Corruption

156.    Pemex is often involved in high-profile corruption scandals.  For example, it is currently at the center of the Odebrecht bribery case.  From 2014 to date, Brazilian law enforcement agencies have uncovered one of the largest corruption schemes in history (known commonly as "*Lava Jato*").  The *Lava Jato* corruption scheme involved payments of hundreds of millions of dollars in bribes, by numerous Brazilian and foreign companies, to government officials in over a dozen countries, including México, in exchange for valuable contracts.  At the heart of *Lava Jato* is Odebrecht, the largest construction company in Brazil.

157.    Brazil's evidence against Odebrecht includes that it paid at least $10.5 million in bribes to Lozoya, Pemex's CEO from 2012 to early 2016.  Notably, Lozoya was the CEO of Pemex during the time period in which Pemex entered into the Oro Negro Contracts and the Pemex-Seamex Contracts.  Oro Negro did not pay any bribes to Lozoya and, as opposed to Seamex, never obtained any favorable treatment from Pemex during Lozoya's tenure as CEO.

### H.    Oro Negro was a Victim of Pemex's Pattern of Corruption

158.    From 2012 to 2017, agents of the Mexican government solicited bribes from Oro Negro and its principals, which they refused to pay.  México retaliated against Oro Negro by imposing the drastic 2015 and 2016 Amendments and ultimately purporting to cancel the Oro

-34-

Negro Contracts with the aim of having the Ad-Hoc Group, Seadrill and Fintech take possession of the Rigs and then leasing the Rigs from them.

159.    Oro Negro's United States shareholders have, among other evidence, recorded statements by current and former senior Pemex officials confirming that Pemex singled out and discriminated against Oro Negro because it never paid bribes to Pemex. The recordings indicate that officials at the highest levels of the Mexican political establishment, including a former Minister of Energy and Lozoya often requested bribes and retaliated against those who refused to pay them.  Indeed, this evidence indicates that México had a pervasive "pay-to-play" system in place and that Oro Negro's refusal to participate led to its demise.  México's acts of retaliation against Oro Negro are the subject of the NAFTA Claim, which is described above (*supra* ¶ 13).

## VI.    **The Mexican Trust**

160.    The Bond Agreement provided for the establishment of a Mexican trust (in Spanish, *fideicomiso*) that receives the payments by Pemex to Perforadora for leasing the Rigs (the "Mexican Trust").  Pursuant to its "waterfall" structure, the Mexican Trust must first distribute to Perforadora the funds it needs to pay ordinary business expenses, including operating the Rigs, taxes and salaries.  As such, Perforadora's economic survival depends on payments from the Mexican Trust.  To block payments from the Mexican Trust to Perforadora is to deprive Perforadora of cash and ensure its demise.

161.    The Mexican Trust's administrator (i.e., the entity responsible for managing the trust funds, including paying the beneficiaries) is Defendant Deutsche México, the Mexican subsidiary of Deutsche Bank, AG, a large German bank ("Deutsche Bank").

## PART II: EVENTS FROM MARCH 2017 TO SEPTEMBER 11, 2017

**I.**     **2017 Proposed Pemex Amendments**

162.    In March 2017, Pemex broke its promise, indicating to Perforadora that the Oro Negro Contracts would not revert to their original terms, and demanding that (a) the two contracts for the *Primus* and *Laurus* remain suspended; and (b) Perforadora accept permanent daily rate reductions of approximately 27% on the other three contracts (the "2017 Proposed Pemex Amendments").

163.    The 2017 Proposed Pemex Amendments risked Oro Negro's solvency, including its ability to repay the $900 million bond debt.

164.    To force Perforadora to accept the 2017 Proposed Pemex Amendments, from April to September 2017, Pemex repeatedly threatened to terminate all the Oro Negro Contracts. In addition, Pemex refused to approve and pay Perforadora's outstanding invoices even though the Rigs remained in operation and Pemex pumped oil using the Rigs.  From April to September 2017, while Pemex was pressuring Perforadora to accept the 2017 Proposed Pemex Amendments, Perforadora accrued close to $90 million in unpaid daily rates.

165.    Given this turn of events, Oro Negro, which often communicated with its Bondholders, discussed Pemex's position and tactics with ARCM so that ARCM would support Oro Negro and prevent Pemex from imposing its draconian terms.  But the opposite occurred.



II.    **The Ad-Hoc Group**

A.    **Formation and Members**

166.    In or around May 2017, the Ad-Hoc Group, owning approximately 60% of the Bonds, was formed.  As of no later than May 2017, the members of the Ad-Hoc Group were (a) Alterna;  (b) ARCM;  (c) CQS;  (d) GHL;  (e) MFC;  and  (f) SFIL.[6]  The Ad-Hoc Group engaged the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") to represent them.  MFC purportedly left the Ad-Hoc Group in December 2018.

167.    On information and belief, none of the members of the Ad-Hoc Group purchased the majority of their Bonds at 100% of the Bonds' value but, instead, purchased them at prices ranging from 45% to 65% of the Bonds' value—i.e., they have paid from $243 million to $351 million for their Bonds.

168.    The Ad-Hoc Group members holding the largest amount of Bonds are ███████

████████████████████████████████████████████████████████████

████████████████████████████    As described above (*supra* ¶ 65), Fredriksen owns or controls Seadrill, which owns 50% of Seamex.[7]

B.    **The Ad-Hoc Group's Advisors**

1.    AMA and Leand

169.    AMA and Leand have been key participants in the Ad-Hoc Group's scheme. AMA specializes in investing in the shipping and offshore industries and in advising creditors of shipping and offshore companies, including companies that service Pemex.

---

[6]    Contrarian Capital Management, LLC ("Contrarian") joined the Ad-Hoc Group in early October 2017.

[7]    Other Bondholders include Borr (described *supra* ¶ 102, n.5).  Borr was established and is managed by several former senior Seadrill executives.

170.   From 2015 to date, AMA has served as the Bondholders' financial advisor in connection with Oro Negro.

171.   Leand is AMA's Managing Director and CEO.   Leand has a very close relationship with Fredriksen and his companies.  For example, Leand was a member of the Board of Directors of (a) Seadrill from 2013 to July 2018; (b) SFIL from 2003 to August 2018; (c) North Atlantic Drilling Limited, one of Fredriksen's drilling companies, from 2012 to 2018; and (d) Frontline, one of Fredriksen's shipping companies, since 2015.  In addition, AMA has advised Fredriksen's companies including SFIL and Golar LNG Limited.

172.   Leand abruptly resigned from the Board of Directors of SFIL in August 2018 after the Foreign Representative served SFIL, through him, with a subpoena in the Chapter 15 Proceeding.

173.



174.



175. 

2.    Aagaard

176.    Another key participant in the Ad-Hoc Group's scheme has been Aagaard.  As stated above (*supra* ¶¶ 122–123), Aagaard is an expert on rig operations, who acted as the Bondholders' consultant in connection with the Bond Agreement Amendments.

177.    In early 2017, Oro Negro appointed Aagaard as its COO, and thus he had access to Oro Negro's material non-public information.  Unbeknownst to Oro Negro, Aagaard was a mole for Fredriksen, AMA and Leand, whose objective was to report to them on the status of Oro Negro and ensure that Fredriksen's companies and the Bondholders could easily take over the Rigs and the Oro Negro Contracts when the time was right.

178.    For example,

179.    Further, from September 19 to October 11, 2017, while he was still an officer of Oro Negro, Aagaard leaked confidential information of Oro Negro to the Ad-Hoc Group and

Seadrill, including legally privileged information, to further the Ad-Hoc Group's plans to take over the Rigs and the Oro Negro Contracts.  For example, Aagaard:



180.    Aagaard resigned from Integradora on October 12, 2017.



181.

### C.   The Coordinated Activities of Pemex and the Ad-Hoc Group

182.   The Ad-Hoc Group wanted Pemex to successfully force Perforadora to accept the 2017 Proposed Pemex Amendments because this would ensure that Oro Negro Drilling would eventually default on the Bonds upon their maturity, thereby allowing the Bondholders to foreclose on, or take possession of, the Rigs.   Either way, Perforadora would no longer be a competitor of Seamex and the Ad-Hoc Group would hold the Rigs, which are worth well above what they paid for their Bonds.

183.   As set forth above (*supra* ¶ 164), in order to compel Perforadora to accept the 2017 Proposed Pemex Amendments, starting in March 2017, Pemex threatened to cancel the Oro Negro Contracts and stopped paying what it owed to Perforadora, even though Pemex continued to use the Rigs.

184.



185.



186. ███████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

187.     ████████████     on information and belief, Pemex, ARMC and MFC agreed that Pemex would force Perforadora to accept the 2017 Proposed Pemex Amendments and that, if Perforadora refused to accept them, Pemex would cancel the Oro Negro Contracts so that the Bondholders could then take over the Rigs and lease them to Pemex.  On information and belief, they knew Oro Negro could not accept the 2017 Proposed Pemex Amendments without effectively placing Oro Negro in permanent and irreversible financial distress.

188.     When Pemex proposed the 2017 Proposed Pemex Amendments and then began to pressure Perforadora to accept them, Oro Negro reached out to the Ad-Hoc Group to discuss amending the Bonds.  On August 28, 2017, Oro Negro proposed that Oro Negro would repay the Bonds by (a) issuing to the Bondholders new bonds (totaling $300 million) and equity in

Integradora; (b) making a cash payment of $30 million; and (c) turning over possession of the *Primus*.

189.    The Ad-Hoc Group rejected this offer and instead demanded that Oro Negro relinquish all available cash to the Bondholders as partial payment of the Bonds.  The Ad-Hoc Group insisted that Perforadora accept the 2017 Proposed Pemex Amendments.  In August and September 2017, the Ad-Hoc Group sent three letters to Oro Negro demanding that Perforadora yield to Pemex and accept the 2017 Proposed Pemex Amendments.

190.    The Ad-Hoc Group knew that Pemex's priority was to further the interests of holders of the Bonds.

191.    On information and belief, Leand reported this to the Ad-Hoc Group.  Thus, by August 2017, the Ad-Hoc Group knew that Pemex would favor the Bondholders, not Oro Negro.

192.    On August 11, 2017, facing a severe liquidity crisis caused by Pemex's refusal to pay its daily rates and fearing Pemex would unlawfully purport to cancel the Oro Negro Contracts, Perforadora informed Pemex that it would accept the 2017 Proposed Pemex Amendments.

193.    Despite Perforadora's acceptance, Pemex failed to execute the 2017 Proposed Pemex Amendments.  As a result, by early September 2017, Perforadora feared that Pemex was preparing to illegally terminate the Oro Negro Contracts.

194.    As a consequence of Pemex failing to execute the 2017 Proposed Pemex Amendments, which would have made the 2015 and 2016 Amendments permanent, the

temporary terms of the 2015 and 2016 Amendments expired in late 2017 and the Oro Negro

Contracts returned to their original terms (i.e., to their original daily rates and duration).

## PART III:  EVENTS AFTER SEPTEMBER 11, 2017

I.    **The *Concurso* Proceeding**

    A.    ***Concurso* Request**

195.    To protect Oro Negro's shareholders, creditors and employees, on September 11, 2017, Perforadora filed for restructuring in México, known as a *concurso mercantil*. Perforadora's *concurso mercantil* proceeding was assigned to the Second District Court for Civil Matters of México City (*Juzgado Segundo de Distrito en Materia Civil en la Ciudad de México*) (as defined above, the "*Concurso* Court").

196.    Perforadora immediately sought injunctive relief to prevent Pemex from terminating the Oro Negro Contracts and ceasing to perform under the Oro Negro Contracts.  At the time that Perforadora filed its *concurso* petition, Pemex owed it approximately $90 million in past due daily rates.

197.    Perforadora requested that the *Concurso* Court issue injunctions to maintain its *status quo*, including expressly prohibiting (a) Pemex from terminating the Oro Negro Contracts or ceasing to pay Perforadora the daily rates under the Oro Negro Contracts; (b) the Bondholders from foreclosing on the Rigs; and (c) Deutsche México from disbursing any trust funds other than to Perforadora to operate its business.

198.    On September 29, 2017, Integradora commenced its *concurso mercantil* proceeding before the *Concurso* Court.  Upon commencing its *concurso mercantil* proceeding, Integradora requested that the *Concurso* Court consolidate the Integradora proceeding with the

pending Perforadora proceeding and thus, that the *Concurso* Court decide them simultaneously. The *Concurso* Court granted this request on October 31, 2017.[9]

199.    Integradora also sought injunctive relief to prevent Nordic Trustee from continuing to act in furtherance of its declaration of default (described *infra* ¶¶ 199), including by exercising the Oro Negro Drilling Share Charge and attempting to collect on the Guarantee.

## B.    Injunctions Protecting Oro Negro

200.    On October 5, 2017, the *Concurso* Court issued an order granting Perforadora's request to initiate a *concurso* proceeding (the "October 5 Order").  In the October 5 Order, the *Concurso* Court issued numerous injunctions, including enjoining:

(a)    Pemex from terminating the Oro Negro Contracts and from ceasing to pay Perforadora under the Oro Negro Contracts;

(b)    Nordic Trustee from taking any action to terminate the Bareboat Charters; and

(c)    Deutsche México from disbursing any funds in the Mexican Trust.

201.    On October 8, 2017, Perforadora informed the *Concurso* Court that Pemex and the Singapore Rig Owners (acting under the unlawful control of the Ad-Hoc Group) had attempted to terminate the Oro Negro Contracts and the Bareboat Charters (*infra* ¶¶ 250–251).

202.    As a result, on October 11, 2017, the *Concurso* Court issued an order confirming that (a) Pemex was enjoined from terminating the Oro Negro Contracts, including taking any steps to further its purported terminations (e.g., ceasing to pay Perforadora); and (b) Nordic Trustee was enjoined from taking any action to terminate the Bareboat Charters, including acting

---

[9]    This is analogous to jointly administered bankruptcy cases under the United States Bankruptcy Code.  *See* Fed. R. Bankr. P. 1015.

in furtherance of the Singapore Rig Owners' purported terminations of the Bareboat Charters (the "October 11 Order").

203.     Pemex moved to reconsider the scope of the October 5 and October 11 Orders. On December 29, 2017, the *Concurso* Court issued an order resolving the motion (the "December 29 Order"). In the December 29 Order, the *Concurso* Court expressly stated that the October 5 and 11 Orders applied retroactively and as such, that Pemex's purported terminations of the Oro Negro Contracts "were not valid" (i.e., that they are null, void and unenforceable) and that the Oro Negro Contracts were valid and enforceable.[10]

204.     On October 31, 2017, the *Concurso* Court issued an order granting Integradora's request to initiate a *concurso* proceeding (the "October 31 Order"). In the October 31 Order, the *Concurso* Court issued numerous injunctions including enjoining Nordic Trustee from (a) exercising or taking any actions in furtherance of the Oro Negro Drilling Share Charge; and (b) asserting any claims against Integradora under the Guarantee. Both injunctions are in effect.

205.     The Ad-Hoc Group has blatantly violated the *Concurso* Court's injunctions. As set forth below (*infra* ¶¶ 254–255), they caused Nordic Trustee to exercise the Oro Negro Drilling Share Charge and have been acting in furtherance of the Oro Negro Drilling Share Charge since October 2017, mainly by acting as the purported owners of Oro Negro Drilling and through it, of the Singapore Rig Owners.

---

[10]   In late January 2018, Pemex filed an *amparo* (a remedy for the protection of constitutional rights available in Mexican courts) against the December 29 Order. On February 21, 2018, the *amparo* judge stayed the December 29 Order as to Pemex pending a final decision on the *amparo* on the ground that, although the October 5 Order's and the October 11 Order's injunctions are lawful and appropriate under Mexican insolvency law, maintaining them as to Pemex supposedly threatens Pemex's financial survival. The *amparo* is still pending.

## C.   Disputed *Concurso* of Oro Negro Drilling and the Singapore Rig Owners

206.   On September 29, 2017, when Integradora filed for *concurso*, Oro Negro Drilling and the Singapore Rig Owners were also part of the *concurso* request.

207.   Oro Negro Drilling and the Singapore Rig Owners, acting under the Ad-Hoc Group's control, objected.

208.   On October 16, 2017, Integradora and Perforadora, for themselves and in the names of Oro Negro Drilling and each Singapore Rig Owner, moved for an order from the *Concurso* Court ruling that Nordic Trustee's declaration of default and exercise of the Oro Negro Drilling Share Charge and the Singapore Rig Owner Share Charges were invalid and unlawful because they violated the Mexican bankruptcy law prohibition of terminating a contract or worsening the debtor's condition due to a *concurso* filing (the "Default Annulment Motion"). On October 20, 2017, the *Concurso* Court denied the Default Annulment Motion on the ground that Nordic Trustee's rights under the Bond Agreement are subject solely to Norwegian law and courts.  Integradora, Oro Negro Drilling, the Singapore Rig Owners and Perforadora challenged that order via an *amparo*—a remedy for the protection of constitutional rights available in Mexican courts.

209.   In March 2019, a Mexican federal court decided the *amparo*, ruling that the *Concurso* Court could issue orders regarding Nordic Trustee's rights under the Bond Agreement to the extent they impact Integradora and Perforadora, because Integradora and Perforadora are Mexican companies subject to a Mexican restructuring proceeding.

210.   The Mexican federal court remanded the case to the *Concurso* Court for the *Concurso* Court to decide, consistent with the *amparo's* rulings, whether to grant the Default Annulment Motion.  If the *Concurso* Court grants the Default Annulment Motion, all of the

Bondholders' actions in furtherance of Nordic Trustee's declaration of default and the Oro Negro

Drilling Share Charge will become null, void and unenforceable.

**D.      The Defendants' Actions in Contravention of the *Concurso* Proceeding**

211.    As described above in this section, the *Concurso* Court issued several injunctions

during October 2017 that were meant to protect Integradora's and its subsidiaries' assets,

businesses and operations and preserve their *status quo* during the *concurso*.  The Ad-Hoc Group

responded by implementing a carefully calculated plan to skirt those injunctions and ensure that

Integradora and Perforadora would lose control of the Rigs, run out of money, and end up in

liquidation.   The Ad-Hoc Group never had any intention of allowing Integradora and its

subsidiaries to successfully reorganize—their plan has always been one and the same:  to destroy

the business of Integradora and its subsidiaries by taking over the Rigs and the Oro Negro

Contracts.

212.    The Defendants were no doubt angered by the commencement of the *concurso*

proceeding and have repeatedly defied the orders of the *Concurso* Court.

213.    At no time during the *concurso* have the members of the Ad-Hoc Group acted as

reasonable commercial lenders or in good faith.  They did not care about maximizing recovery

on the Bonds; the goal was to put Oro Negro out of business and take over the Rigs

1.      Pemex and the Ad-Hoc Group Collude to Terminate the Oro Negro
        Contracts on October 3, 2017

214.    Even though Perforadora had already sought *concurso* protection, including

seeking injunctive relief to prevent the termination of the Oro Negro Contracts, on October 3,

2017, Pemex delivered letters to Perforadora purporting to terminate the Oro Negro Contracts

(the "Termination Letters").

215.    By this time, Pemex owed Perforadora $96 million for past due services and immediately became liable for future amounts due under the Oro Negro Contracts.  The table below reflects the amounts that Pemex would owe Perforadora through the maturity of each Pemex Contract:

| Pemex Contract | Daily Rates Through End of Contract |
|---|---|
| Primus Contract | $82,520,000 |
| Laurus Contract | $140,555,000 |
| Fortius Contract | $180,621,000 |
| Decus Contract | $192,544,000 |
| Impetus Contract | $219,050,000 |
| **Total** | **$815,291,000** |

216.    As to the Oro Negro Contracts for the *Primus, Laurus, Fortius* and *Decus*, Pemex asserted in the Termination Letters that it was terminating the contracts because Pemex had entered into lease agreements with other vendors of Rigs for a daily rate of $116,300 and Perforadora had purportedly failed to accept leasing the Rigs to Pemex for that rate.

217.    These four Oro Negro Contracts do not contain any provision allowing Pemex to unilaterally terminate them on the ground that it obtained better rates from Perforadora's competitors, and thus Pemex could not terminate the Oro Negro Contracts for that reason.

218.    Moreover, Pemex's assertions were false—Perforadora accepted that rate on August 11, 2017, when it accepted the 2017 Proposed Pemex Amendments (*supra* ¶¶ 192–193); it was Pemex that failed to execute.

219.    On October 26, 2017, Perforadora sued Pemex in a Mexican federal court, seeking a declaration that Pemex breached the Decus, Fortius, Laurus and Primus Contracts by unlawfully terminating them, and demanding performance and damages.

-50-

220.    In February 2019, that Mexican federal court issued a 176-page judgment ruling that Pemex breached the Decus, Fortius, Laurus and Primus Contracts by terminating them and, as such, that the terminations of those Oro Negro Contracts were unlawful, invalid and unenforceable.  The court held that (a) Pemex did not have the right to unilaterally terminate the Oro Negro Contracts on the ground that other vendors had yielded to better terms than Perforadora; and (b) in any event, Perforadora had already agreed to modify the Oro Negro Contracts as Pemex had demanded.  Pemex appealed this ruling and the appeal is pending.

221.    As to the Pemex Contract for the *Impetus*, Pemex asserted in the Termination Letter that it was terminating it because Perforadora had filed for *concurso*.  Analogous to the unenforceability of certain *ipso facto* clauses as a matter of United States bankruptcy law, terminating a contract in México because a counter-party files for *concurso* is unlawful and unenforceable because it violates a rule in the Mexican Bankruptcy Code expressly prohibiting termination of a contract (or taking any actions to worsen the debtor's condition) due to a *concurso* filing.

222.    On November 7, 2017, Perforadora sued Pemex in the *concurso* proceeding (in an ancillary proceeding within the *concurso*) seeking a declaration that Pemex breached the Impetus Contract by unlawfully terminating it, and demanding performance and damages.  The case remains pending as of the date of this Complaint.

223.    Even if Pemex had validly terminated the Oro Negro Contracts, each Pemex Contract provided that Pemex had to pay Perforadora, as liquidated damages, all the remaining daily rates through the end of the Contracts' terms.  Here, as set forth above, the total amount due to Perforadora under the Oro Negro Contracts from the purported October 3, 2017 date of

termination through maturity of the Oro Negro Contracts is approximately $815 million. Pemex has failed to make this payment to Perforadora.

224.    Aside from breaching the Oro Negro Contracts by unlawfully terminating them, in defiance of the *Concurso* Court's October 5 and 11 Orders (which prohibited Pemex from terminating the Oro Negro Contracts or acting in furtherance of any purported terminations), Pemex returned the Rigs to Perforadora and stopped paying the daily rates, including past due daily rates.

225.    Perforadora repeatedly sought relief from the *Concurso* Court, which the *Concurso* Court repeatedly granted. For example, on June 18, 2018, the *Concurso* Court issued an order instructing Pemex to pay the approximately $96 million that it owed for services provided by Perforadora prior to October 3, 2017. Pemex did not comply with the June 18 order. On July 24, August 22 and September 4, 2018, the *Concurso* Court issued additional orders, reiterating Pemex's obligation to pay the $96 million and holding Pemex and its CEO in contempt for their failure to comply with the June 18 order. Finally, on September 4 and 6, 2018, Pemex paid approximately $96 million.

226.    Because Pemex was Perforadora's only customer and the amounts it owed to Perforadora would be the only source of repayment of the Bonds, it is reasonable to have expected the Ad-Hoc Group to affirmatively support Perforadora's efforts to collect from Pemex, including in the *concurso* proceeding and the Mexican federal court.

227.    The Ad-Hoc Group never lifted a finger despite repeated requests for assistance by Perforadora. Specifically, on three occasions during the *concurso*, Perforadora formally requested that the Ad-Hoc Group, directly or through Nordic Trustee, assist Perforadora in obtaining payment from Pemex. Perforadora advised the Ad-Hoc Group that such payment was

necessary for the maintenance of the Rigs.    The Ad-Hoc Group never responded to any of Perforadora's requests.

228.    Rather, the Ad-Hoc Group worked affirmatively ***against*** Oro Negro, and with Pemex, so that Pemex would terminate the Oro Negro Contracts and instead award identical contracts to them and/or to Seadrill or Seamex, after the Ad-Hoc Group took over the Rigs. Once Pemex actually did purport to terminate the Oro Negro Contracts, the Ad-Hoc Group celebrated the move and did everything it could to cripple Perforadora's ability to litigate against Pemex.

229.    For example,



230.

231.    Pemex initially had no plans to terminate the Oro Negro Contracts as a result of Perforadora's *concurso* filing



Therefore, the Ad-Hoc Group knew that it had to convince Pemex to terminate the Oro Negro Contracts.

232.

233.    In his April 26, 2019 deposition in this Chapter 15 Proceeding,

234.

235.    In parallel to their interference with the Oro Negro Contracts, the Ad-Hoc Group improperly asserted control over the Singapore Rig Owners.  From

---

[11]    "Operate" (*operar*) is a term used in México to denote using intermediaries to pay bribes or otherwise improperly exert influence on Mexican government officials.

236.    On September 25, 2017, Nordic Trustee, instructed by the Bondholders, declared Oro Negro Drilling in default and appointed Bartlett and Hancock to act as directors of Oro Negro Drilling and the Singapore Rig Owners.  In appointing Bartlett and Hancock as directors, the Ad-Hoc Group gained full control of Oro Negro Drilling and the Singapore Rig Owners.

237.    In gaining control of the Singapore Rig Owners, the Ad-Hoc Group positioned itself to cause the termination of the Bareboat Charters upon Pemex's terminations of the Oro Negro Contracts and to then demand that Perforadora turn over the Rigs to the Singapore Rig Owners.  On October 5, 2017, two days after Perforadora received Pemex's Termination Letters, the Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group, sent an email to Perforadora purporting to terminate the Bareboat Charters and demanding that Perforadora return to them the Rigs on the sole ground that Pemex had validly terminated the Oro Negro Contracts.  The Ad-Hoc Group caused the Singapore Rig Owners to attempt to terminate the Bareboat Charters so that the Ad-Hoc Group could take over the Rigs and negotiate new contracts with Pemex.

238.    The Ad-Hoc Group was confident that it would succeed.  For example,

239.



240.    In the following days, but before any termination of the Oro Negro Contracts or termination of the Bareboat Charters,

241.

2.    Pemex and the Ad-Hoc Group Collude to Ignore *Concurso* Court Orders

242.    The *Concurso* Court's October 5 and 11 Orders threw a wrench into the Defendants' scheme.

243.    The Defendants clearly understood the significance of these Orders, i.e., they understood that the Oro Negro Contracts had not been terminated and would remain in effect.

244.    Despite this acknowledgement, again, the Ad-Hoc Group took no steps, and did not direct Nordic Trustee to take any steps, to assists Perforadora in recovering money due and owing by Pemex.

245.    Similarly,



246.    The absurdity of the Ad-Hoc Group's efforts to undermine Oro Negro to ensure that Oro Negro would lack money to repay the Bonds is demonstrated by



247.    Specifically, the Ad-Hoc Group



248.    It is inconceivable that a commercially reasonable lender acting in good faith would take such a position.

249.    Further, as Leand testified in his April 26, 2019 deposition in this Chapter 15 Proceeding,

3.    The Ad-Hoc Group's Efforts to Unlawfully Terminate the Bareboat Charters

250.    As set forth above, on October 5, 2017, two days after Perforadora received Pemex's Termination Letters, the Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group, purported to terminate the Bareboat Charters and demanded that Perforadora return to them the Rigs on the sole ground that Pemex had validly terminated the Oro Negro Contracts.

251.    The Ad-Hoc Group caused the Singapore Rig Owners to attempt to terminate the Bareboat Charters so that the Ad-Hoc Group could take over the Rigs and lease them back to Pemex.

4.    The Ad-Hoc Group's Illegal Seizure of Control of the Singapore Rig Owners and Misuse of Estate Cash

252.    As set forth above in this section, Perforadora filed for *concurso* on September 11, 2017.  Integradora publicly announced Perforadora's filing on September 21, 2017.  Based solely

on Integradora's September 21 announcement that Perforadora had filed for *concurso*, on September 25, Nordic Trustee declared an event of default (the "Declaration of Default"). The Ad-Hoc Group instructed Nordic Trustee to issue the Declaration of Default and indemnified Nordic Trustee for issuing it.

253.   Prior to September 25, 2017, Oro Negro Drilling had made every payment that it was required to make under the Bond Agreement. As such, Oro Negro Drilling had not defaulted on any of its payment obligations.

254.   Nordic Trustee did not demand that Oro Negro Drilling pay the entire amount of the Bonds upon issuing the Declaration of Default. Instead, the Bondholders only demanded full payment of the Bonds more than one year later, through a payment demand to Oro Negro Drilling dated November 14, 2018. The payment demand purported to copy Integradora and Perforadora—however, the Bondholders concealed this payment demand from Integradora and Perforadora and never delivered it to them.[12]

255.   Based on Nordic Trustee's Declaration of Default, on or around September 25 2017, Nordic Trustee purported to exercise the Oro Negro Drilling Share Charge and the Singapore Rig Owner Share Charges by replacing Oro Negro Drilling's directors and the Singapore Rig Owners' directors with Hancock and Bartlett, directors recruited, paid and controlled by the Ad-Hoc Group and AMA.[13] On or around October 3, 2017, Nordic Trustee purported to exercise the Oro Negro Drilling Share Charge and claimed the exclusive right to exercise the shares of Oro Negro Drilling. Nordic Trustee's repeated actions in furtherance of

---

[12]   Mexican bankruptcy law expressly and specifically prohibits terminating a contract or taking any action to worsen a debtor's condition because a counter-party files for *concurso*. As set forth above in this section, Nordic Trustee issued the Declaration of Default solely based on Perforadora's *concurso* filing. As such, the Declaration of Default is unlawful and unenforceable as a matter of Mexican public policy.

[13]   Cochrane, the third director of Oro Negro Drilling and the Singapore Rig Owners, had been a director of those companies since September 2016. He was appointed by and has always been controlled by the Bondholders.

the Oro Negro Drilling Share Charge directly violate the injunction contained in the October 31

Order issued by the *Concurso* Court, which expressly enjoined any actions in furtherance of the

Oro Negro Drilling Share Charge.[14]

256.    Further, as of September 2017, the Singapore Rig Owners held approximately

$8 million in bank accounts. ██████████████████████████████████████

███████████████████████████████████████████████████ Integradora should still control the

Singapore Rig Owners and thus, this cash was misappropriated by the Ad-Hoc Group.

5.    <u>The Mexican Trust Fails to Comply with *Concurso* Court Orders, at the
Ad-Hoc Group's Direction</u>

257.    Despite the *Concurso* Court's express orders, Deutsche México has failed to make

numerous payments to Perforadora and instead made a substantial payment to the Bondholders.

In December 2017, in violation of the *Concurso* Court's orders, Deutsche México wired

$23 million of funds in the Mexican Trust to the Bondholders.

258.    Deutsche México's efforts to aid the Bondholders contrast with its efforts to

starve Oro Negro of cash.  On five separate occasions, on February 7, February 28, March 27,

April 2 and April 6, 2018, the *Concurso* Court ordered Deutsche México to disburse to

Perforadora funds for Perforadora to pay its ordinary business expenses such as taxes, salaries

and maintenance of the Rigs.

259.    To compel Deutsche México's compliance, the *Concurso* Court threatened to

sanction Deutsche México's CEO if Deutsche México failed to disburse to Perforadora the funds

to pay for its ordinary business expenses.  Even under these extraordinary measures, Deutsche

---

[14]    Additionally, the October 31 Order applies retroactively and, as such, voided the exercise of the Oro Negro
Drilling Share Charge.

México failed to comply with the *Concurso* Court's orders and refused for months to disburse any funds to Perforadora.

260.    On May 8, 2018, Deutsche México finally complied with the *Concurso* Court's orders and disbursed approximately $8 million in funds to Perforadora.

261.    The Ad-Hoc Group has made numerous efforts to prevent Deutsche México from disbursing any funds to Perforadora—all with the sole purpose of starving Perforadora of cash to operate the Rigs. ███████████████████████████████████████████████
███████████████████████████

262.    From October 2017 to date, Nordic Trustee and the Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group, have filed dozens of motions and challenges in the *concurso* seeking orders that Deutsche México refrain from disbursing any funds to Perforadora.

263.    ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████ Deutsche México ultimately lost that appeal.

264.    In April and June 2018, Oro Negro Primus and Oro Negro Decus, acting under the Ad-Hoc Group's control, sought and obtained preliminary injunctions from local judges in México City (*not* the *Concurso* Court) enjoining Deutsche México from disbursing any funds to Perforadora.

-61-

265.    Oro Negro Primus and Oro Negro Decus obtained these injunctions based on the false contention that they had never received any information from Perforadora or Deutsche México regarding the cash flow into and out of the Mexican Trust.  This assertion was false because ███████████████████████████████████████████████████████████████

266.    Perforadora challenged these injunctions as improper circumventions of the *Concurso* Court's jurisdiction—Perforadora prevailed, setting aside the injunctions.

267.    It is not surprising that Deutsche México has typically obeyed the Ad-Hoc Group's commands, notwithstanding express orders of the *Concurso* Court, because ███ ████████████████████████████████████████████████████████████████████

268.    ███████████████████████████████████████████████████████████████████

269.    But even Deutsche México could not ignore every *Concurso* Court order, and when Pemex finally paid the $96 million as ordered by the *Concurso* Court, Deutsche México was likely going to have to pay Perforadora absent a further court order.  After numerous *Concurso* Court orders and facing contempt, in early September 2018, Pemex finally paid into the Mexican Trust the approximately $96 million that it owed Perforadora for services provided until October 3, 2017.  On September 10, 2018, Perforadora instructed Deutsche México to immediately disburse to it approximately $27 million of the $96 million, which comprised value

added tax ("VAT") on Perforadora's invoices to Pemex and expenses that Perforadora incurred in providing the services to Pemex underlying the $96 million payment.  On September 27, 2018, Deutsche México disbursed approximately $13 million to Perforadora, most of which Perforadora had to use to pay VAT.

270.    In order to block Perforadora from receiving any of the funds, in September 2018, as described below (*infra* ¶¶ 349–367), the Ad-Hoc Group improperly commenced a criminal proceeding against Perforadora and colluded with Mexican prosecutors and judges to seize all of the funds in the Mexican Trust that Pemex had just paid.

271.    The Mexican Trust is currently seized and, as a result of the seizure, has not made any payments to Perforadora since September 2018.  For example, in February 2019, the *Concurso* Court ordered Deutsche México to pay approximately $13 million to Perforadora and Deutsche México refused on the ground that the funds in the Mexican Trust are seized.

## II.    The Defendants Again Interfere with the Oro Negro Contracts

272.    The Defendants were no doubt angered by the commencement of the *concurso* and the fact that their plan did not result in taking over the Rigs in October 2017.  Their fears grew when they learned that

273.    Specifically, in

274.    But the Defendants were not acting as lenders.

275.

276.    Pemex ultimately cancelled the meeting with Oro Negro.

277.    Pemex never reactivated the Oro Negro Contracts.

278.    As Leand testified in his April 26, 2019 deposition in this Chapter 15 Proceeding,

## PART IV:  LITIGATION OUTSIDE OF MÉXICO

I.     **The Ad-Hoc Group Unleashes Litigation Around the World**

279.    The Ad-Hoc Group has unleashed a torrent of litigation, in multiple countries, entirely outside of the *Concurso* Court.  These litigation efforts have cost Oro Negro millions of dollars in legal fees and costs and substantially interfered with efforts to reorganize in the *concurso*.

A.     **The Singapore Litigation**

280.    On January 26, 2018, Oro Negro Drilling and the Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group, filed a complaint in Singapore against Integradora and two of its managers, seeking a declaration that they could not act on behalf of Oro Negro Drilling and the Singapore Owners in the *concurso*, as well as damages resulting from these entities' filing for *concurso* on September 29, 2017 (the "Singapore Proceeding"). Moreover, Oro Negro Drilling and the Singapore Rig Owners sought, *ex parte*, to enjoin Integradora and its managers from acting on behalf of Oro Negro Drilling and the Singapore Rig Owners in the *concurso*, which a Singapore court granted on January 30, 2018.

281.    This was an extraordinary gambit done at the behest of the Ad-Hoc Group. Rather than have matters litigated in the *Concurso* Court, they ran to Singapore, *ex parte*.

282.    Integradora moved to set aside the injunction and dismiss the case.  In support of Oro Negro Drilling's and the Singapore Rig Owners' opposition, Leand submitted written testimony.

283.    In September 2018, the Singapore court granted Integradora's motion and dismissed the case in its entirety on the ground that the *Concurso* Court, not any court in Singapore, would decide in due course who owns and controls Oro Negro Drilling and the Singapore Owners.  The Singapore court held that "[Oro Negro Drilling and the Singapore Rig

Owners acted] in bad faith.   They not only resisted the Mexican proceedings initiated by
[Integradora] and Perforadora but had also launched fresh proceedings . . . against [Mexican
counsel for Integradora and its subsidiaries], [the Foreign Representative] and Perforadora.  The
plaintiffs then applied to the Singapore courts to muzzle and/or prevent the defendants from
pursuing the pending Mexican proceedings by an anti-suit injunction.  It would be a different
consideration altogether if the plaintiffs had applied to the Mexican courts to stay proceedings
there against Oro Negro and/or the rigs owners but they did not."  The Singapore court also held
that "[a]n injunction is an equitable remedy. He who comes to equity must come with clean
hands — the plaintiffs' hands were not clean as material facts had been suppressed."

284.    The Singapore court ordered Oro Negro Drilling and the Singapore Rig Owners to
pay $40,000 to Integradora and its managers in attorneys' fees and costs.  Oro Negro Drilling
and the Singapore Rig Owners appealed and their appeal is pending.

### B.    The New York Litigation

285.    On March 15, 2018, the Singapore Rig Owners, acting under the Ad-Hoc Group's
unlawful control, sued Perforadora in the United States District Court for the Southern District of
New York, seeking, *inter alia*, an order compelling Perforadora to deliver the Rigs to them.[15]

286.    The Singapore Rig Owners' complaint in the New York Litigation made no
mention of the *Concurso* Court's October 5 and 11 Orders expressly enjoining termination of the
Bareboat Charters.  The Singapore Rig Owners never sought relief from the *Concurso* Court
(akin to seeking relief from stay in a United States bankruptcy case) to commence the New York
Litigation.

---

[15]    At the time, and still to this date, Integradora and the Bondholders have been litigating in México the issue of
control over the Singapore Rig Owners.

287.     The Chapter 15 Proceeding stayed the New York Litigation.

288.     On October 12, 2018, abruptly and without advance notice to this Court or the Foreign Representative, the Singapore Rig Owners voluntarily dismissed the New York Litigation.   On information and belief, dismissal of the New York Litigation was done to (unsuccessfully) attempt to avoid this Court's jurisdiction over the Singapore Rig Owners in connection with claims by Oro Negro resulting from their unlawful attempt to seize the Rigs—as discussed below (*infra* ¶ 374), they had known for weeks that they would launch their attack to forcibly take over the Rigs on October 19.

### C.     The Norway Lawsuit

289.     In November 2018, Nordic Trustee initiated a proceeding in Norway to obtain a declaration that Oro Negro Drilling had defaulted on the Bonds (the "Norwegian Declaratory Action").   Oro Negro Drilling, acting under the unlawful control of the Ad-Hoc Group, did not defend itself and simply accepted Nordic Trustee's allegations.

290.     On January 10, 2019, the Norwegian court ruled that Oro Negro Drilling had defaulted on the Bonds.

291.     Nordic Trustee did not provide notice to Integradora or Perforadora of the Norwegian Declaratory Action.   The existence of the suit was disclosed to the Foreign Representative only in late January 2019.

## II.     The Chapter 15 Proceeding

292.     The Foreign Representative initiated a Chapter 15 Proceeding before this Court on April 20, 2018.   The purposes of the Chapter 15 Proceeding were to (a) obtain recognition from this Court of Integradora's and Perforadora's *concurso*; (b) stay the New York Litigation; (c) enforce the *Concurso* Court's orders; and (d) obtain information from several parties (the Ad-Hoc Group, AMA, Pemex, Seamex and Deutsche México) regarding their potential misconduct.

293.    This Court recognized the *concurso* as the foreign main proceeding, stayed the New York Litigation, granted comity to the October 5, October 11 and December 29 Orders (the "Comity Order") and authorized the Foreign Representative to obtain discovery from the Ad-Hoc Group, AMA and Deutsche México.  Eventually, as a result of evidence uncovered in that discovery, the Court authorized the Foreign Representative to also obtain discovery from Seadrill and Fintech Advisory.

294.    During the second hearing in the Chapter 15 Proceeding, the Ad-Hoc Group and AMA, through their counsel, falsely represented to this Court that they were not seeking to dispossess Perforadora of the Rigs and were just lenders seeking to get repaid.

295.    Their subsequent actions, as well as the discovery that they eventually provided to the Foreign Representative, leave no doubt that they lied to this Court.  Taking over the Rigs is exactly what the Ad-Hoc Group has endeavored to accomplish since at least May 2017.

A.    **The Ad-Hoc Group's Discovery Misconduct**

296.    The Ad-Hoc Group and AMA have gone to great lengths to avoid producing key discovery to the Foreign Representative.  As of the date of this Complaint, only AMA and two members of the Ad-Hoc Group that happen to be domiciled in the United States (Alterna and Contrarian) have produced documents.  No other member has.  Even though Paul Weiss, their counsel, has appeared in the Chapter 15 Proceeding and even though the Singapore Rig Owners (using the same counsel) commenced the New York Litigation at the direction of the Ad-Hoc Group, every other member has hidden behind jurisdictional arguments to avoid discovery.

297.    MFC and SFIL, two of the members of the Ad-Hoc Group, evaded service of the Foreign Representative's discovery subpoenas.  In July 2018, the Foreign Representative sought to serve MFC at its Miami offices, which MFC publicly held out as its headquarters as of April 2018, the month the Foreign Representative initiated the Chapter 15 Proceeding.  When

attempting service, the Foreign Representative learned that MFC had recently evacuated the premises, leaving no forwarding address.

298.    Similarly, the Foreign Representative served SFIL through Leand, a long-time member of SFIL's Board of Directors.  After the Foreign Representative served SFIL through Leand, he resigned from SFIL's Board and SFIL disclaimed service.

299.    Both SFIL and MFC were ultimately forced to recognize their improper practices and Paul Weiss accepted service of the Foreign Representative's discovery subpoenas on their behalf, but that was merely their first act of stonewalling.  A month later both objected to producing any discovery on the ground that this Court has no jurisdiction over them to compel them to produce discovery.  To this day, neither has produced a single document.

300.    Even for the entities that have produced discovery (Alterna, Contrarian and AMA), it has come only at great delay and cost.  Among other tricks, they failed to collect and produce documents from any of their agents, including key parties such as Aagaard and GGB, causing the Foreign Representative to move to compel production numerous times.  Likewise, they refused, until ordered by the Court, to produce key categories of documents such as the ███████████████████████████████████████████████, which turned out to ███████

███████████████████████████████████████████

301.    As the Court indicated during a hearing on December 19, 2018, ████████████

███████████████████████████████████████████

## B.    Seadrill's and Fintech Advisory's Discovery Misconduct

302.    Similar to the behavior of the Ad-Hoc Group and AMA, Seamex's first interaction with this Court was to falsely represent that it had no interest or relationship whatsoever with Oro Negro and thus, that the Court should deny any discovery from Seamex. As this Court summarized it, Seadrill and Fintech falsely represented that "[t]here were no other

contacts, there was no other relationship, and that it would wholly inappropriate for this Court to authorize any sort of a discovery motion with respect to SeaMex because we're just a competitor and they're doing that for an improper purpose . . . [w]e have no idea why we're here; we have nothing to do with Oro Negro." The Court concluded that those representations were "simply not true."

303.    Documents subsequently produced by AMA revealed that Seadrill and Fintech Investments or Fintech Advisory, Seamex's parents, have had significant interests in Oro Negro since as early as March 2017. For example,

304.    Further, Seadrill and Fintech Advisory conspired with the Ad-Hoc Group and AMA in late September 2017 to cause Pemex to terminate the Oro Negro Contracts so that the Bondholders could take over the Rigs and give them to Seamex to manage under new contracts with Pemex.

305.    Equally important, during this Chapter 15 Proceeding, Seadrill and Fintech Advisory misled the Foreign Representative and the Court by misrepresenting and concealing that the owner of Seamex was Fintech Investments, not Fintech Advisory. This prevented the Foreign Representative from seeking discovery into Fintech Investments, including to investigate whether any member of the Ad-Hoc Group has an interest in Fintech Investments or whether Fintech Investments has made any payments, directly or indirectly, to members of the Ad-Hoc Group or other relevant parties such as Pemex officials. The Foreign Representative learned of Fintech Investments during Fintech Advisory's deposition in mid-April 2019.

## PART V:  THE MEXICAN CRIMINAL PROCEEDINGS

**I.    <u>Overview</u>**

306.    Having failed to take over the Rigs in October 2017, knowing that Oro Negro might prevail against Pemex such that Pemex would have to pay the $96 million owed since October 2017, and having failed to stop discovery in the Chapter 15 Proceeding, the Ad-Hoc Group grew desperate.  So did AMA, which saw its ███████████████.

307.    But they had another card to play, one that involved their Mexican lawyers.  The Ad-Hoc Group, AMA and their agents have launched a relentless campaign to criminally prosecute Integradora, Perforadora, and their directors, executives and employees, including Gil, based on fabricated evidence.

308.    As result of those criminal investigations, they came close to forcibly seizing control of the Rigs (but failed).  They did, however, succeed in freezing all of Perforadora's cash in the Mexican Trust.

309.    Even though, as described below, the criminal investigations have gone nowhere, the relevant Defendants succeeded in their end-game; Perforadora finally ran out of money earlier this year and, on May 15, the *Concurso* Court ordered them to turn over the Rigs to the Singapore Rig Owners.

310.    All told, the Ad-Hoc Group's and the Singapore Defendants' brazen abuse of Mexican criminal proceedings had devastating consequences on Oro Negro and its directors, officers and employees, including Gil.  The Ad-Hoc Group Defendants and the Singapore Defendants managed to seize all of Oro Negro's cash, suffocating Oro Negro and depriving it of its ability maintain the Rigs, which ultimately allowed them to take over the Rigs.   The actions of the Ad-Hoc Group Defendants and the Singapore Defendants have destroyed Gil's reputation and his business as a financial advisor and investment manager.

-71-

## II.    <u>Mexican Criminal Counsel</u>

311.    ████████ the Ad-Hoc Group retained GGB, a Mexican criminal law firm. GGB has two partners and a handful of associates.

312.    ████████████████, without talking to a single Oro Negro employee, and without even notifying the *Concurso* Court or this Court, GGB commenced four separate criminal proceedings in the name of the Singapore Rig Owners.

313.    GGB accomplished this feat by using fabricated evidence against Oro Negro.

314.

315.

316.

317.



318. 

319.

320.

## III.    The Four Criminal Proceedings

321.    In the space of six months, GGB, on behalf of the Singapore Rig Owners, acting under the Ad-Hoc Group's unlawful control, filed four separate criminal complaints against Oro Negro, its directors, officers and employees, including Gil.

322.    Tellingly, the Ad-Hoc Group has not made any similar accusations in any other proceedings, including in the *concurso* or in the Chapter 15 Proceeding.  If the Ad-Hoc Group truly believed Oro Negro or its representatives had engaged in criminal behavior, it would have brought this to the attention of the *Concurso* Court or this Court to cause the removal of such persons from overseeing Oro Negro.

323.    For example, the Ad-Hoc Group could have objected in this Court to the recognition of the *concurso* proceedings, or sought modification of the recognition, on the basis that the Foreign Representative was a criminal.  Or the Ad-Hoc Group could have sought relief

from orders of this Court to permit it to seize the Rigs on the basis that Oro Negro had committed a crime. Of course, that would have opened the door to discovery, cross-examination under oath and adjudication.

### A. First Criminal Complaint

324. On June 18, 2018, GGB, on behalf of the Singapore Rig Owners, acting under the Ad-Hoc Group's unlawful control, filed a criminal complaint before the *Procuraduría General de la República* (the "PGR"), México's federal prosecutors' office, against Integradora, Perforadora, Gil, Integradora's CEO, and three of their employees falsely accusing them of mismanaging funds in the Mexican Trust.

325. The Singapore Rig Owners' criminal complaint falsely alleges that during 2017, Perforadora obtained from the Mexican Trust more funds than Perforadora required to maintain and operate the Rigs.

326. The Ad-Hoc Group knows that this allegation is false and was conjured by Leand and AMA.

327.

328. Because the Mexican Trust should disburse to the Singapore Rig Owners as Charter Hire the Pemex revenue that is left after paying for Perforadora's expenses,

█████████████████████████████████████████████████████████████████████

329.    AMA and Leand know and understand how the Mexican Trust works and knew that it was impossible to infer mismanagement due to the facts █████████████ AMA and Leand knew that their conclusion was false because:

(a)    the Mexican Trust disburses funds to Perforadora based on the expenses that Perforadora incurs in connection with its services to Pemex (Perforadora keeps an accounting of the specific expenses it incurs in connection with the services underlying each of the invoices it issues to Pemex);

(b)    for each payment by Pemex of each invoice submitted to it by Perforadora, the Mexican Trust must disburse to Perforadora the expenses that Perforadora incurred in connection with the services subject to that invoice; and therefore

(c)    AMA and Leand could not have calculated how much the Mexican Trust had to disburse in 2017 to the Singapore Rig Owners without determining what expenses Perforadora had incurred in connection with the invoices that Pemex paid during 2017.

330.    Neither AMA nor any member of the Ad-Hoc Group ever requested any information from Perforadora to determine which invoices Pemex paid in 2017, much less the expenses Perforadora incurred in connection with the services supporting each of those invoices.

331.    In his April 26, 2019 deposition in this Chapter 15 Proceeding, Leand ██████████████████████████████████████████████████████████

332.    Perforadora's 2017 expenses are obviously unrelated to services underlying invoices issued in 2016.

333.    At no time did AMA or the Ad-Hoc Group ask Perforadora or its managers and employees about the allegedly missing $16 million, nor did they take any action in the *Concurso* Court to obtain discovery into this issue.

334.    Importantly, as further discussed below, on September 18, 2018, following a request by the PGR to seize the Mexican Trust and all of the Mexican Trust's and Perforadora's bank accounts, a Mexican federal judge concluded that the allegations of mismanagement of the Mexican Trust were ***completely baseless*** and that the PGR had ***no evidence*** demonstrating that the Mexican Trust was in any way related to any criminal conduct.

335.    The Ad-Hoc Group and their agents caused the Singapore Rig Owners to file that complaint knowing that it had no merit and did that solely as a vehicle to obtain information regarding Perforadora from the *Servicio de Administración Tributaria* (the "SAT"), México's tax agency, that the Singapore Rig Owners subsequently used in another criminal proceeding.

336.    On June 25, 2018, just one week after the Singapore Rig Owners filed their complaint, the PGR sent a broad request to the SAT, seeking all available tax information regarding Perforadora.

337.    The SAT responded less than one week later and provided all the information the PGR requested.    The SAT sent to the PGR a disc with hundreds of tax filings filed by Perforadora and tax filings by third-parties reflecting services supposedly provided to them by Perforadora (tax filings by an entity reflecting its vendors are known as *Declaraciones*

*Informativas de Operaciones con Terceros*, "DIOT[s]"), as well as charts summarizing these tax

filings.

338.    The PGR's broad request, and the SAT's response, is highly unusual.  Article 69

of the *Código Fiscal de la Federación*, México's federal tax code, prohibits tax authorities from

disclosing tax information to anyone, including other government agencies, unless required by a

court order or in money laundering or tax evasion criminal investigations, which is not the case

here.  On information and belief, the SAT often denies similar requests by the PGR because it

considers them a violation of Article 69.

339.    GGB allegedly "found" in the documents provided by the PGR one Excel

spreadsheet reflecting that from 2014 to 2017, Perforadora had supposedly issued invoices,

totaling approximately $500,000, to 16 companies blacklisted by the Mexican government

because they facilitate tax evasion.

340.    As further described below in this section, the information in that spreadsheet is

demonstrably false and GGB knew it.

341.    Notably, when SAT provided this information to the PGR, the Minister of

Finance of México (the SAT is part of the Ministry of Finance) was González, who served as

Pemex's CEO when Pemex purported to unilaterally terminate the Oro Negro Contracts ██████

██████████████████████████████████████

342.    Oro Negro learned of this investigation because it appeared in the front page of

*Reforma*, the largest newspaper in México, on July 11, 2018. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

### B.    Second Criminal Complaint

343.    On June 18, 2018, the Singapore Rig Owners, acting under the Ad-Hoc Group's unlawful control, filed a second criminal complaint before the *Procuraduría General de Justicia de la Ciudad de México* (the "México City DA"), México City's local prosecutors' office, against Alonso Del Val ("Del Val"), the then-Foreign Representative, for signing on behalf of Integradora, on September 20, 2017, shareholder resolutions of Oro Negro Drilling and the Singapore Rig Owners authorizing Jesus Guerra ("Attorney Guerra"), Integradora's and its subsidiaries' Mexican attorney, to file *concurso* petitions on their behalf.

344.    The Singapore Rig Owners argue in their complaint that Del Val purportedly misled the *Concurso* Court by allowing Attorney Guerra to act on behalf of Oro Negro Drilling and the Singapore Rig Owners because, according to the Bondholders, they control Oro Negro Drilling and the Singapore Rig Owners and they did not authorize Attorney Guerra to act on their behalf.    The Singapore Rig Owners allege that this constitutes a crime called procedural fraud (*fraude procesal*), which is to mislead a public official.

345.    This investigation is based on allegations that warrant no serious consideration.

346.    First, Integradora's shareholder authorization to Attorney Guerra is dated September 20, 2017, Attorney Guerra filed the petitions on September 29 and Nordic Trustee exercised the Oro Negro Drilling Share Charge on October 3.    Thus, the authorization was almost two weeks before, and the *concurso* filing was six days before, the date when Bondholders purportedly became the owners of Oro Negro Drilling.

347.    Second, the *Concurso* Court has not yet decided whether Nordic Trustee properly exercised the Oro Negro Drilling Share Charge and thus, whether it validly owns and controls Oro Negro Drilling and the Singapore Rig Owners.

348.    This case remains pending.

C.     **The Sham Companies Investigation**

1.     Fabrication of Evidence

349.   In early September 2018, based on the allegations of mismanagement of the Mexican Trust (which are described above) and the SAT's false evidence, the Singapore Rig Owners, through GGB, requested that the PGR obtain a court order from a Mexican federal judge seizing the Mexican Trust and all of Perforadora's bank accounts.

350.   On September 17, 2018, the PGR obliged and requested the seizure order.  One day later, a Mexican federal judge denied the seizure as baseless.  The federal judge determined that the Singapore Rig Owners had failed to provide ***any*** evidence that the Mexican Trust or any of the bank accounts of the Mexican Trust or Perforadora were in any way related to, or held proceeds of, any criminal conduct.  As such, the federal judge concluded that the allegations of mismanagement of the Mexican Trust were baseless, much less justified the seizure of the Mexican Trust or any bank account.  Additionally, the federal judge gave no weight whatsoever to the SAT's false evidence.

351.   The Ad-Hoc Group, through GGB, decided to go around the Mexican federal courts and procured the assistance of friendly México City prosecutors and judges.

352.   On September 14, 2018, the Singapore Rig Owners, still acting under the Ad-Hoc Group's unlawful control, filed a criminal complaint before the México City DA against Perforadora accusing it of issuing invoices, totaling approximately $500,000, from 2014 to 2017 to 16 companies that supposedly facilitate tax evasion.  The complaint alleges that by supposedly issuing these invoices, Perforadora committed a crime called fraudulent administration (*administración fraudulenta*), which is to knowingly mismanage the finances and assets of a company.

353.    By this date, Pemex had finally complied with *Concurso* Court orders and paid $96 million into the Mexican Trust (*supra* ¶ 225).  The Ad-Hoc Group knew this.  The Ad-Hoc Group's plan to starve Perforadora of cash so that it would abandon the Rigs was on the verge of failing.

354.    On September 21, 2018, Ricardo Contreras ("Contreras"), an associate at GGB, sat for an interview with the México City DA.  In the interview, Contreras stated to the México City DA that in the PGR investigation, the PGR had obtained from the SAT tax information regarding Perforadora and that GGB had reviewed that information.

355.    Contreras stated that the SAT sent the PGR a disc with hundreds of tax filings filed by Perforadora and DIOTs (tax filings that companies must file every month reflecting their vendors) submitted by third-parties reflecting services supposedly provided to them by Perforadora, as well as charts summarizing these tax filings.

356.    Embedded in the hundreds of documents provided by the SAT to the PGR, GGB supposedly "found" one Excel spreadsheet reflecting that from 2014 to 2017, Perforadora had issued invoices totaling approximately $500,000 to 16 "sham" companies.

357.    Contreras, however, did not provide in his interview with the México City DA a copy of the Excel spreadsheet, much less copies of the underlying DIOTs allegedly reflecting the invoices that Perforadora purportedly issued to these "sham" companies.

358.    These "sham" companies are notorious in México, which explains why GGB chose them as the supposed "sham" companies.  At the time of Contreras' interview, two of these 16 companies were on a list the SAT maintains of companies that facilitate tax evasion (known in Spanish as *Empresas que Facturan Operaciones Simuladas*, "EFOS").  Since Contreras' interview, the SAT has added 11 of these 16 companies to its list of EFOS.

359.     Additionally, most of the 16 companies were on a list published in 2017 by a Mexican investigative think tank accusing them of being vehicles for Javier Duarte ("Duarte"),[16] the governor of the Mexican state of Veracruz from 2010 to 2016, to embezzle public funds.

360.     The Singapore Rig Owners' accusations are demonstrably false.

361.     First, Perforadora provides services only to Pemex thus, it makes no sense whatsoever that it would have ever invoiced anyone else, much less "sham" companies.

362.     Second, on information and belief, not one of the 16 companies has anything to do with Pemex or with operating the Rigs.

363.     Third, Perforadora conducted a comprehensive internal investigation and determined that these allegations are false.   Under Mexican law, every company, including Perforadora, must upload their invoices to an electronic database that the SAT keeps of all invoices.   As the SAT has now confirmed in writing to Perforadora, there is no record in the SAT's database of Perforadora ever issuing an invoice to these sham companies.

364.     Additionally, Perforadora reviewed all its internal accounting records, which are electronically stored in SAP, a standard software that companies use to keep all their business and accounting records, and found no records of any transactions of any kind related to the "sham" companies.

365.     GGB knew or should have known that the evidence on the SAT's disc was false. The SAT's disc contained—and GGB reviewed—another document reflecting exactly the opposite of the Excel spreadsheet containing the "sham" companies.   In particular, the disc contained a file listing all the companies to which Perforadora had ever issued invoices and

---

[16]   Coincidentally, GGB used to be Duarte's counsel and has been accused by the media of acting as a strawmen for Duarte by holding real estate properties on his behalf.

which had ever issued invoices to Perforadora—the "sham" companies are nowhere to be found in that file.

366.   Further evidence that GGB knew or should have known that the Excel spreadsheet contained false information is that it never took any steps whatsoever to confirm the information there, such as, for example, obtaining and reviewing the underlying DIOTs supposedly reflecting that Perforadora had been a vendor of the "sham" entities.

367.   At no time did GGB, or any other representative of the Ad-Hoc Group, ask Perforadora about whether Perforadora had ever contracted with any of the 16 "sham" companies.

    2.    Seizure Order

368.   Solely based on Contreras' September 21 interview, and despite the patent falsity of the Singapore Rig Owners' accusations, on September 25, 2018, the México City DA, at the Singapore Rig Owners' behest, sought and obtained an order from Judge Enrique Cedillo-Garcia ("Judge Cedillo"), a local judge in México City, seizing all the bank accounts of the Mexican Trust and of Perforadora (the "Seizure Order").   At the time, there were approximately $83 million in the Mexican Trust.

369.   GGB did not disclose to the México City DA or Judge Cedillo that a Mexican federal judge had already denied the very same seizure request.

370.   ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

371.   GGB, the México City DA and Judge Cedillo provided no notice whatsoever to Perforadora about the criminal investigation, much less the Seizure Order.   Instead, Perforadora

learned of the criminal investigation and the Seizure Order because the Mexican media published

articles regarding the investigation and Seizure Order on October 1, 2018.

      3.      <u>The Rigs Take-Over Order</u>

372.     Emboldened by the success of the Seizure Order, and again solely based on

Contreras' interview, on Thursday, October 18, 2018, GGB, acting on behalf of the Singapore

Rig Owners, sought and one day later obtained a second unlawful order from Judge Cedillo.  In

this order, Judge Cedillo authorized the Singapore Rig Owners, as restitution, to take possession

of the Rigs (the "Rigs Take-Over Order").  The hearing in which GGB requested the Rigs Take-

Over Order and in which Judge Cedillo issued the Order was recorded on video.[17]

373.     Given that each Rig is worth approximately $150 million, Judge Cedillo in effect

authorized the Bondholders to dispossess Integradora of approximately $750 million in value,

based on invoices Perforadora allegedly sent to 16 "sham" companies totaling $500,000.

374.



375.     Shortly after learning of the Rigs Take-Over Order, Integradora and Perforadora

demanded that the Ad-Hoc Group and its counsel turn over the video recordings of the hearing

where GGB sought and obtained the Order.  The Ad-Hoc Group lied, representing that it did not

have any copies.

---

[17]    Courts in México City routinely take video recordings of hearings.  The parties may file written requests or request the issuance of written orders.  The Singapore Rig Owners did not request in writing this Order and Judge Cedillo did not issue a written order and thus, the only record of this is the video recording of the hearing.

376.    Weeks later, in the course of an *amparo* filed by Perforadora against the Rigs Take-Over Order, Perforadora obtained the video recordings of the hearing.  The recordings show attorneys from GGB requesting and obtaining a copy of the video.

377.    Upon reviewing the hearing recordings, it became obvious why the Ad-Hoc Group concealed it from Integradora and Perforadora.  The video recordings of the hearing reflect that GGB's summary of the facts in support of its request lasted less than 45 minutes, and did not include the submission of any corroborating documentation.  On the basis of that summary, and without asking so much as a single question, or requesting any documentation, Judge Cedillo issued the Rigs take-over order.

378.    Further, to ensure that GGB and the Singapore Rig Owners would have all the possible assistance from the Mexican government to enforce the Rigs Take-Over Order, Judge Cedillo also issued orders to the *Agencia de Investigación Criminal* (the "AIC") of the PGR, which is the police force of the PGR, and to the *Fuerzas Armadas*, the Mexican army, to provide all possible assistance to the Singapore Rig Owners in taking over the Rigs.

379.    The events that ensued on the evening of Friday, October 19, and during the following days, defy reality.  The Ad-Hoc Group and its agents, led by Aagaard, placed their crews in helicopters and deployed the helicopters on the evening of October 19 to fly over the Rigs.

380.    On Saturday, October 20 and Sunday, October 21, the helicopters attempted to land by force on the Rigs.

381.    On October 21, one of the helicopters flew dangerously close in attempting to land by force on the *Decus* and three men jumped onboard.  In attempting to land by force, the helicopter almost caused one of the *Decus'* crewmembers to fall overboard.

-84-

382.    Of the three men who forcibly landed on the *Decus*, one was a police officer from the AIC; one purported to be a private security guard hired by GGB; and the other was Contreras, the GGB associate who provided to the México City DA the interview that served as the sole basis for the Seizure and the Rigs Take-Over Orders.

383.    The AIC police officer left the *Decus* the same day, but Contreras and his security guard stayed on the *Decus* for almost a week, refusing to leave.  While they were on board, GGB's partners falsely asserted, via media appearances, that Oro Negro had kidnapped Contreras and his security guard.

384.    In addition, during that week, Aagaard called crewmembers aboard the Rigs and threatened them with criminal prosecution and losing their licenses to work in oil drilling platforms if they did not let the Bondholders take over the Rigs.

385.    The actions of the Ad-Hoc Group and the Singapore Rig Owners violated 11 U.S.C. § 1520, which stays all actions against property of a debtor located in the United States, because they were interfering with Perforadora's rights under the Bareboat Charters, which are contracts that constitute property located within the territorial jurisdiction of the United States.

386.    The actions of the Ad-Hoc Group, the Singapore Rig Owners, and their agents also violated this Court's July 11, 2018, Order which gave recognition to and enforcement of the October 5 and October 11 Orders issued by the *Concurso* Court.  These orders prohibited interference with Perforadora's possession rights under the Bareboat Charters.

387.    The Ad-Hoc Group's restitution actions were halted by this Court.  On October 23, 2018, upon a motion by Integradora and Perforadora, this Court entered a temporary restraining order (the "TRO") prohibiting the Ad-Hoc Group and its agents from continuing to attempt to

take over the Rigs or in any way deprive Perforadora of its possession of the Rigs. The TRO expressly applied to the Singapore Rig Owners and their agents.

388.    GGB's partners publicly disregarded the TRO and stated that their clients would not comply with it. Specifically, after this Court issued the TRO, Roberto Garcia, one of GGB's partners, made several media statements calling for México to continue using police and military forces to assist the Singapore Rig Owners in taking over the Rigs and stating that they would not comply with the TRO. For example, during a press conference on October 24, Roberto Garcia stated that "public forces should be used" to enforce the Rigs Take-Over Order. During the same press conference, Roberto Garcia also stated that, although "there might be a purported order from a United States judge," because the TRO had not been served on him, "it might as well not exist."

389.    Following the TRO, late on October 24, the *Concurso* Court also ordered the Singapore Rig Owners to cease their unlawful actions and instructed Judge Cedillo to withdraw the Rigs Take-Over Order, which Judge Cedillo refused to do.

390.    Perforadora then filed an *amparo* against the Rigs Take-Over Order and requested its stay pending resolution of the *amparo* on the ground that the Singapore Rig Owners had obtained it surreptitiously and without notice to Perforadora. On October 26, Perforadora obtained a stay of the Order until a final resolution of the *amparo*, which is still pending. Ultimately, three different court orders (from the *Concurso* Court, this Court and the *amparo* court) determined that the Ad-Hoc Group's conduct was unlawful and instructed it to stop.

391.    Given the chronology of events, there are numerous obvious red flags that Mexican officials were bribed to (a) convince the SAT to fabricate or deliver to the PGR fabricated evidence; and/or (b) procure the Seizure Order and/or the Rigs Take-Over Order. The

Foreign Representative has sought discovery of GGB's documents, which the Ad-Hoc Group vehemently resisted at every turn, requiring multiple interventions by this Court. Ultimately, GGB produced almost exclusively filings and court orders in the various Mexican proceedings and produced no other documents or communications.

392.    Counsel for the Foreign Representative wrote to counsel for the Ad-Hoc Group about these red flags and requested an investigation into whether GGB engaged in corruption in México. To date, over four months after that letter, there has been no written response.

393.    The red flags include that:

(a)    the SAT delivered false evidence to the PGR;

(b)    the SAT sent to the PGR broad tax information regarding Perforadora, a request that the SAT often denies the PGR;

(c)    GGB "found" that false evidence, imbedded in the numerous records provided by the SAT to the PGR;

(d)    GGB knew or should have known that the information was false because other documents that it reviewed indicated that Perforadora did not have any relationship of any kind with the "sham" companies and GGB made no attempt to verify it;

(e)    in only eleven days after launching the investigation in the México City DA, GGB obtained the Seizure Order;

(f)    the Seizure Order seized $84 million, while the accusation against Perforadora is that it issued invoices for $500,000 to 16 companies, an accusation that has nothing to do with and is blatantly disproportionate *vis-à-vis* the Seizure Order;

(g)     Judge Cedillo issued the Seizure Order with no supporting evidence and based solely on Contreras' *ex parte* and unsupported statements;

(h)     the Ad-Hoc Group and its agents knew that Judge Cedillo would issue the Rigs Take-Over Order almost two weeks in advance of the day when they requested and obtained it;

(i)     the Rigs Take-Over Order authorized the seizure of close to $750 million in value, while the accusation against Perforadora has nothing to do with and is blatantly disproportionate *vis-à-vis* the Rigs Take-over Order;

(j)     GGB obtained the Rigs Take-Over Order based solely on a short, 40-minute summary at a hearing, without providing and without Judge Cedillo requesting any evidence; and

(k)     

### D.      The Fourth Criminal Proceeding

394.    On October 21, 2018, the Singapore Rig Owners, acting under the Ad-Hoc Group's unlawful control, filed a fourth criminal complaint against Perforadora and its employees before the PGR's office in Ciudad del Carmen, a city in México close to where the Rigs are located.

395.    The Singapore Rig Owners filed this complaint during the week when they were attempting to enforce the Rigs Take-Over Order.  The complaint alleges that Perforadora and its employees were in contempt of the Rigs Take-Over Order because they did not allow the Singapore Rig Owners to take over the Rigs.  Of course, three courts have held that the Ad-Hoc

Group, the Singapore Rig Owners and their agents, were restrained from enforcing the Rigs Take-Over Order.

396.    In January 2019, the PGR filed charges against three Perforadora employees who were on board the Rigs during the week when the Singapore Rig Owners attempted to take over them.

397.    A federal judge dismissed the charges on the ground that federal prosecutors and judges do not have jurisdiction over the investigation.  Since then, nothing else has happened in the case.

## PART VI:  INTERFERENCE WITH ORO NEGRO'S KEY CONTRACTS, BUSINESS RELATIONSHIPS AND RESTRUCTURING EFFORTS

**I.**    **Interference with the Oro Negro Contracts and Perforadora's Relationship With Pemex**

**A.**    **March 2017 – September 18, 2017**

**1.**    Background

398.    In March 2017, Pemex informed Perforadora that the Oro Negro Contracts would not revert to their original terms, demanding that (a) two contracts remain suspended; and (b) Perforadora submit to permanent daily rate reductions of approximately 27% on the other three contracts.

399.    The 2017 Proposed Pemex Amendments were devastating to Oro Negro in that they would indefinitely place Oro Negro in financial distress and make it impossible to repay the $900 million bond debt.

**2.**    The Defendants Place a Mole in Oro Negro

400.    In March 2017, Oro Negro offered Aagaard the role of COO.  As described above (*supra* ¶ 122–123), Aagaard had acted as the Bondholders' consultant on the status and operations of the Rigs in connection with the Bond Agreement Amendments.  Following the Bond Agreement Amendments, Oro Negro appointed him COO as a good faith gesture towards the Bondholders to ensure a smooth and collaborative relationship going forward.

401.    Unbeknownst to Oro Negro, Aagaard served as a mole for the Defendants with the objective of reporting to them on the status of Oro Negro and ensuring that the Defendants could easily take over the Rigs and the Oro Negro Contracts when the time was right.  Aagaard's actions against Oro Negro included ██████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

-90-



and threatened the crews on the Rigs with imprisonment and

other consequences if they did not let the Bondholders take over the Rigs.

    3.    <u>Seadrill Analyzes Taking Over Oro Negro</u>

402.



    4.    <u>The Ad-Hoc Group's Communications with Pemex</u>

403.    Starting

404.

405.

406.    on information and belief, Pemex, agreed

that Pemex would force Perforadora to accept the 2017 Proposed Pemex Amendments and that,

if Perforadora refused to accept them, Pemex would unilaterally cancel the Oro Negro Contracts so that the Bondholders could then take over the Rigs and lease them to Pemex.

407.   The Ad-Hoc Group knew that Pemex's priority was to further the interests of the Bondholders.  As such, the Bondholders knew that they controlled Pemex, including Pemex's treatment of Perforadora.

### 5.   Outcome of the Ad-Hoc Group's Interference

408.   To gradually force Perforadora to yield to the 2017 Proposed Pemex Amendments, from April to September 2017, Pemex (a) threatened to unilaterally terminate all the Oro Negro Contracts if Perforadora did not accept the 2017 Proposed Pemex Amendments; and (b) refused to approve and pay Perforadora's invoices, suffocating Oro Negro financially.  From April to September 2017, while Pemex was pressuring Perforadora to accept the 2017 Proposed Pemex Amendments, Perforadora accrued close to $90 million in unpaid daily rates.

### 6.   Pressure on Perforadora to Accept the 2017 Proposed Pemex Amendments

409.   In July and August 2017, AMA, including its CEO, Leand, ARCM, including its CEO, Ercil, and MFC, including its CEO, Bodden, in emails and telephone conferences with principals of Oro Negro, demanded that Perforadora yield to Pemex and accept the 2017 Proposed Pemex Amendments.

410.   Further, in August and September 2017, the Bondholders, under the Ad-Hoc Group's control, sent three letters to Oro Negro demanding that Perforadora yield to Pemex and accept the 2017 Proposed Pemex Amendments.

411.   While Pemex was forcing on Perforadora the 2017 Proposed Pemex Amendments, to prevent Oro Negro Drilling's default, Oro Negro sought debt relief from the Bondholders. The Bondholders, acting under the Ad-Hoc Group's control, rejected Oro Negro's efforts to amend the Bonds and refused to even discuss providing any debt relief.   Instead, the

Bondholders demanded that Oro Negro relinquish all available cash to the Bondholders as partial

payment of the Bonds, providing no debt relief and practically ensuring default in January 2019,

upon the Bonds' maturity.

**B.      September 19, 2017 – October 11, 2017**

      1.      <u>Plan Against Oro Negro</u>

    412.    The Ad-Hoc Group reacted violently to Perforadora's *concurso* filing.



      2.      <u>Interference with Pemex</u>

    413.

Therefore, the Ad-Hoc Group and their agents knew that they had

to convince Pemex to terminate the Oro Negro Contracts.

    414.



3.    <u>Seizure of the Singapore Rig Owners</u>

415.    In parallel to interfering in the Oro Negro Contracts, the Ad-Hoc Group took over the Singapore Rig Owners.



On September 25, 2017, Nordic Trustee, instructed by the Bondholders, declared Oro Negro Drilling in default and appointed Bartlett and Hancock to act as directors of Oro Negro Drilling and the Singapore Rig Owners. Cochrane, the third director, had been appointed by the Bondholders and had been acting under their control since November 2016.

416.    In gaining control of the Singapore Rig Owners, the Ad-Hoc Group positioned itself to cause the termination of the Bareboat Charters upon Pemex's terminations of the Oro Negro Contracts.

4.    <u>Conspiracy with Seadrill and Fintech Advisory</u>

417.

418.

5.    Outcome of the Plan

419.    On October 3, 2017, Pemex delivered letters to Perforadora purporting to terminate the Oro Negro Contracts.  Pemex had no right to terminate the Oro Negro Contracts and as, described above (*supra* ¶ 221), Mexican courts have now declared those terminations unlawful, invalid and unenforceable.  ██████████████████████████████████████

420.    On October 5, 2017, the Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group, purported to terminate the Bareboat Charters on the sole ground that Pemex had validly terminated the Pemex-Oro Negro Contracts.  Pemex's terminations of the Oro Negro Contracts are unlawful, invalid and unenforceable.  Accordingly, so are the Singapore Rig Owners' terminations of the Bareboat Charters.

6.    Aagaard's Assistance

421.    Aagaard, while he was still Oro Negro's COO, was a key figure in the plan hatched by the Ad-Hoc Group.  ██████████████████████████████████████

422.    Aagaard resigned from Oro Negro on October 12, 2017.

423.    Upon his departure from Oro Negro, ██████████████████████████████████████

7.    The *Concurso* Court's Injunctions

424.    The Ad-Hoc Group's plan failed.  On October 5 and 11, 2017, the *Concurso* Court issued orders prohibiting Pemex from terminating the Oro Negro Contracts and the Singapore Rig Owners from terminating the Bareboat Charters.  As a result, the Oro Negro Contracts and the Bareboat Charters remained in place and the Ad-Hoc Group, Seadrill and Fintech Advisory failed in their plan to dispossess Perforadora of the Rigs.

425.    The Ad-Hoc Group clearly believed that the Oro Negro Contracts remained in place.



**C.    October 2017 – February 2018**

1.    Common Interest Agreement with Pemex

426.



2.    Interference with the Reactivation of the Oro Negro Contracts



428.

Indeed, Pemex never again performed under the Oro Negro Contracts.

3.    Attempt to Interfere with the *Afores*

429.

with the *afores*, its 47% shareholders

## II.    Interference With the Bareboat Charters and Perforadora's Relationship With the Singapore Rig Owners

### A.    Interference with the Bareboat Charters

430.    As described above (*supra* ¶ 214), on October 3, 2017, Pemex delivered the

Termination Letters to Perforadora, purporting to terminate the Oro Negro Contracts.

---

[18]    Axis refers to Axis Capital Management, a Mexican asset management and financial advisory services firm that manages the *afores'* 47% stake in Integradora.  Axis' principals are, among others, Jose A. Cañedo, the Chairman of the Board of Directors of Integradora and Gil, Integradora's CEO.

431.    On October 5, 2017, the Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group, purported to terminate the Bareboat Charters on the sole ground that Pemex had validly terminated the Oro Negro Contracts.

**B.    Interference with Perforadora's Relationship With the Singapore Rig Owners**

432.    The Defendants have interfered in Perforadora's relationship with the Singapore Rig Owners in three ways:

(a)    by causing the Singapore Rig Owners to initiate four criminal investigations against Integradora, Perforadora, and their directors, executives and employees, including Gil (*supra* ¶¶ 306–397). These investigations are based on fabricated evidence and false allegations and arguments and are potentially the result of bribes to Mexican government officials;

(b)    by causing the Singapore Rig Owners to fail to pay the Reimbursement Costs to Perforadora (*supra* ¶¶ 130–139); and

(c)    by making it impossible for Perforadora to pay past due Charter Hire to the Singapore Rig Owners as a result of the Seizure Order.

**III.    Acts to Sabotage Integradora's and Perforadora's Reorganization Efforts**

433.    The Defendants have sabotaged Integradora's and Perforadora's efforts to accomplish an orderly reorganization in the *concurso*. Their acts of sabotage include:

(a)    ██████ with Pemex to cause Pemex to terminate the Oro Negro Contracts after Perforadora filed for *concurso* (*supra* ¶¶ 214–241);

(b)    ████████████████████████████████████████
██████████ (*supra* ¶ 231);

(c) 

(*supra* ¶¶ 272–278);

(d) (*supra* ¶¶ 245, 257–271); and

(e) improperly causing the seizure of all of the funds in the Mexican Trust (*supra* ¶¶ 324–342).

## IV.   The Defendants Profited from Interfering with Oro Negro's Contracts and Business

434.   The Defendants wanted Oro Negro to default and be unable to repay the Bonds' principal in January 2019.   This would allow the Bondholders to foreclose on the Rigs and Seadrill and Fintech to remove from the market Seamex's largest competitor.

435.   Indeed, the Ad-Hoc Group's initial plan was to maintain Oro Negro with sufficient cash flow until the Bonds' maturity, guaranteeing the Bondholders steady and hefty interest payments by Oro Negro Drilling until January 2019.   That is why the Ad-Hoc Group caused Pemex to impose the 2017 Proposed Pemex Amendments.   Then, when Oro Negro filed for *concurso*, the Ad-Hoc Group immediately sought to seize the Rigs and replace Perforadora in the Oro Negro Contracts because this represented a windfall.

436.   Given that the Rigs are each worth at least approximately $150 million (for a total of approximately $750 million), the Ad-Hoc Group envisioned substantial profits simply by taking over them.   With the associated lease agreements the Ad-Hoc Group stood to make hundreds of millions of dollars in causing the cancellation of the Oro Negro Contracts and seizing the Rigs.   Seadrill and Fintech similarly stood to reap substantial profits by destroying Seamex's largest competitor, while absorbing the Rigs, the Oro Negro Contracts and, ultimately, the entire Oro Negro business.

## PART VII:  DAMAGES

437.    The acts of the Defendants since as early as April 2017 through today have caused substantial damage to both Perforadora and Integradora, effectively wiping out hundreds of millions of dollars in equity value of Integradora.

438.    Many of the Defendants sought to cause the termination of the Oro Negro Contracts in October 2017 and subsequently interfered ████████████████████████████ ████████████████████████████████████████████████████████████████

439.    In October 2017, immediately prior to Pemex's purported termination of the Oro Negro Contracts, Integradora owned the five Rigs, with an aggregate of approximately $750 million without considering their associated Oro Negro Contracts.  Perforadora also had rights to future payments from Pemex under the Oro Negro Contracts totaling approximately $815 million.

440.    Thus, as of October 2017, when Pemex purported to terminate the Oro Negro Contracts, Integradora had substantial equity value.

441.    Further, Oro Negro has not yet received the $83 million in the Mexican Trust as a result of Pemex's payment in September 2018 because those funds are improperly seized and currently under the control of the Mexican government and the Ad-Hoc Group.

442.    Perforadora has been further harmed by the failure of the Singapore Rig Owners to pay the Reimbursement Costs, which total $7,795,205.17.

443.    In addition, the misconduct of the Defendants has caused Integradora and Perforadora to incur tens of millions of dollars in legal fees and costs.

444.    The Defendants' misconduct, which includes violations of section 1520 and this Court's orders giving effect to the *Concurso* Court's October 5 and October 11 Orders, has been willful.

445.    In addition, the Ad-Hoc Group Defendants' and the Singapore Defendants' brazen abuse of the criminal proceedings in México destroyed Gil's reputation and businesses, including his business as a financial advisor and investment manager.

## CAUSES OF ACTION

### COUNT ONE
**(Tortious Interference and Conspiracy to Tortiously Interfere with the Oro Negro Contracts against the Ad-Hoc Group Defendants (Except GGB) and the Seamex Defendants)**

446.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

447.    The Oro Negro Contracts were valid contracts between Pemex and Perforadora.

448.    The Ad-Hoc Group Defendants and the Seamex Defendants knew that the Oro Negro Contracts existed, were valid and that they were between Pemex and Perforadora.

449.    The Ad-Hoc Group Defendants intentionally caused, or conspired to cause, Pemex to breach the Oro Negro Contracts by arranging or participating, or conspiring to arrange or participate, in meetings and telephone conferences with, or corresponding with, Pemex to cause Pemex to:

(a)    force Perforadora to yield to the 2017 Proposed Pemex Amendments, which was a breach of the Oro Negro Contracts because those Contracts had to return to their original terms in late 2017;

(b)    unlawfully terminate the Oro Negro Contracts, which was a breach of the Oro Negro Contracts because Pemex had no right to unilaterally terminate the Contracts as a result of Perforadora's purported refusal to yield to the 2017 Proposed Pemex Amendments; and

(c)    fail to perform under the Oro Negro Contracts ████████, which was a breach of the Oro Negro Contracts because the Oro Negro Contracts were valid and enforceable and Pemex had to pay daily rates to Perforadora under those Contracts.

450.    The Seamex Defendants agreed with the Ad-Hoc Group Defendants that the Seamex Defendants would manage the Rigs including through new leases awarded by Pemex to the Ad-Hoc Group and/or Seadrill or Seamex after Pemex unlawfully breached the Oro Negro Contracts by unlawfully terminating them and the Ad-Hoc Group prevailed in unlawfully taking over the Rigs.

451.    The Ad-Hoc Group Defendants and the Seamex Defendants knowingly damaged Integradora and Perforadora by interfering with the Oro Negro Contracts because this caused the destruction of Integradora's equity value and ultimately ensured Oro Negro's collapse, including the loss of all revenue and of the Rigs.

452.    The Ad-Hoc Group Defendants and the Seamex Defendants had no justification for interfering in the Oro Negro Contracts because they were not parties to the Oro Negro Contracts, did not have rights in those Contracts, had no control or rights over Perforadora's relationship with Pemex and had no right to disturb Perforadora's use and possession of the Rigs. The Ad-Hoc Group Defendants and the Seamex Defendants acted with the intention of destroying Oro Negro by ensuring its collapse and with the objective of taking over the Rigs and the Oro Negro Contracts.

453.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

## COUNT TWO
**(Aiding and Abetting Tortious Interference with the Oro Negro Contracts against the Seamex Defendants)**

454.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

455.    The Seamex Defendants aided and abetted the Ad-Hoc Group Defendants by agreeing with them that the Seamex Defendants would manage the Rigs including through new leases awarded by Pemex to the Ad-Hoc Group and/or Seadrill or Seamex after Pemex unlawfully breached the Oro Negro Contracts by unlawfully terminating them and the Ad-Hoc Group prevailed in unlawfully taking over the Rigs.

456.    The Seamex Defendants knowingly provided material assistance that damaged Integradora and Perforadora by interfering with the Oro Negro Contracts because this caused the destruction of Integradora's equity value and ultimately ensured Oro Negro's collapse, including the loss of all revenue and of the Rigs.

457.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

## COUNT THREE
**(Tortious Interference and Conspiracy to Tortiously Interfere with Perforadora's Business Relationship with Pemex against the Ad-Hoc Group Defendants (Except GGB) and the Seamex Defendants )**

458.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

459.    Perforadora and Pemex had a business relationship.

460.    The Ad-Hoc Group Defendants and the Seamex Defendants knew that Perforadora and Pemex had a business relationship.

461.    The Ad-Hoc Group Defendants intentionally interfered, or conspired to interfere, in Pemex's business relationship with Perforadora by arranging or participating, or conspiring to arrange or participate, in meetings and telephone conferences with, or corresponding with, Pemex to cause Pemex to:

(a)    force Perforadora to yield to the 2017 Proposed Pemex Amendments, which were terms that would have ensured Oro Negro's collapse, including the loss of the Rigs;

(b)    unlawfully terminate the Oro Negro Contracts, which left Oro Negro with no revenue; and

(c)    prevent Pemex from reactivating the Oro Negro Contracts ████████ ████, which destroyed Oro Negro's possibility to reorganize and resume its business.

462.    The Seamex Defendants agreed with the Ad-Hoc Group Defendants that the Seamex Defendants would manage the Rigs including through new leases awarded by Pemex to the Ad-Hoc Group and/or Seadrill or Seamex after Pemex unlawfully breached the Oro Negro Contracts by unlawfully terminating them and the Ad-Hoc Group prevailed in unlawfully taking over the Rigs.

463.    The Ad-Hoc Group Defendants and the Seamex Defendants knowingly damaged Integradora and Perforadora by interfering in Pemex's business relationship with Perforadora because this caused the destruction of Integradora's equity value and ultimately ensured Oro Negro's collapse, including the loss of all revenue and of the Rigs.

464.    The Ad-Hoc Group Defendants and the Seamex Defendants had no justification for interfering in Perforadora's business relationship with Pemex because they were not parties

to the Oro Negro Contracts, did not have rights in those Contracts, had no control or rights over Perforadora's business relationship with Pemex and had no right to disturb Perforadora's use and possession of the Rigs. The Ad-Hoc Group Defendants and the Seamex Defendants acted with the intention of destroying Oro Negro by ensuring its collapse and with the objective of taking over the Rigs and the Oro Negro Contracts.

465. As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

## COUNT FOUR
### (Aiding and Abetting Tortious Interference with Pemex's Business Relationship with Perforadora against the Seamex Defendants)

466. The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

467. The Seamex Defendants aided and abetted the Ad-Hoc Group Defendants by agreeing with them that the Seamex Defendants would manage the Rigs including through new leases awarded by Pemex to the Ad-Hoc Group and/or Seadrill or Seamex after Pemex unlawfully breached the Oro Negro Contracts by unlawfully terminating them and the Ad-Hoc Group prevailed in unlawfully taking over the Rigs.

468. The Seamex Defendants knowingly provided material assistance that damaged Integradora and Perforadora by interfering with the Oro Negro Contracts because this caused the destruction of Integradora's equity value and ultimately ensured Oro Negro's collapse, including the loss of all revenue and of the Rigs.

469. As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

**COUNT FIVE**
**(Alternative to Counts One to Four)**
**(Intentional Torts Under Mexican Law against the Ad-Hoc Group Defendants (Except GGB) and the Seamex Defendants)**

470.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

471.    The Foreign Representative hereby gives notice of his intention to rely on Mexican law.

472.    Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the México City Civil Code, a party is liable for any damages that it willfully causes to another party.

473.    The Ad-Hoc Group Defendants intentionally injured, or conspired to injure, Integradora and Perforadora by arranging or participating, or conspiring to arrange or participate, in meetings and telephone conferences with, or corresponding with, Pemex to cause Pemex to:

(a)    force Perforadora to yield to the 2017 Proposed Pemex Amendments, which contained terms that would have ensured Oro Negro's collapse, including the loss of the Rigs;

(b)    unlawfully terminate the Oro Negro Contracts; and

(c)    fail to perform under the Oro Negro Contracts in January 2018, which destroyed Oro Negro's possibility to reorganize and go back to business.

474.    The Seamex Defendants intentionally injured, or conspired to or provided material assistance to injure, Integradora and Perforadora by agreeing with the Ad-Hoc Group Defendants that the Seamex Defendants would manage the Rigs including through new leases awarded by Pemex to the Ad-Hoc Group and/or Seadrill or Seamex after Pemex unlawfully

breached the Oro Negro Contracts by unlawfully terminating them and the Ad-Hoc Group prevailed in unlawfully taking over the Rigs.

475.    The Ad-Hoc Group Defendants and the Seamex Defendants knowingly damaged Integradora and Perforadora by causing the destruction of Integradora's equity value and ultimately causing Oro Negro's collapse, including the loss of all revenue and of the Rigs.

476.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

**COUNT SIX**
**(Alternative to Count Five)**
**(Negligent Torts Under Mexican Law against the Ad-Hoc Group Defendants (Except GGB)**
**and the Seamex Defendants)**

477.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

478.    The Foreign Representative hereby gives notice of his intention to rely on Mexican law.

479.    Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the México City Civil Code, a party is liable for any damages that it negligently causes to another party.

480.    The Ad-Hoc Group Defendants negligently injured Integradora and Perforadora by arranging or participating in meetings and telephone conferences with, or corresponding with, Pemex to cause Pemex to:

(a)    force Perforadora to yield to the 2017 Proposed Pemex Amendments, which were terms that would have ensured Oro Negro's collapse, including the loss of the Rigs;

(b)    unlawfully terminate the Oro Negro Contracts; and

(c)    fail to perform under the Oro Negro Contracts in January 2018, which destroyed Oro Negro's possibility to reorganize and go back to business.

481.    The Seamex Defendants negligently injured Integradora and Perforadora by agreeing with the Ad-Hoc Group Defendants that the Seamex Defendants would manage the Rigs including through new leases awarded by Pemex to the Ad-Hoc Group and/or Seadrill or Seamex after Pemex unlawfully breached the Oro Negro Contracts by unlawfully terminating them and the Ad-Hoc Group prevailed in unlawfully taking over the Rigs.

482.    The Ad-Hoc Group and the Seamex Defendants acted negligently because they knew, should have known or could have foreseen that their conduct would cause the destruction of Integradora's equity value and ultimately cause Oro Negro's collapse, including the loss of all revenue and of the Rigs.

483.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

### COUNT SEVEN
**(Intentional Torts under Mexican Law in Connection with Integradora's and Perforadora's Reorganization Efforts against All Defendants)**

484.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

485.    The Foreign Representative hereby gives notice of his intention to rely on Mexican law.

486.    Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the México City Civil Code, a party is liable for any damages that it willfully causes to another party.

487.    All the Defendants intentionally damaged, or conspired to damage, Integradora and Perforadora by sabotaging their efforts to reorganize.  Their acts of sabotage include:

-108-

(a)    colluding with Pemex to cause Pemex to terminate the Oro Negro Contracts after Perforadora filed for *concurso*;

(b)    colluding with Pemex ███████████████████████████████████ ████████████

(c)     ████████████████████████████████████████████ ████████████████████████████

(d)    preventing Pemex from performing on the Oro Negro Contracts ██████████ ██

(e)    causing Deutsche México to fail to make almost any payments to Perforadora during the *concurso*, which has suffocated Perforadora and has left it with no cash to fund its operations; and

(f)    improperly causing the seizure of all of the funds in the Mexican Trust.

488.    All the Defendants knowingly damaged Integradora and Perforadora by depriving them of an opportunity to reorganize and go back to business, thereby causing their demise.

489.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

### COUNT EIGHT
### (Alternative to Count Seven)
### (Negligent Torts under Mexican Law in Connection with Integradora's and Perforadora's Reorganization Efforts against All Defendants)

490.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

491.    The Foreign Representative hereby gives notice of his intention to rely on Mexican law.

492.    Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the México City Civil Code, a party is liable for any damages that it negligently causes to another party.

493.    All the Defendants negligently damaged Integradora and Perforadora by sabotaging their efforts to reorganize.  Their acts of sabotage include:

(a)    colluding with Pemex to cause Pemex to terminate the Oro Negro Contracts after Perforadora filed for *concurso*;

(b)    colluding with Pemex ██████████████████████████████████████
███████████

(c)    ██████████████████████████████████████████████████████████
█████████████████████;

(d)    preventing Pemex from performing on the Oro Negro Contracts ████████████

(e)    causing Deutsche México to fail to make almost any payments to Perforadora during the *concurso*, which has suffocated Perforadora and has left it with no cash to fund its operations; and

(f)    improperly causing the seizure of all of the funds in the Mexican Trust.

494.    The Defendants acted negligently because they knew, should have known or could have foreseen that their conduct would deprive Integradora and Perforadora of an opportunity to reorganize and return to business, thereby causing their demise.

495.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

## COUNT NINE
**(By Gil Personally and as the Foreign Representative)**
**(Abuse of Process and Conspiracy to Commit Abuse of Process against the Ad-Hoc Group Defendants (Except Antonius) and the Singapore Defendants)**

496.    Gil, personally and as the Foreign Representative, incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

497.    The Ad-Hoc Group Defendants and the Singapore Defendants have caused, or conspired to cause, México to open four criminal investigations against Integradora, Perforadora and their directors, executives and employees, including Gil.

498.    The Ad-Hoc Group Defendants and the Singapore Defendants did so without any excuse or justification, based on fabricated evidence and false allegations and arguments, and potentially by paying bribes to Mexican government officials.

499.    The Ad-Hoc Group Defendants and the Singapore Defendants have used, or conspired to use, the Mexican criminal investigations not to prosecute crimes and pursue their rights as victims of criminal offenses but rather to cause the destruction of Integradora and its subsidiaries, including cutting their access to cash and depriving them of the Rigs through the Seizure Order and the Rigs Take-Over Order.  As such, they have used, or conspired to use, the Mexican criminal investigations in a perverted manner to obtain their own unlawful, collateral objective.

500.    As a result of the foregoing, Gil, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

## COUNT TEN
### (Alternative to Count Nine)
### (By Gil Personally and as the Foreign Representative)
### (Intentional Torts under Mexican Law in Connection with the Mexican Criminal Proceedings against the Ad-Hoc Group Defendants (Except Antonius) and the Singapore Defendants)

501.    Gil, personally and as the Foreign Representative, incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

502.    The Foreign Representative hereby gives notice of his intention to rely on Mexican law.

503.    Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the México City Civil Code, a party is liable for any damages that it willfully causes to another party.

504.    The Ad-Hoc Group Defendants and the Singapore Defendants have intentionally injured Integradora and Perforadora by causing, or conspiring to cause, México to open four criminal investigations against Integradora, Perforadora and their directors, executives and employees, including Gil.

505.    The Ad-Hoc Group Defendants and the Singapore Defendants did so without any excuse or justification, based on fabricated evidence and false allegations and arguments, and potentially by paying bribes to Mexican government officials.

506.    The Ad-Hoc Group Defendants and the Singapore Defendants have used, or conspired to use, the Mexican criminal investigations not to prosecute crimes and pursue their rights as victims of criminal offenses but rather to cause the destruction of Integradora and its subsidiaries, including cutting their access to cash and depriving them of the Rigs through the Seizure Order and the Rigs Take-Over Order.

507.    As a result of the foregoing, Gil, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

### COUNT ELEVEN
### (Alternative to Ten)
### (By Gil Personally and as the Foreign Representative)
### (Negligent Torts under Mexican Law in Connection with the Mexican Criminal Proceedings against the Ad-Hoc Group Defendants (Except Antonius) and the Singapore Defendants)

508.    Gil, personally and as the Foreign Representative, incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

509.    The Foreign Representative hereby gives notice of his intention to rely on Mexican law.

510.    Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the México City Civil Code, a party is liable for any damages that it negligently causes to another party.

511.    The Ad-Hoc Group Defendants and the Singapore Defendants have negligently injured Integradora and Perforadora by causing México to open four criminal investigations against Integradora, Perforadora and their directors, executives and employees, including Gil.

512.    The Ad-Hoc Group Defendants and the Singapore Defendants did so without any excuse or justification, based on fabricated evidence and false allegations and arguments, and potentially by paying bribes to Mexican government officials.

513.    The Ad-Hoc Group Defendants and the Singapore Defendants have used the Mexican criminal investigations not to prosecute crimes and pursue their rights as victims of criminal offenses but rather to cause the destruction of Integradora and its subsidiaries, including cutting their access to cash and depriving them of the Rigs through the Seizure Order and the Rigs Take-Over Order.  They acted negligently and/or recklessly because they knew, should

have known or could have foreseen that their conduct would cause the destruction of Integradora and its subsidiaries, including cutting their access to cash and depriving them of the Rigs through the Seizure Order and the Rigs Take-Over Order.

514.    As a result of the foregoing, Gil, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

## COUNT TWELVE
### (Violation of the Implied Covenant of Good Faith and Fair Dealing in the Bareboat Charters against the Singapore Rig Owners)

515.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

516.    The Bareboat Charters are valid and enforceable contracts between Perforadora and the Singapore Rig Owners.

517.    The Bareboat Charters contain an implied covenant of good faith and fair dealing requiring the Singapore Rig Owners to act in good faith.

518.    The Singapore Rig Owners breached the implied covenant of good faith and fair dealing by acting in bad faith.

519.    On October 5, 2017, the Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group, purported to terminate the Bareboat Charters on the sole ground that Pemex had validly terminated the Oro Negro Contracts.  Pemex's terminations of the Oro Negro Contracts are unlawful, invalid and unenforceable and were caused by the actions of the Ad-Hoc Group, its co-conspirators and agents.

520.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

## COUNT THIRTEEN
### (Tortious Interference and Conspiracy to Tortiously Interfere in the Bareboat Charters against the Ad-Hoc Group Defendants (Except GGB and Antonius), the Seamex Defendants and the Singapore Directors)

521.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

522.    The Bareboat Charters were valid contracts between Perforadora and the Singapore Rig Owners.

523.    The Ad-Hoc Group Defendants, the Seamex Defendants and the Singapore Directors knew that the Bareboat Charters existed, were valid and that they were between Perforadora and the Singapore Rig Owners.

524.    The Ad-Hoc Group Defendants, the Seamex Defendants and the Singapore Directors intentionally caused, or conspired to cause, the Singapore Rig Owners to breach the Bareboat Charters by causing the Singapore Rig Owners to unlawfully terminate the Bareboat Charters based solely on Pemex's unlawful termination of the Oro Negro Contracts, which the Ad-Hoc Group, its co-conspirators and agents had caused.

525.    The Ad-Hoc Group Defendants, the Seamex Defendants and the Singapore Directors knowingly damaged Integradora and Perforadora in causing the Singapore Rig Owners to unlawfully terminate the Bareboat Charters because this ensured the collapse of Integradora and its subsidiaries, including the loss of the Rigs.

526.    The Ad-Hoc Group Defendants, the Seamex Defendants and the Singapore Directors had no justification for interfering in the Bareboat Charters because they were not parties to the Bareboat Charters, did not have rights in those Charters, had no control or rights over Perforadora's relationship with the Singapore Rig Owners and had no right to disturb Perforadora's use and possession of the Rigs.  The Ad-Hoc Group Defendants, the Seamex

-115-

Defendants and the Singapore Directors acted with the intention of destroying Oro Negro by ensuring its collapse and with the objective of taking over the Rigs and the Oro Negro Contracts.

527.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

## COUNT FOURTEEN
**(Tortious Interference and Conspiracy to Tortiously Interfere in Perforadora's Business Relationship with the Singapore Rig Owners against the Ad-Hoc Group Defendants (Except Antonius) and the Singapore Directors)**

528.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

529.    The Singapore Rig Owners and Perforadora had a business relationship.

530.    The Ad-Hoc Group Defendants and the Singapore Directors knew that the Singapore Rig Owners and Perforadora had a business relationship.

531.    The Ad-Hoc Group Defendants and the Singapore Directors intentionally interfered, or conspired to interfere, in Perforadora's business relationship with the Singapore Rig Owners in three ways:

> (a)    by causing the Singapore Rig Owners to initiate four criminal investigations against Integradora, Perforadora, and their directors, executives and employees, including Gil.  The Singapore Rig Owners did so without any excuse or justification, based on fabricated evidence and false allegations and arguments, and potentially, by paying bribes to Mexican government officials.  The Singapore Rig Owners have used the Mexican criminal investigations not to prosecute crimes and pursue their rights as victims of criminal offenses but rather to cause the destruction of Integradora and its subsidiaries, including cutting their access to cash and

depriving them of the Rigs through the Seizure Order and the Rigs Take-Over Order;

(b)    by causing the Singapore Rig Owners to fail to pay the Reimbursement Costs to Perforadora; and

(c)    by making it impossible for Perforadora to pay past due Charter Hire to the Singapore Rig Owners as a result of the Seizure Order.

532.    The Ad-Hoc Group Defendants and the Singapore Directors knowingly damaged Integradora and Perforadora in interfering in Perforadora's business relationship with the Singapore Rig Owners because this ensured the collapse of Integradora and its subsidiaries, including the loss of the Rigs.

533.    The Ad-Hoc Group Defendants and the Singapore Directors had no justification for interfering in Perforadora's business relationship with the Singapore Rig Owners because they were not parties to the Bareboat Charters, did not have rights in those Charters, had no control or rights over Perforadora's relationship with the Singapore Rig Owners and had no right to disturb Perforadora's use and possession of the Rigs.  The Ad-Hoc Group Defendants and the Singapore Directors acted with the intention of destroying Oro Negro by ensuring its collapse and with the objective of taking over the Rigs and the Oro Negro Contracts.

534.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

### COUNT FIFTEEN
**(Alternative to Counts Sixteen and Seventeen)**
**(Intentional Torts under Mexican Law in Connection with the Bareboat Charters and the Singapore Rig Owners against the Ad-Hoc Group Defendants (Except Antonius), the Seamex Defendants and the Singapore Directors)**

535.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

536.    The Foreign Representative hereby gives notice of his intention to rely on Mexican law.

537.    Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the México City Civil Code, a party is liable for any damages that it willfully causes to another party.

538.    The Ad-Hoc Group Defendants, the Seamex Defendants and the Singapore Directors intentionally injured Integradora and Perforadora by interfering, or conspiring to interfere, in the Bareboat Charters by causing the Singapore Rig Owners to unlawfully terminate the Bareboat Charters based solely on Pemex's unlawful termination of the Oro Negro Contracts, which the Ad-Hoc Group, its co-conspirators and agents had caused.  Additionally, the Ad-Hoc Group Defendants and the Singapore Directors intentionally injured Integradora and Perforadora by interfering, or conspiring to interfere, in Perforadora's business relationship with the Singapore Rig Owners in three ways:

> (a)    by causing the Singapore Rig Owners to initiate four criminal investigations against Integradora, Perforadora, and their directors, executives and employees, including Gil.  The Singapore Rig Owners did so without any excuse or justification, based on fabricated evidence and false allegations and arguments, and potentially, by paying bribes to Mexican government officials.  The Singapore Rig Owners have used the Mexican criminal investigations not to prosecute crimes and pursue their rights as victims of criminal offenses but rather to cause the destruction of Integradora and its subsidiaries, including cutting their access to cash and

depriving them of the Rigs through the Seizure Order and the Rigs Take-Over Order;

(b)     by causing the Singapore Rig Owners to fail to pay the Reimbursement Costs to Perforadora; and

(c)     by making it impossible for Perforadora to pay past due Charter Hire to the Singapore Rig Owners as a result of the Seizure Order.

539.     The Ad-Hoc Group Defendants, the Seamex Defendants and the Singapore Directors knowingly damaged Integradora and Perforadora by causing the termination of the Bareboat Charters and by interfering in Perforadora's business relationship with the Singapore Rig Owners because this ensured the collapse of Integradora and its subsidiaries, including the loss of the Rigs.

540.     As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

## COUNT SIXTEEN
### (Alternative to Count Fifteen)
### (Negligent Torts under Mexican Law in Connection with the Bareboat Charters and the Singapore Rig Owners against the Ad-Hoc Group Defendants (Except Antonius), the Seamex Defendants and the Singapore Directors)

541.     The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

542.     The Foreign Representative hereby gives notice of his intention to rely on Mexican law.

543.     Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the México City Civil Code, a party is liable for any damages that it negligently causes to another party.

544.    The Ad-Hoc Group Defendants, the Seamex Defendants and the Singapore
Directors negligently injured Integradora and Perforadora in interfering in the Bareboat Charters
by causing the Singapore Rig Owners to unlawfully terminate the Bareboat Charters based solely
on Pemex's unlawful termination of the Oro Negro Contracts, which the Ad-Hoc Group, its co-
conspirators and agents had caused.    Additionally, the Ad-Hoc Group Defendants and the
Singapore Directors negligently injured Integradora and Perforadora by interfering in
Perforadora's business relationship with the Singapore Rig Owners in three ways:

(a)    by causing the Singapore Rig Owners to initiate four criminal
investigations against Integradora, Perforadora, and their directors,
executives and employees, including Gil.  The Singapore Rig Owners did
so without any excuse or justification, based on fabricated evidence and
false allegations and arguments, and potentially, by paying bribes to
Mexican government officials.  The Singapore Rig Owners have used the
Mexican criminal investigations not to prosecute crimes and pursue their
rights as victims of criminal offenses but rather to cause the destruction of
Integradora and its subsidiaries, including cutting their access to cash and
depriving them of the Rigs through the Seizure Order and the Rigs Take-
Over Order;

(b)    by causing the Singapore Rig Owners to fail to pay the Reimbursement
Costs to Perforadora; and

(c)    by making it impossible for Perforadora to pay past due Charter Hire to
the Singapore Rig Owners as a result of the Seizure Order.

545.    The Ad-Hoc Group Defendants, the Seamex Defendants and the Singapore

Directors acted negligently because they knew, should have known or could have foreseen that

causing the termination of the Bareboat Charters and interfering in Perforadora's business

relationship with the Singapore Rig Owners would result in the collapse of Integradora and its

subsidiaries, including the loss of the Rigs.

546.    As a result of the foregoing, Integradora and Perforadora seek damages, including

punitive damages, in an amount to be proven at trial.

**COUNT SEVENTEEN**
**(Breach of the Bareboat Charters for Failure to Pay the Reimbursement Costs against the
Singapore Rig Owners)**

547.    The Foreign Representative incorporates by reference and re-alleges each and

every allegation set forth above as though fully set forth herein.

548.    The Bareboat Charters are valid and enforceable contracts between Perforadora

and the Singapore Rig Owners.

549.    The Singapore Rig Owners have breached the Bareboat Charters because they

owe but have failed to pay the Reimbursement Costs to Perforadora.

550.    As a result of the foregoing, Integradora and Perforadora seek damages, including

punitive damages, in an amount to be proven at trial.

**COUNT EIGHTEEN**
**(Declaratory Judgment and Damages against the Ad-Hoc Group Defendants and the
Singapore Defendants for Violations of 11 U.S.C. § 1520(a)(1) and the Comity Order)**

551.    The Foreign Representative incorporates by reference and re-alleges each and

every allegation set forth above as though fully set forth herein.

552.    The Foreign Representative seeks a declaration that Defendants have violated

section 1520(a)(1) and this Court's Comity Order.

553.    The Defendants' actions violate section 1520(a)(1) and this Court's Comity Order because section 1520(a)(1) and the Comity Order automatically stayed all actions against property of Perforadora located in the United States.

554.    At all relevant times, the Defendants have sought to and ultimately successfully deprived Perforadora of its right to "full possession" of the Rigs under the Bareboat Charters.

555.    Under section 1520(a)(1), upon recognition of a foreign main proceeding "sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States."  11 U.S.C. § 1520.  Under section 362, upon recognition "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" is automatically stayed.  11 U.S.C. § 362.

556.    Perforadora's right under the Bareboat Charters to "full possession" of the Rigs constitutes property located within the territorial jurisdiction of the United States.

557.    When the Comity Order granted section 1520's protections to Perforadora, any action to obtain possession of Perforadora's rights in the United States, including its right to "full possession" of the Rigs, was automatically stayed.  Therefore, the Defendants' seizure of the Rigs violated section 1520(a)(1) and Recognition Order.

558.    The Defendants also violated the Comity Order.  The October 5 and 11 Orders prohibit any foreclosure actions on the Rigs and maintain the Bareboat Charters in force.  This Court expressly recognized and awarded full force and effect to the October 5 and 11 Orders through its Comity Order.

559.    The Defendants violated the October 5 and 11 Orders by (a) foreclosing on the Rigs; and (b) depriving Perforadora of its right to "full possession" of the Rigs.

-122-

560.    Therefore, an actual and justiciable controversy exists between Plaintiff and the Defendants.  This controversy is ripe for determination because Defendants seized the Rigs.

561.    Based on the foregoing, the Foreign Representative requests that the Court determine that the Defendants violated the Comity Order.

562.    Further, under Bankruptcy Code section 362(k), a party "injured by any willful violation of a stay [ ] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362.

563.    Here, section 1521(a)(1) and the Comity Order stayed all actions against rights and assets of Perforadora in the United States, which include Perforadora's possession right of the Rigs under the Bareboat Charters.

564.    The Defendants have willfully violated section 1521(a) and the Comity Order by taking possession of the Rigs.

565.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

**COUNT NINETEEN**
**(Prima Facie Tort against All Defendants)**

566.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

567.    The Defendants conspired to and intentionally injured Integradora and Perforadora by:

(a)    ██████████████████████████████████████ ██████████████████████  to cause Pemex to (i) force Perforadora to yield to the 2017 Proposed Pemex Amendments, which were terms that would have ensured Oro Negro's collapse, including the loss of the Rigs;

-123-

(ii) unlawfully terminate the Oro Negro Contracts; and (iii) fail to perform

under the Oro Negro Contracts ███████████;

(b)    colluding with Pemex to cause Pemex to terminate the Oro Negro

Contracts after Perforadora filed for *concurso*;

(c)    colluding with Pemex ██████████████████████████████████

████████;

(d)    ██████████████████████████████████████████████████████

████████████████████████████;

(e)    preventing Pemex from performing on the Oro Negro Contracts in ███████

███;

(f)    ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

(g)    causing México to open four criminal investigations against Integradora,

Perforadora, and their directors, executives and employees, including Gil,

based on fabricated evidence and false allegations and arguments, and

potentially, by paying bribes to Mexican government officials; and

(h)    improperly causing the seizure of all of the funds in the Mexican Trust.

568.    The Defendants had no justification for injuring Oro Negro.  They acted with the

intention of destroying Oro Negro, with the objective of taking over the Rigs and the Oro Negro

Contracts as well as with the intention of sabotaging Oro Negro's efforts to reorganize.

569.    As a result of the foregoing, Integradora and Perforadora seek damages, including

punitive damages, in an amount to be proven at trial.

## COUNT TWENTY
### (Negligence against the Ad-Hoc Group and the Singapore Rig Owners)

570.    The Foreign Representative incorporates by reference and re-alleges each and
every allegation set forth above as though fully set forth herein.

571.    The Ad-Hoc Group Defendants and the Singapore Rig Owners owe a duty of
reasonable care to Integradora and Perforadora in the collection of the Bonds and the Charter
Hire.

572.    The Ad-Hoc Group Defendants and the Singapore Rig Owners breached their
duty of reasonable care by:

    (a)    ██████████████████████████████████████████████ ██████████████████ resulting in Pemex (i) forcing Perforadora to yield to the 2017 Proposed Pemex Amendments; (ii) unlawfully terminating the Oro Negro Contracts; and (iii) ████████████████ ██████████████████;

    (b)    failing to take any actions at any time to prevent Pemex from (i) forcing Perforadora to yield to the 2017 Proposed Pemex Amendments; (ii) unlawfully terminating the Oro Negro Contracts; and (iii) ████████ ████████████████████████████████ or otherwise perform under the Contracts;

    (c)    ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████;

    (d)    causing México to open four criminal investigations against Integradora, Perforadora, and their directors, executives and employees, including Gil,

-125-

based on fabricated evidence and false allegations and arguments, and potentially, by paying bribes to Mexican government officials;

(e)    failing to take any actions at any time to prevent Judge Cedillo from issuing the Seizure Order and the Rigs Take-Over Order based on fabricated evidence, including failing to take any steps to determine whether the evidence that served as the basis of those Orders was false; and

(f)    improperly causing the seizure of all of the funds in the Mexican Trust.

573.    The Ad-Hoc Group Defendants and the Singapore Rig Owners knew or should have known and/or was reasonably foreseeable that their actions would result in the destruction of Oro Negro, including the loss of the Oro Negro Contracts and of the possession of the Rigs, and would prevent Oro Negro from successfully reorganizing.  The Ad-Hoc Group Defendants and the Singapore Rig Owners prevailed, including by ultimately taking over the Rigs.

574.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

**COUNT TWENTY-ONE**
**(Unjust Enrichment and Conspiracy to Commit Unjust Enrichment against the Ad-Hoc Group and the Singapore Rig Owners)**

575.    The Foreign Representative incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

576.    The Ad-Hoc Group and the Singapore Rig Owners ultimately took over the Rigs, depriving Integradora of its ownership of the Rigs and Perforadora of its possession of the Rigs. This destroyed Oro Negro by depriving it of its only assets.

577.    It is against equity and good conscience to permit the Ad-Hoc Group and the Singapore Rig Owners to retain the Rigs because they caused Oro Negro to lose all sources of

revenue and run out of cash, making it impossible for Oro Negro to maintain the Rigs.  The Ad-Hoc Group's and the Singapore Rig Owners' misconduct includes:

(a)  to cause Pemex to (i) unlawfully terminate the Oro Negro Contracts; and (ii) fail to perform under the Oro Negro Contracts ██████████;

(b) colluding with Pemex to cause Pemex to terminate the Oro Negro Contracts after Perforadora filed for *concurso*;

(c) ████████████████████████████

(d) 

(e) preventing Pemex from performing on the Oro Negro Contracts ████████;

(f) ████████████████████████████████;

(g) causing México to open four criminal investigations against Integradora, Perforadora, and their directors, executives and employees, including Gil, based on fabricated evidence and false allegations and arguments, and potentially, by paying bribes to Mexican government officials; and

(h) improperly causing the seizure of all of the funds in the Mexican Trust.

578.    The Ad-Hoc Group and the Singapore Rig Owners had no justification in injuring Oro Negro.  They acted with the intention of destroying Oro Negro, with the objective of taking over the Rigs and the Oro Negro Contracts as well as with the intention of sabotaging Oro Negro's efforts to reorganize.

579.    As a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages, in an amount to be proven at trial.

**WHEREFORE**, for the reasons set forth above, Gil, in his personal capacity and as Foreign Representative, respectfully requests judgment be entered in his favor as follows:

(a)    Awarding damages to Gil, Integradora and Perforadora, including punitive damages, in an amount to be determined at trial;

(b)    Awarding Gil's, Integradora's and Perforadora's fees and expenses in bringing this action;

(c)    Awarding pre-judgment interest at the maximum legal rate applicable to a judgment issued by the Court entering such judgment; and

(d)    Granting any such additional as the Court deems just and proper.

Gil, in his personal capacity and in his capacity as Foreign Representative reserves the right to seek all remedies available at law and equity.

Dated:  June 6, 2019
New York, New York

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

/s/      Juan P. Morillo

Juan P. Morillo (*pro hac vice*)
Derek L. Shaffer
Gabriel F. Soledad
Daniel Pulecio-Boek
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Facsimile:  (202) 538-8100
Email:  juanmorillo@quinnemanuel.com
Email:  derekshaffer@quinnemanuel.com
Email:  gabrielsoledad@quinnemanuel.com
Email:  danielpulecioboek@quinnemanuel.com

Scott C. Shelley
Samantha Gillespie (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile: (212) 849-7100
Email:  scottshelley@quinnemanuel.com
Email:  samanthagillespie@quinnemanuel.com

Eric D. Winston (*pro hac vice*)
William C. Price (*pro hac vice forthcoming*)
865 S. Figueroa St., 10th Floor
Los Angeles, California  90017
Telephone:  (213) 443-3000
Facsimile:  (212) 443-3100
Email:  ericwinston@quinnemanuel.com
Email:  williamprice@quinnemanuel.com

Sara C. Clark (*pro hac vice*)
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile:  (713) 221-7100
Email:  saraclark@quinnemanuel.com

*Attorneys for Gonzalo Gil-White, in his personal
capacity and as Foreign Representative*

-129-