**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PERFORADORA ORO NEGRO, S. DE R.L. DE C.V., *et al*. | Case No. 18-11094 (SCC) (Jointly Administered) |
| Debtors in a Foreign Proceeding. | |
| ORO NEGRO PRIMUS PTE., LTD.; ORO NEGRO LAURUS PTE., LTD.; ORO NEGRO FORTIUS PTE., LTD.; ORO NEGRO DECUS PTE., LTD.; ORO NEGRO IMPETUS PTE., LTD., AND ORO NEGRO DRILLING PTE. LTD., | Adv. Pro. No. _____ |
| Plaintiffs, | |
| -against- | |
| ALTERNA CAPITAL PARTNERS, LLC; AMA CAPITAL PARTNERS, LLC; ASIA RESEARCH AND CAPITAL MANAGEMENT LTD.; GHL INVESTMENTS (EUROPE) LTD.; MARITIME FINANCE COMPANY LTD; ROGER ALAN BARTLETT; ROGER ARNOLD HANCOCK; and SHIP FINANCE INTERNATIONAL LTD., | |
| Defendants. | |

## COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

PARTIES ...............................................................................................................................9

I.      Plaintiffs ..................................................................................................................9

II.     Defendants ...............................................................................................................9

JURISDICTION AND VENUE ...........................................................................................15

FACTS ..................................................................................................................................16

III.    Background .............................................................................................................16

IV.     Defendants Violated Injunctions Issued by México and This Court .....................19

        A.      Defendants' Actions Were Prohibited by Injunctions That the *Concurso*
                Court Issued ...............................................................................................19

        B.      Defendants' Actions Violated This Court's Comity Order and Temporary
                Restraining Order .......................................................................................22

V.      Defendants Violated Mexican Law and Public Policy ..........................................23

        A.      The First Motion .........................................................................................24

        B.      The Second Motion .....................................................................................27

VI.     Defendants' Actions Via Their Illegal Control of Plaintiffs Are Void .................30

        A.      New York Lawsuit to Return Rigs ..............................................................30

        B.      Criminal Cases ...........................................................................................31

                1.      Mismanagement of Funds Complaint .............................................32

                2.      Procedural Fraud Complaint ...........................................................33

                3.      Sham Invoices Complaint ...............................................................34

                4.      Contempt Complaint .......................................................................34

                5.      May 3 Complaint .............................................................................35

                6.      Abuse of Trust Complaint ...............................................................38

        C.      Arrest Warrants ..........................................................................................39

        D.      Red Notices and INTERPOL Decision .......................................................39

        E.      Seizure Order ..............................................................................................40

        F.      Rigs Takeover Order ...................................................................................41

VII.    The Chapter 15 Discovery ......................................................................................42

VIII.   The February 22 Decision Vindicates Claims in the Existing Adversary
        Proceedings .............................................................................................................42

    A.     Tortious Interference Actions ...................................................................43

    B.     The Releases Action ..................................................................................46

IX.    Defendants Have Avoided U.S. Litigation For Over a Year ...............................................47

X.    Damages............................................................................................................................52

CAUSES OF ACTION ...................................................................................................................52

    COUNT ONE (Conversion against Ad-Hoc Group and Singapore Rig Directors) ..........52

    COUNT TWO (Aiding and Abetting Conversion against AMA) .....................................53

    COUNT THREE (Unjust Enrichment against Ad-Hoc Group and Singapore Rig
        Directors) ....................................................................................................54

    COUNT FOUR (Aiding and Abetting Unjust Enrichment against AMA).......................55

    COUNT FIVE (Tortious Interference with Bareboat Charters against Ad-Hoc
        Group and AMA)........................................................................................56

    COUNT SIX (Tortious Interference with Business Relations against Ad-Hoc
        Group and AMA)........................................................................................57

    COUNT SEVEN (Breach of Fiduciary Duty against Singapore Rig Directors)..............58

    COUNT EIGHT (Aiding and Abetting Breach of Fiduciary Duty against Ad-Hoc
        Group and AMA)........................................................................................59

    COUNT NINE (Civil Conspiracy against all Defendants)................................................60

    COUNT TEN (Alternative to Counts One, Two, Five, and Six)......................................61

    (Breach of Article 1910 of the Mexican Civil Code against all Defendants)...................61

    COUNT ELEVEN ............................................................................................................63

    (Alternative to Count Three) (Breach of Article 1882 of the Mexican Federal
        Civil Code against Ad-Hoc Group and Singapore Rig Directors).........................63

    COUNT TWELVE ...........................................................................................................64

    (Alternative to Count Seven) (Breach of Fiduciary Duty under Mexican
        Insolvency Law and Mexican Federal Civil Code against Singapore Rig
        Directors) ....................................................................................................64

Oro Negro Primus Pte., Ltd. ("ON Primus"), Oro Negro Laurus Pte., Ltd. ("ON Laurus"), Oro Negro Fortius Pte., Ltd. ("ON Fortius"), Oro Negro Decus Pte., Ltd. ("ON Decus"), Oro Negro Impetus Pte., Ltd. ("ON Impetus," and together with ON Primus, ON Laurus, ON Fortius, and ON Decus, the "Singapore Rig Owners"), and Oro Negro Drilling Pte. Ltd. ("Oro Negro Drilling," and together with the Singapore Rig Owners, "Plaintiffs") file this complaint (the "Complaint") against Alterna Capital Partners, LLC ("Alterna"), Asia Research and Capital Management Ltd. ("ARCM"), GHL Investments (Europe) Ltd. ("GHL"), Maritime Finance Company Ltd. ("MFC"), Ship Finance International Ltd. ("SFIL," and together with Alterna, ARCM, GHL, and MFC, the "Ad-Hoc Group"), AMA Capital Partners, LLC ("AMA"), Roger Alan Bartlett ("Bartlett"), and Roger Arnold Hancock ("Hancock," together with Bartlett, the "Singapore Rig Directors," and together with the Ad-Hoc Group and AMA, the "Defendants"), and, on information and belief, allege as follows:

## INTRODUCTION

1.        This is an action to recover damages from Defendants' unlawful seizure and sale of the Plaintiffs' only assets, five state-of-the-art jack-up rigs used for offshore drilling in the Gulf of México (the "Rigs").

2.        Plaintiffs are wholly-owned subsidiaries of Integradora de Servicios Petroleros Oro Negro, S.A.P.I. de C.V. ("Integradora," and together with its subsidiaries, "Oro Negro").  Oro Negro is a Mexican oil services company, which operated the Rigs and leased them to Petróleos Mexicanos ("Pemex"), the Mexican government-owned oil and gas monopoly.

3.        Plaintiffs Singapore Rig Owners are Singaporean entities each of which owns one of the five Rigs.  Plaintiff Oro Negro Drilling is a Singaporean entity that is the parent company of Plaintiffs Singapore Rig Owners.

4.     The Singapore Rig Owners leased the Rigs to another wholly-owned subsidiary of Integradora, Perforadora Oro Negro, S.A.P.I. de C.V. ("Perforadora"), which is responsible for operating the Rigs.  The Singapore Rig Owners leased the Rigs to Perforadora through agreements entered into between each Singapore Rig Owner and Perforadora (the "Bareboat Charters").  A bareboat charter is an instrument commonly used in the maritime industry to lease a vessel without a crew or equipment.

5.     Perforadora, in turn, entered into agreements (the "Oro Negro Contracts") pursuant to which—prior to Defendants' unlawful actions—it leased the Rigs to Pemex.

6.     In 2014, to fund the purchase of the Rigs, Oro Negro issued bonds with an aggregate face value of $900 million (the "Bonds").  The Bonds are governed by a bond agreement (the "Bond Agreement") entered into between Plaintiff Oro Negro Drilling and Nordic Trustee ASA ("Nordic Trustee") on behalf of all of the investors that own the Bonds (the "Bondholders"). Nordic Trustee, a Norwegian financial services firm, is the trustee under the Bond Agreement and is responsible for acting on behalf of the Bondholders to collect on the Bonds.

7.     The Bonds are primarily secured by mortgages on the Rigs.

8.     Defendant Ad-Hoc Group is a group of investors that owns the majority of the Bonds.

9.     Defendant AMA is the financial advisor of the Bondholders.

10.    Starting in at least 2017, the Ad-Hoc Group and AMA colluded with Pemex to destroy Oro Negro, so that the Ad-Hoc Group could take possession of the Rigs, which are much more valuable than the Bonds.

11.    Indeed, the Ad-Hoc Group's motive has been to extract as much cash as it could from Oro Negro via interest payments on the Bonds, and then to seize the Rigs.  On information

and belief, none of the members of the Ad-Hoc Group purchased the majority of the Bonds at 100% of their face value, but rather at prices ranging from 45% to 65% of their face value—that is, they paid from between $243 million to $351 million for the Bonds. The five Rigs, however, are collectively worth approximately $750 million, so the Ad-Hoc Group stood to substantially profit by seizing the Rigs themselves rather than receiving the return on the Bonds.

12.    In early 2017, Pemex imposed drastic amendments on the Oro Negro Contracts that, if accepted by Oro Negro, would have financially strangled it. However, the Ad-Hoc Group, together with AMA, colluded with Pemex to pressure Oro Negro to accept the amendments. At the same time, it refused to renegotiate the Bond Agreement with Oro Negro that would have alleviated some of Oro Negro's financial distress.

13.    By September 2017, the joint actions of the Ad-Hoc Group, AMA, and Pemex forced Integradora and Perforadora (together, the "Debtors") to file for bankruptcy protection in México, known as a *concurso mercantil* proceeding (the "*Concurso* Proceeding"). In addition, in April 2018, the Debtors filed Chapter 15 petitions in the underlying main action in this Court (the "Chapter 15 Proceeding").

14.    Shortly after Perforadora filed its *concurso* petition, the Ad-Hoc Group purported to use Section 15.1(g)(i), a provision in the Bond Agreement, to declare an event of default on the Bonds solely because Perforadora filed for an insolvency proceeding. Section 15.1(g)(i) states that the "Bond Trustee may declare the Bonds to be in default upon the occurrence of [insolvency proceedings] … solely to the extent such events occur after the date hereof."

15.    However, as described in ¶¶ 21-22 below, declaring an event of default solely due to an insolvency event is prohibited by Mexican law and public policy.

16.    Upon the declaration of the event of default, the Ad-Hoc Group, with AMA's help, replaced the directors of Plaintiffs Oro Negro Drilling and the Singapore Rig Owners with Defendants Singapore Rig Directors pursuant to provisions in the Bond Agreement permitting it to do so upon an event of default.  Because the declaration of an event of default was unlawful, the Ad-Hoc Group's replacement of the directors of Oro Negro Drilling and Singapore Rig Owners was unauthorized.

17.    With Plaintiffs under the unauthorized control of the Singapore Rig Directors, Defendants Ad-Hoc Group and Singapore Rig Directors proceeded to unlawfully terminate, on behalf of the Singapore Rig Owners, the Bareboat Charters between Perforadora and the Singapore Rig Owners.  Then, having terminated the Bareboat Charters, they demanded that Perforadora return the leased Rigs back to the Singapore Rig Owners that were now under Defendants' unlawful control.

18.    Defendants Ad-Hoc Group and Singapore Rig Directors, with Defendant AMA's assistance, continued to exert unlawful control over Plaintiffs, including misappropriating the funds in Plaintiffs' Singapore Rig Owners' bank accounts, and instituting numerous baseless criminal actions against Oro Negro and its shareholders and employees.

19.    Defendants Ad-Hoc Group and Singapore Rig Directors continued to exert unlawful control over Plaintiffs even after the Debtors obtained injunctions from the Mexican bankruptcy court (the "*Concurso* Court") that prohibited the Nordic Trustee, acting on behalf of the Ad-Hoc Group, from terminating the Bareboat Charters and attempting to physically seize the Rigs.

20.    Defendants Ad-Hoc Group and Singapore Rig Directors continued to exert unlawful control over Plaintiffs even after the Debtors obtained an order from this Court

4

recognizing and granting full force and effect to the injunctions that the *Concurso* Court issued (the "Comity Order").

21.     In addition to violating the *Concurso* Court's injunctions and this Court's Comity Order, Defendants' declaration of an event of default solely on account of the Debtors' *Concurso* Proceeding is contrary to Mexican law and public policy.  Specifically, Article 87 of the *Ley de Concursos Mercantiles* ("LCM"), the Mexican statute that governs insolvency proceedings, prevents creditors from taking an action that would worsen the condition of the debtor, including preventing the debtor's ability to successfully reorganize.

22.     Indeed, in February 2021, the *Concurso* Court ruled that the Ad-Hoc Group's declaration of an event of default under the Bond Agreement was a violation of Article 87 of the LCM, and as such, all resulting actions taken by Defendants in furtherance of the declaration of the event of default are void (the "February 22 Decision").  Specifically, the February 22 Decision held that the following actions taken by Defendants are void: (a) the notification of breach of the Bond Agreement; (b) the change in directors of Plaintiffs Singapore Rig Owners; (c) the change in directors of Plaintiff Oro Negro Drilling; (d) the revocation of powers of attorneys of the previous directors and former lawyers of the Singapore Rig Owners and the granting of powers of attorney to Defendants Singapore Rig Directors and the Ad-Hoc Group's lawyers; (e) the letters of resignation of the previous directors of the Singapore Rig Owners from their positions as directors; and (f) any actions carried out as a consequence of the above.

23.     The February 22 Decision is the result of more than three years of the Debtors' litigation before the Mexican courts of the issue of whether the *Concurso* Court has jurisdiction to apply Article 87 of the LCM to the Bond Agreement, which is governed by Norwegian law.  It

follows two rulings by the Mexican appellate court holding that the *Concurso* Court does have jurisdiction to apply Article 87 of the LCM.

24.     The Ad-Hoc Group and Singapore Rig Directors have, with the coordination and strategic efforts of Defendant AMA, instituted numerous legal proceedings using their unlawful control of Plaintiffs, including filing an action in this Court on behalf of Plaintiffs Singapore Rig Owners against Perforadora demanding that Perforadora turn over the Rigs to the Ad-Hoc Group, as well as initiating numerous baseless criminal complaints in México on behalf of Plaintiffs Singapore Rig Owners against Oro Negro and its shareholders and employees, which have resulted in the seizure of Oro Negro's funds, attempts to physically take over the Rigs, and the issuance of Mexican and international arrest warrants ("Red Notices") against Oro Negro's shareholders and employees.

25.     The Red Notices were sought and obtained by México in September 2019 from the International Criminal Police Organization ("INTERPOL"), an international organization that assists countries in locating fugitives around the world.  The Oro Negro shareholders and employees against whom the Red Notices were issued filed a petition with INTERPOL requesting cancellation of the Red Notices, and in support, cited the illegal actions undertaken by Defendants, including the baseless criminal complaints that Defendants filed against the Oro Negro shareholders and employees, Defendants' freezing of Oro Negro's funds, and Defendants' attempts to seize the Rigs by force.  In response, in an extraordinary and unprecedented decision, INTERPOL withdrew the Red Notices.

26.     Eventually, these unlawful actions led to the Ad-Hoc Group's confiscation of the Rigs.  Defendants Singapore Rig Directors and Ad-Hoc Group transported the Rigs out of Mexican

waters, and sold them to themselves through a sham auction in the Bahamas for substantially less than they are worth.

27.     The unlawful actions that Defendants took in violation of the *Concurso* Court's injunctions and this Court's Comity Order, and in violation of Mexican law and public policy, have been described in detail in three adversary proceedings filed in connection with this Chapter 15 Proceeding (the "Adversary Proceedings"). *See* Complaint, *Gil-White v. Ercil*, No. 19-01294, Bankr. S.D.N.Y. (June 6, 2019), ECF No. 1; Complaint, *Gil-White v. Contrarian Capital Management, LLC*, No. 19-01301, Bankr. S.D.N.Y. (June 24, 2019), ECF No. 1, at 84-85; Complaint, *Perez-Correa v. Asia Research and Capital Management Ltd.*, No. 19-01360, Bankr. S.D.N.Y. (Sept. 26, 2019). The Adversary Proceedings were filed by the foreign representative of the Debtors' estate in the Chapter 15 Proceeding (the "Foreign Representative") as well as by certain of Oro Negro's shareholders and employees against, among others, the Defendants herein.

28.     The Adversary Proceedings have been subject to a stay for more than one year while Defendants have made offers to purchase the Debtors' assets, including the Debtors' claims in the Adversary Proceedings, for much less than their worth.

29.     First, in October 2019, Nordic Trustee and its affiliate NT Refectio XX AS ("NT Refectio") submitted an offer to the *Concurso* Court to purchase the Debtors' assets, including the claims that the Foreign Representative asserted on behalf of Debtors in the Adversary Proceedings, for $15 million.

30.     The *Concurso* Court rejected the offer on the grounds that none of the unsecured creditors would receive payment.

31.     Nevertheless, in February 2020, Nordic Trustee and NT Refectio submitted a second offer to the *Concurso* Court identical to the first in all ways except that they raised the

purchase price to $19,224,850. While the second offer—which almost certainly was going to be rejected as it contained the same defects as the first offer—was pending the review of the *Concurso* Court, the Adversary Proceedings remained stayed.

32.    On September 24, 2020, the *Concurso* Court rejected the bid, including because, as expected, the bid offered a single price for both Debtors' assets, instead of separating the offer between Integradora and Perforadora.

33.    Nevertheless, instead of proceeding forward with the Adversary Proceedings, on November 26, 2020, shortly before the expiration of the stay, Defendant AMA submitted an offer for the Debtors' assets, requiring a further extension of the stay. Moreover, AMA's offer had all of the same defects as the Nordic Trustee's and NT Refectio's, and furthermore, was for a substantially lesser amount—$5 million.

34.    As a result, the defendants to the Adversary Proceedings, including the Defendants herein, have successfully stayed the litigation of the claims in the Adversary Proceedings for an entire year, precluding the plaintiffs in the Adversary Proceeding from proceeding with their claims.

35.    Defendants' actions have resulted in a total loss of equity to Plaintiffs, leaving them as mere shell entities by depriving them of their sole and valuable possessions, the Rigs. This Complaint seeks to recover the damages that Defendants caused by their unlawful seizure of Plaintiffs, including the value of the Rigs, the misappropriated funds, and the unnecessary tens of millions of dollars in legal fees and costs incurred by Plaintiffs Oro Negro Drilling and Singapore Rig Owners in connection with the baseless civil and criminal actions instituted by the Defendants.

## PARTIES

### I.    Plaintiffs

36.    Plaintiff Oro Negro Drilling is a wholly-owned subsidiary of Integradora, the holding company of Oro Negro.  Oro Negro Drilling was established and has its principal place of business in Singapore, at 137 Telok Ayer St. #08-01, Singapore 08602.  Oro Negro Drilling is also the parent company of Plaintiffs Singapore Rig Owners.  Oro Negro Drilling issued the Bonds to the Bondholders of Oro Negro, and is a party to the Bond Agreement with Nordic Trustee, on behalf of the Bondholders.

37.    Plaintiffs Singapore Rig Owners are companies that were established and have their principal place of business in Singapore.  They all share the same address and are located at 137 Telok Ayer St. #08-01, Singapore 08602.  Each Singapore Rig Owner owns one Rig.

38.    Each Singapore Rig Owner is a party to one of five Bareboat Charters with another wholly-owned subsidiary of Integradora, Perforadora.  The Bareboat Charters are governed by United States Maritime law and are subject to the jurisdiction of New York courts.

### II.    Defendants

39.    Defendant Alterna is a Delaware limited liability company.  Alterna is an investment manager and financial advisor.  Its principal place of business is in Connecticut.  Its address is 15 River Road, Suite 320, Wilton, Connecticut 06897.

40.    Alterna manages, among other funds, Alterna Core Capital Assets Fund II, L.P., a Delaware limited partnership (the "Alterna Fund").  As of December 2017, the Alterna Fund owned at least $57,207,105 in Bonds.  As the Alterna Fund's investment manager, Alterna has been a member of the Ad-Hoc Group since at least May 2017.

41.    The funds that Alterna manages, including the Alterna Fund, raise substantial capital in the United States through private placements (i.e., investment offerings that do not entail

selling securities that are registered with the Securities and Exchange Commission, the "SEC").

To raise capital in the United States through private placements, an investment manager and its

fund must file a Notice of Exempt Offering of Securities (known as a "Form D") with the SEC,

providing general information about the fund, its investment manager and the amount that the fund

will raise.  Alterna and its funds have filed numerous Forms D with the SEC since 2009, reflecting

private placements totaling approximately $1.4 billion.

42.    Defendant ARCM is a Hong Kong-based investment manager and financial

advisor.  Its principal place of business is 21/F, Shanghai Commercial Bank Tower, 12 Queens

Road Central, Hong Kong.

43.    ARCM manages, among other funds, ARCM Master Fund II, Ltd., ARCM Master

Fund III, Ltd. and ARCM Distressed Energy Opportunities Master Fund, Ltd. (the "ARCM

Funds").  The ARCM Funds are all established in the Cayman Islands, a tax haven.  As of

December 2017, the ARCM Funds owned at least $115,448,060 in Bonds.  Cayman Islands is a

secretive jurisdiction and, as a result, the names of the directors and officers of the ARCM Funds

are not public.  As the ARCM Funds' investment manager, ARCM has been a member of the Ad-

Hoc Group since at least May 2017.

44.    Funds managed by ARCM were, until December 2018, significant shareholders of

Seadrill Limited, a company traded on the New York Stock Exchange ("NYSE").  Additionally,

funds ARCM manages invest permanently and significantly in New York.  As an investment

manager, ARCM must file quarterly reports (known as a "Form 13F") with the SEC, disclosing

the amount of U.S. publicly traded stock that is held by the funds that ARCM manages.  According

to its Form 13F for the last quarter of 2018, ARCM-managed funds hold approximately $234

million in stock traded on the NYSE.  The funds that ARCM manages, including the ARCM Funds,

raise substantial capital in the United States through private placements. ARCM and its funds have filed numerous Form Ds with the SEC since 2012, reflecting private placements totaling over $1.6 billion.

45.     On April 19, 2019, ARCM, together with the other members of the Ad-Hoc Group, made a submission to an arbitration tribunal established under NAFTA to resolve a claim by the United States shareholders of Integradora against México (the "NAFTA Claim"). Through that submission, the Ad-Hoc Group sought to keep any damages payment by México, instead of that payment going to Integradora's shareholders. In the submission, ARCM admitted that it has a significant presence in the United States. Indeed, as an example of its presence in the United States, ARCM stated that it "makes 13F filings in the U.S."

46.     Defendant GHL is a company established and with its principal place of business in Cyprus. Its address is John Kennedy, Iris House, Floor 7, Flat 740B, 3106, Limassol, Leymosun, Cyprus.

47.     GHL is ultimately owned and controlled by John Fredriksen ("Fredriksen"), a billionaire shipping tycoon who became known as the "lifeline of the Ayatollah" because he began making his fortune in the 1980s during the bloody Iran-Iraq war by shipping oil out of Iran, thereby ensuring Iran a steady flow of revenue from oil exports during the war. Since then, he has amassed a large fortune by being the world's largest owner and operator of vessels, tankers and offshore drilling rigs.

48.     GHL is a personal investment vehicle of Fredriksen to own and control his businesses and investments. Fredriksen permanently and significantly invests or conducts business in New York. For example, he (a) ultimately owns and controls approximately 20% of Quintana Energy Services, Inc., a Houston-based and NYSE-traded oil and gas company; (b)

ultimately owns and controls approximately 48% of Frontline Ltd., a shipping company that trades on the NYSE; (c) ultimately owns and controls approximately 30% of Seadrill Limited, which trades on the NYSE; (d) ultimately owns and controls approximately 22.5% of SFIL, which trades on the NYSE; (e) ultimately owns and controls approximately 35% of Golden Ocean Group Limited, a shipping company that trades on the NASDAQ; and (f) through Seadrill Limited, co-owns SeaMex Limited 50/50 with Fintech Investments, which is managed by New York-based Fintech Advisory, Inc.

49.     Fredriksen ultimately owns or controls GHL through a web of trusts that he controls. Those trusts own Greenwich Holdings Limited ("Greenwich Holdings"), a company established and with its principal place of business in Cyprus. Greenwich Holdings indirectly owns and controls GHL. As of December 2017, GHL owned at least $126,087,850 in Bonds. GHL has been a member of the Ad-Hoc Group since as at least May 2017.

50.     GHL is managed by Seatankers Management Company Limited, a company established and with its principal place of business in Cyprus that is ultimately owned and controlled by Fredriksen.

51.     Defendant MFC is a Bermuda company. It is an investment management company that invests in the shipping and offshore industries. Until around May 2018, MFC's principal place of business was Miami, Florida. Its address was 601 Brickell Key Drive, Suite 510, Miami, Florida 33131.

52.     MFC is owned and controlled by United States-based individuals. Kristan Bodden ("Bodden") is MFC's CEO and Vadim Vladimirovich Reingevurts ("Reingevurts") is MFC's Chief Financial Officer ("CFO"). They both live in Miami, Florida. Peter Desloge, MFC's Partner and Managing Director until December 2018, also resides in the United States.

53.    MFC conducts permanent and substantial business in New York because its primary business is to invest funds provided from New York by New York-based investment firms. Specifically, MFC manages the investments of Maritime Finance Holdings I Ltd. ("MFCH"). MFCH is an investment vehicle funded by (a) KKR & Co. Inc. ("KKR"), a New York-based investment firm; (b) Omega Advisors, Inc. ("Omega"), a New-York-based investment firm; and (c) Wafra Inc. ("Wafra"), a New York-based investment firm. MFCH's Board of Directors is comprised of two KKR executives, one Omega executive and one Wafra executive. MFCH's manager is Gulf Stream Asset Management Ltd. ("Gulf Stream AM"). Gulf Stream AM's directors are Bodden, who is also the CEO, and Reingevurts, who is also the CFO. From March 2017 to March 2019, Gulf Stream AM was an SEC registered financial advisor. Its registered address was the same Miami address that MFC had until May 2018. As of December 2017, MFCH owned at least $56,254,499 in Bonds.

54.    As the investment manager of MFCH, MFC was a member of the Ad-Hoc Group since at least May 2017. MFC purportedly ceased being a member of the Ad-Hoc Group in December 2018.

55.    Defendant SFIL is a company established and with its principal place of business in Bermuda. Its address is Par-la-Ville Place, 14 Par-la-Ville Road, Hamilton HM 08, Bermuda.

56.    SFIL is ultimately owned and controlled by Fredriksen. SFIL's largest shareholder is Hemen Holding Limited ("Hemen"), a company established and with its principal place of business in Cyprus. Hemen owns approximately 26% of SFIL. Fredriksen ultimately owns or controls Hemen through a web of trusts that he controls. Those trusts own Greenwich Holdings. As of December 2017, SFIL owned at least $16,778,152 in Bonds. SFIL has been a member of the Ad-Hoc Group since at least May 2017.

57.    SFIL conducts permanent and substantial business in New York and has strong connections to New York. Specifically, SFIL trades on the NYSE. In addition, SFIL's auditor, including the auditor responsible for reviewing and certifying SFIL's filings with the SEC, is based in New York. SFIL has other strong United States connections. For example, one of the members of its Board of Directors is based in Connecticut.

58.    On April 19, 2019, SFIL, together with the other members of the Ad-Hoc Group, made a submission to the arbitrational tribunal overseeing the NAFTA Claim. In the submission, SFIL admitted that it has a significant presence in the United States. Indeed, as an example of its presence in the United States, SFIL stated that it has a "significant U.S. shareholder base."

59.    Defendant AMA is a New York limited liability company that specializes in investing in the shipping and offshore industries and in advising creditors of shipping and offshore companies. Its principal place of business is in New York. Its address is 405 Lexington Avenue, 67th Floor, New York, New York 10174.

60.    AMA has been the financial advisor to the Bondholders since approximately 2015. AMA has been the coordinator and driving force of the Ad-Hoc Group's collusion efforts with Pemex to destroy Oro Negro.

61.    Defendant Bartlett is a purported director of the Singapore Rig Owners. In September 2017, he was unlawfully appointed to the boards of the Singapore Rig Owners by the Ad-Hoc Group. Bartlett is a resident of Singapore. His address is 7 Temasek Boulevard #07-08, Suntec Tower One, Singapore 038987.

62.    Defendant Hancock is a purported director of the Singapore Rig Owners. In September 2017, he was unlawfully appointed to the boards of the Singapore Rig Owners by the

Ad-Hoc Group. Hancock is a resident of Singapore. His address is 7 Temasek Boulevard #07-08, Suntec Tower One, Singapore 038987.

### JURISDICTION AND VENUE

63.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

64.     Recognition of foreign proceedings, enforcement of orders of this Court, and other matters under Chapter 15 of the Bankruptcy Code are expressly designated as core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (O), and (P).

65.     Venue is proper in this Court pursuant to 28 U.S.C. § 1410.

66.     This Court has personal jurisdiction over AMA pursuant to 18 U.S.C. § 1965 because it is a New York resident.

67.     The Court has personal jurisdiction over the Defendants because they unlawfully controlled the Singapore Rig Owners, who are parties to the Bareboat Charters, which state that the "parties to this Charter hereby irrevocably submit to the jurisdiction of the courts of the State of New York and the Federal courts of the United States of America located in the Borough of Manhattan in The City of New York solely in respect of the interpretation and enforcement of the provisions of this Charter and of the documents referred to in this Charter, and in respect to the transactions contemplated hereby."

68.     The Court also has personal jurisdiction over the Defendants because Defendants, via their unlawful control of the Singapore Rig Owners, availed themselves of the jurisdiction of this Court by suing Perforadora in the United States District Court for the Southern District of New York in an attempt to cause Perforadora to turn over the Rigs to Defendants. *See* Complaint, *Oro Negro Decus Pte. Ltd. et al. v. Perforadora Oro Negro, S. de R.L. de C.V.*, No. 1:18-cv-02301, S.D.N.Y. (Mar. 15, 2018), ECF No. 1.

69.    This Court also has personal jurisdiction over the Defendants because they conspired with AMA to commit the torts alleged herein, wherein the majority of the coordination, planning, and execution of the torts took place in this District.

70.    This Court also has personal jurisdiction over each Defendant because: each Defendant is found or resides in this District, has or had agents in this District, transacted business throughout the United States, including in this District; availed itself of courts in this District in the context of the events giving rise to the claims herein; violated a right in the United States; and/or a substantial part of the events giving rise to the claims herein arose in this District.

## FACTS

### III.  Background

71.    Integradora and Perforadora (together, the "Debtors") are joint debtors in the above-captioned underlying Chapter 15 proceeding (as defined above, the "Chapter 15 Proceeding"), Case No. 18-11094.

72.    Integradora is the holding company of Oro Negro, a Mexican oil services company. Integradora owns 100% of the equity of Plaintiff Oro Negro Drilling, which in turn owns 100% of the equity in each Singapore Rig Owner.  Each Singapore Rig Owner owns one of five state-of-the-art rigs, the *Decus*, *Fortius*, *Impetus*, *Primus*, and *Laurus* (as defined above, the "Rigs").

73.    Each Rig, without an associated contract, is worth approximately $150 million.[1] With an associated contract, each Rig can be worth hundreds of millions of dollars.

74.    Each Singapore Rig Owner entered into a bareboat charter with another wholly-owned subsidiary of Integradora, Perforadora (collectively, as defined above, the "Bareboat

---

[1]    This value is based on the Ad-Hoc Group's calculations and on the price that Borr Drilling Limited ("Borr"), a Bermuda offshore drilling company, paid for three almost identical rigs in Singapore in October 2017. These three rigs had been built for Integradora and Integradora had paid $120 million to the Singaporean shipyard as a down payment.  Integradora was ultimately unable to complete payment for those rigs as a result of collusion between the Defendants and Pemex to destroy Oro Negro, and the shipyard sold them to Borr.

Charters"). A bareboat charter is an instrument commonly used in the maritime industry to lease a vessel without a crew or equipment.

75. Perforadora is the Integradora subsidiary that was responsible for operating the Rigs. The Singapore Rig Owners leased the Rigs to Perforadora through the Bareboat Charters.

76. The five Bareboat Charters are governed by United States maritime law and are subject to the jurisdiction of New York courts.

77. Perforadora, in turn, entered into contracts (as defined above, the "Oro Negro Contracts") with a subsidiary of Pemex, the Mexican government-owned oil and gas monopoly, through which it leased the Rigs to Pemex for oil drilling and exploration.

78. In 2014, to finance the acquisition of the Rigs, Plaintiffs Oro Negro Drilling and ON Impetus issued two series of bonds (as defined above, the "Bonds") with an aggregate face value of $900 million to international investors (as defined above, the "Bondholders"). All of the Bonds were later consolidated into a single bond debt with Plaintiff Oro Negro Drilling as the issuer.

79. The Bonds are governed by a bond agreement between Plaintiff Oro Negro Drilling and Nordic Trustee (as amended and restated, and as defined above, the "Bond Agreement"). Nordic Trustee, a Norwegian financial services firm, is the trustee under the Bond Agreement and is responsible for acting on behalf of the Bondholders to collect on the Bonds.

80. The Bond Agreement is governed by Norwegian law.

81. The Bonds are primarily secured by:

    (a)    a share charge (equivalent to a pledge of stock) granted by Integradora to Nordic Trustee over Integradora's shares in Plaintiff Oro Negro Drilling, which includes Integradora's authorization to Nordic Trustee to replace, if

17

certain conditions are met, Plaintiff Oro Negro Drilling's directors (the "Oro Negro Drilling Share Charge");

(b)    share charges granted by Plaintiff Oro Negro Drilling to Nordic Trustee over Oro Negro Drilling's shares in the Singapore Rig Owners, which includes Oro Negro Drilling's authorization to Nordic Trustee to replace, if certain conditions are met, each of Plaintiffs Singapore Rig Owners' directors (the "Singapore Rig Owner Share Charges"); and

(c)    mortgages on the Rigs.

82.    The Oro Negro Drilling Share Charge and the Singapore Rig Owner Share Charges are governed by Singaporean law.

83.    The mortgages are governed by Panamanian law.

84.    Under Section 15.1(g)(i) of the Bond Agreement, an event of default includes Integradora or any of its subsidiaries, including Perforadora, initiating restructuring, insolvency or bankruptcy proceedings. Specifically, Section 15.1(g)(i) states:

> The Bond Trustee may declare the Bonds to be in default upon the occurrence of any of the following events, in each case solely to the extent such events occur after the date hereof…
>
> (g) Insolvency proceedings and dissolution
>
> If for any of the Issuer, the Parent, the Charterer or any Rig Owner, any corporate action, legal proceedings or other procedure step is taken in relation to: (i) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, provisional liquidation, judicial management, scheme of arrangement or otherwise) other than solvent liquidation or reorganisation…

Bond Agreement, Section 15.1(g)(i).

85.     In such circumstances, Nordic Trustee may declare an event of default, exercise the Bondholders' security rights (including the Oro Negro Drilling Share Charge and the Singapore Rig Owner Share Charges), and demand immediate payment of the entire principal and accrued interest.[2]

86.     In or around May 2017, Defendants Alterna, ARCM, GHL, MFC, and SFIL formed the Ad-Hoc Group of Bondholders.  The Ad-Hoc Group owns approximately 60% of the Bonds.

87.     On information and belief, none of the members of the Ad-Hoc Group purchased the majority of their Bonds at 100% of the Bonds' face value but, instead, purchased them at prices ranging from 45% to 65% of the Bonds' face value—i.e., they have paid from $243 million to $351 million for their Bonds.

88.     From 2015 to date, Defendant AMA has served as the Bondholders' financial advisor in connection with Oro Negro.

## IV.     Defendants Violated Injunctions Issued by México and This Court

### A.     Defendants' Actions Were Prohibited by Injunctions That the *Concurso* Court Issued

89.     In March 2017, Pemex sought to impose drastic amendments to the Oro Negro Contracts that would have risked Oro Negro's solvency, including its ability to repay the $900 million debt on the Bonds.

90.     To protect Oro Negro's shareholders, creditors, and employees, on September 11, 2017, Perforadora filed for restructuring in México, known as a *concurso mercantil* proceeding (as defined above, the "*Concurso* Proceeding").  Perforadora's *Concurso* Proceeding was assigned

---

[2]   However, as discussed in Section V *infra*, even though the Bond Agreement states that it is governed by Norwegian law, Nordic Trustee's right to declare an event of default under Section 15.1(g)(i) of the Bond Agreement solely as a result of Perforadora's filing for bankruptcy in Mexico is also governed by Mexican law, which provides that terminating a contract or taking any actions to worsen a debtor's condition and prevent a debtor's ability to successfully reorganize, such as declaring an event of default due to the commencement of insolvency proceedings, is unenforceable.

to the Second District Court for Civil Matters of México City (as defined above, the "*Concurso Court*").

91.     Perforadora requested that the *Concurso* Court issue injunctions to maintain its *status quo*, including expressly prohibiting Nordic Trustee, acting on behalf of the Ad-Hoc Group, from terminating the Bareboat Charters and taking possession of the Rigs.

92.     Despite knowing about Perforadora's *Concurso* Proceeding, on September 25, 2017, Nordic Trustee, acting on behalf of the Ad-Hoc Group, declared Oro Negro Drilling in default of the Bond Agreement pursuant to Section 15.1(g)(i) of the Bond Agreement, solely because Perforadora filed for an insolvency proceeding.

93.     The declaration of an event of default was made against Mexican law and public policy.  Pursuant to Article 87 of the *Ley de Concursos Mercantiles* (as defined above, "LCM"), the Mexican statute that governs insolvency proceedings, creditors are prevented from taking any action that would worsen the condition of the debtor and prevent a debtor's ability to successfully reorganize.  A contract provision that conditions an event of default solely on an insolvency is barred by Article 87 of the LCM as well as public policy, because it worsens the condition of the debtor.

94.     Disregarding Mexican law and public policy, upon Nordic Trustee's declaration of an event of default, AMA and the Ad-Hoc Group then directed Nordic Trustee to exercise the Oro Negro Drilling Share Charge and the Singapore Rig Owner Share Charges by replacing the directors of Oro Negro Drilling and the Singapore Rig Owners with Defendants Bartlett and Hancock (as defined above, the "Singapore Rig Directors").  Bartlett and Hancock were recruited by AMA and the Ad-Hoc Group via, on information and belief, communications and meetings that took place in New York.

95.     In appointing Bartlett and Hancock as directors, the Ad-Hoc Group gained full unlawful control of Plaintiffs Oro Negro Drilling and the Singapore Rig Owners.[3]

96.     On September 29, 2017, Integradora commenced its *Concurso* Proceeding before the *Concurso* Court.  Integradora also sought injunctive relief to prevent Nordic Trustee, under the control of the Ad-Hoc Group, from continuing to act in furtherance of its declaration of an event of default of the Bond Agreement.

97.     On October 5, 2017, the *Concurso* Court issued an order granting Perforadora's request to initiate the *Concurso* Proceeding (the "October 5 Order").  In the October 5 Order, the *Concurso* Court also granted Perforadora's request for injunctions, including enjoining Nordic Trustee from taking any action to terminate the Bareboat Charters.

98.     Disregarding the injunction, on that same day, the Ad-Hoc Group and Singapore Rig Directors, via their unlawful control of Plaintiffs Singapore Rig Owners, terminated the Bareboat Charters through which Perforadora leased the Rigs from the Singapore Rig Owners. The Ad-Hoc Group then demanded that Perforadora turn over the Rigs to it.

99.     On October 8, 2017, Perforadora informed the *Concurso* Court that the Ad-Hoc Group, via its unlawful control of the Singapore Rig Owners, had unlawfully terminated the Bareboat Charters.  As a result, on October 11, 2017, the *Concurso* Court issued an order confirming that Nordic Trustee, acting on behalf of the Ad-Hoc Group, was enjoined from taking any action to terminate the Bareboat Charters (the "October 11 Order").  The Ad-Hoc Group and Singapore Rig Directors ignored the injunction, continuing to exert unlawful control of Plaintiffs.

100.    On October 31, 2017, the *Concurso* Court issued an order granting Integradora's request to initiate the *Concurso* Proceeding (the "October 31 Order").  In the October 31 Order,

---

[3]     A third director of the Singapore Rig Owners, Blair Hunter Cochrane, Jr., was appointed by the Bondholders in September 2016.

the *Concurso* Court also issued numerous injunctions, including enjoining Nordic Trustee from exercising or taking any actions in furtherance of the Oro Negro Drilling Share Charge. The Ad-Hoc Group and Singapore Rig Directors ignored this order as well, continuing to exert unlawful control of Plaintiffs.

101.    Despite being subject to Norwegian law, the Bond Agreement's provisions did not override the *Concurso* Court's injunctions because the *Concurso* Proceeding was filed in México, and therefore was subject to Mexican law and public policy.

102.    As described in detail below, Defendants' unlawful control over Plaintiffs included initiating an action in this Court seeking return of the Rigs, misappropriating the funds in Plaintiffs' Singapore Rig Owners' bank accounts, and instituting numerous baseless criminal actions on behalf of Singapore Rig Owners against Oro Negro and its shareholders and employees.

**B.    Defendants' Actions Violated This Court's Comity Order and Temporary Restraining Order**

103.    On April 20, 2018, the Debtors filed a petition pursuant to Chapter 15 of the U.S. Code in this underlying proceeding (as defined above, the "Chapter 15 Proceeding").

104.    On July 11, 2018, this Court issued an order (the "Comity Order") in which it recognized, granted comity, and extended full force and effect to the *Concurso* Court's October 5 Order, October 11 Order, and October 31 Order. *See* Order, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (July 11, 2018), ECF No. 85.

105.    In addition to issuing the Comity Order, on October 23, 2018, this Court also issued a temporary restraining order prohibiting the Ad-Hoc Group from physically taking over the Rigs.

106.    Specifically, in response to the actions taken by Defendants on October 20-21, 2018, described in Section VI.F *infra*, Alonso Del Val-Echeverria ("Del Val"), the then-Foreign Representative of the Debtors, filed a complaint in the Chapter 15 Proceeding against Defendant

AMA and the Singapore Rig Owners, who were acting under the unlawful control of Defendants Ad-Hoc Group and Singapore Rig Directors (the "Rig Seizure Complaint"). *See* Complaint, *Del Val v. AMA Capital Partners, LLC*, No. 18-01593, Bankr. S.D.N.Y. (Oct. 22, 2018), ECF No. 1.

107.    The Rig Seizure Complaint sought declaratory relief, injunctive relief, specific performance, and damages, arising out of Defendants' attempts to physically seize the Rigs, in violation of the Comity Order and the *Concurso* Court's injunctions.

108.    The Rig Seizure Complaint was accompanied by a motion for an *ex parte* temporary restraining order and order to show cause why a preliminary injunction should not be issued to enjoin defendants from taking any action to take over the Rigs, including attempting to physically board and abscond with the Rigs. *See* Motion for *Ex Parte* Temporary Restraining Order, *Del Val v. AMA Capital Partners, LLC*, No. 18-01593, Bankr. S.D.N.Y. (Oct. 22, 2018), ECF No. 2.

109.    On October 23, 2018, this Court granted the *ex parte* motion, and issued a temporary restraining order (the "Temporary Restraining Order") prohibiting the Ad-Hoc Group and its agents from continuing to attempt to take over the Rigs. *See* Order, *Del Val v. AMA Capital Partners, LLC*, No. 18-01593, Bankr. S.D.N.Y. (Oct. 23, 2018), ECF No. 7.

110.    In issuing the Temporary Restraining Order, this Court recognized that defendants' actions were "unlawful" and "placed in serious jeopardy" the Debtors' ability to reorganize. *Id.* at 2.

## V.    Defendants Violated Mexican Law and Public Policy

111.    The Ad-Hoc Group's declaration of an event of default and the subsequent unlawful actions taken by the Ad-Hoc Group and Singapore Rig Directors on behalf of Plaintiffs, with the assistance of AMA, were not only a violation of the *Concurso* Court's injunctions and this Court's Comity Order, but they were also barred by Mexican law and public policy.

23

112.    Indeed, as described below, after over three years of litigation over the issue of whether the *Concurso* Court has jurisdiction to apply Mexican law to the Bond Agreement, which is governed by Norwegian law, the Mexican appellate courts have concluded on two occasions that the *Concurso* Court does have such jurisdiction.  Subsequently, the *Concurso* Court applied Mexican law to the Bond Agreement to hold that the effects of the Ad-Hoc Group's declaration of the event of default pursuant to Section 15.1(g)(i) of the Bond Agreement are void.

A.    **The First Motion**

113.    On October 16, 2017, the Debtors and Plaintiffs filed a motion with the *Concurso* Court asking it to stay or suspend the effects of the Nordic Trustee's declaration of an event of default pursuant to Section 15.1(g)(i) of the Bond Agreement, on the grounds that it is contrary to Article 87 of the LCM.  Section 15.1(g)(i) states that the "Bond Trustee may declare the Bonds to be in default upon the occurrence of [insolvency proceedings] … solely to the extent such events occur after the date hereof."

114.    Article 87 of the LCM provides that "[a]ny contractual stipulation that due to the filing of a petition or lawsuit for bankruptcy, or declaration of bankruptcy, establishes modifications that aggravate the terms of the contracts for the [debtor] Company, will be deemed invalid…"

115.    In addition, pursuant to Mexican public policy, a contractual provision that declares an event of default solely upon the occurrence of an insolvency proceeding is against the public interest, because it does not maximize the value of the estate.

116.    Accordingly, the Debtors and Plaintiffs argued that Article 87 and public policy prevents the Nordic Trustee, acting on behalf of the Ad-Hoc Group, from declaring an event of default solely upon the occurrence of the Debtors' insolvency proceedings, on account that such

action aggravates the Debtors' situation, reduces the estate's value, and prevents the Debtors from being able to successfully reorganize.

117.    On October 20, 2017, the *Concurso* Court denied the Debtors' motion without explanation.

118.    The Debtors and Plaintiffs sought reconsideration of the denial before the *Concurso* Court.

119.    On March 1, 2018, the *Concurso* Court affirmed its earlier denial of the request, this time stating that the Bond Agreement pursuant to which the Ad-Hoc Group declared the event of default is governed by Norwegian law and subject to the jurisdiction of the courts of Norway. As a result, the *Concurso* Court ruled that it does not have the jurisdiction to decide whether the event of default is contrary to Mexican law and public policy.

120.    On April 2, 2018, the Debtors and Plaintiffs filed an *amparo*, which is a constitutional appeal of a court decision, before the Eleventh District Court for Civil Matters in México City (the "Eleventh District Court"), appealing the *Concurso* Court's decision.

121.    The Eleventh District Court denied the *amparo*, and Debtors and Plaintiffs appealed the denial to the Eighth Collegiate Tribunal for Civil Matters (the "Eighth Collegiate Tribunal"), a federal appellate court in México.

122.    On March 13, 2019, the Eighth Collegiate Tribunal granted the appeal solely as to Perforadora, and held that the *Concurso* Court has jurisdiction to apply Article 87 of the LCM to determine the validity of a declaration of an event of default in the Bond Agreement. The Eighth Collegiate Tribunal remanded the motion back to the *Concurso* Court to decide in accordance with the Eighth Collegiate Tribunal's decision.

123.   On April 24, 2019, the *Concurso* Court, in response to the Eighth Collegiate Tribunal's decision, denied the motion on the basis that it had already granted injunctions to the Debtors in the *Concurso* Proceeding to protect the Rigs.

124.   On May 20, 2019, Perforadora filed an *amparo* before the Eleventh District Court on the grounds that the *Concurso* Court did not decide the motion in accordance with the Eighth Collegiate Tribunal's decision, because it did not apply Article 87 of the LCM to determine the validity of a declaration of an event of default in the Bond Agreement

125.   The *amparo* was dismissed, because instead, on October 30, 2019, the Eighth Collegiate Tribunal revoked the *Concurso* Court's April 24, 2019 decision.  The Eighth Collegiate Tribunal found the *Concurso* Court's decision defective on the grounds that the *Concurso* Court had not actually ruled on Perforadora's motion asking it to stay or suspend the effects of the Nordic Trustee's declaration of an event of default.  The Eighth Collegiate Tribunal again ordered the *Concurso* Court to comply with its ruling.

126.   On December 16, 2019, the *Concurso* Court again denied the motion, ruling that it does not have authority to annul the event of default in the Bond Agreement because it is governed by Norwegian law.

127.   The Debtors filed a new *amparo* before the Eleventh District Court challenging this decision on the grounds that even though the *Concurso* Court cannot annul provisions in an agreement governed by Norwegian law, it has jurisdiction to apply Article 87 of the LCM to such provisions, and accordingly, to nullify the effects of the provisions.  That is, the Debtors argued that even if the *Concurso* Court cannot deem a provision in an agreement governed by Norwegian law to be void, it can apply Mexican law and public policy to deem the effects of such provision void.

128.    The Eleventh District Court recently dismissed the Debtors' *amparo* as moot on the grounds that Perforadora is in liquidation.

**B.    The Second Motion**

129.    On September 18, 2018, shortly after the *Concurso* Court formally declared the Debtors in bankruptcy, the Debtors again asked the *Concurso* Court to hold that the Nordic Trustee's declaration of an event of default pursuant to Section 15.1(g)(i) of the Bond Agreement was barred by Article 87 of the LCM and Mexican public policy because it prevents the ability of the Debtors to maximize the value of their assets as well as to successfully reorganize.

130.    On October 11, 2018, the *Concurso* Court declined to rule on the Debtors' motion for the same reason that it declined in March 2018, namely holding that it does not have jurisdiction to rule on the validity of a provision in a contract that is governed by Norwegian law and subject to the jurisdiction of the courts of Norway.

131.    On October 19, 2018, the Debtors filed a motion for reconsideration before the *Concurso* Court, arguing that the Bond Agreement, while governed by Norwegian law, is still subject to Article 87 of the LCM because Article 87 governs an insolvency proceeding filed in México.

132.    On February 25, 2019, the *Concurso* Court denied the Debtors' motion for reconsideration, holding that the *Concurso* Court cannot apply Mexican law to the Bond Agreement because it is subject to Norwegian law and the jurisdiction of the courts of Norway.

133.    On March 22, 2019, the Debtors filed an *amparo* before the Eleventh District Court appealing the *Concurso* Court's decision, again on the grounds that the Bond Agreement, while governed by Norwegian law, is still subject to Article 87 of the LCM because Article 87 governs an insolvency proceeding filed in México.

134.    On January 21, 2020, the Eleventh District Court denied Debtors' *amparo* on the same basis as the *Concurso* Court's denial of their motion.

135.    The Debtors filed an appeal before the Eighth Collegiate Tribunal, again on the grounds that the Bond Agreement, while governed by Norwegian law, is still subject to Article 87 of the LCM because Article 87 governs an insolvency proceeding filed in México.

136.    On October 1, 2020, the Eighth Collegiate Tribunal granted the Debtors' appeal, overturning the Eleventh District Court's denial of the Debtors' *amparo*.  The Eighth Collegiate Tribunal held that the *Concurso* Court does have the jurisdiction to apply Article 87 and Mexican public policy to the Bond Agreement, because Mexican law governs an insolvency proceeding filed in México.

137.    More specifically, the Eighth Collegiate Tribunal held that while the *Concurso* Court cannot nullify the provisions in the Bond Agreement, as it is subject to Norwegian law, it may apply Article 87 of the LCM to nullify the effects of provisions in the Bond Agreement that contravene Article 87.  Accordingly, it remanded the motion to the *Concurso* Court to determine if the event of default provision in the Bond Agreement, which renders a party to be in default solely on account of filing an insolvency proceeding, contravenes Article 87.  This decision is not subject to appeal.

138.    On February 22, 2021, following the October 1, 2020 ruling, the *Concurso* Court held that Section 15.1(g)(i) of the Bond Agreement is contrary to Article 87 of the LCM and public policy, because it worsens the condition of the Debtors, prevents the Debtors from being able to obtain the maximum value to their estate, and prevents the Debtors from being able to successfully reorganize (the "February 22 Decision").

139.    As a result, the *Concurso* Court found that the following actions taken by the Ad-Hoc Group are void:

      (a)     the notification of breach of the Bond Agreement;

      (b)     the change in directors of Plaintiffs Singapore Rig Owners;

      (c)     the execution of the Oro Negro Drilling Share Charge;

      (d)     the revocation of powers of attorneys of the previous directors and lawyers of the Singapore Rig Owners and the granting of powers of attorney to Defendants Hancock and Bartlett and the Ad-Hoc Group's lawyers;

      (e)     the letters of resignation of the previous directors of the Singapore Rig Owners from their positions as directors; and

      (f)     any actions carried out as a consequence of the above.

140.    The February 22 Decision is attached hereto as **Exhibit A**.

141.    The February 22 Decision therefore confirmed that the Defendants' seizure of Plaintiffs Oro Negro Drilling and the Singapore Rig Owners starting in September 2017 was invalid, unlawful, and void.  Accordingly, all subsequent actions taken by Defendants Ad-Hoc Group and Singapore Rig Directors via their unlawful control of Plaintiffs, with the assistance of AMA, are also void, including (a) the filing of an action in New York against Perforadora seeking the return of the Rigs; (b) the filing of criminal complaints on behalf of the Singapore Rig Owners against Oro Negro and its shareholders and employees; and (c) the physical seizure of the Rigs, transport of the Rigs out of Mexican waters, and subsequent sale of the Rigs, described in Section VI *infra*.

## VI. Defendants' Actions Via Their Illegal Control of Plaintiffs Are Void

### A. New York Lawsuit to Return Rigs

142.    On March 15, 2018, the Ad-Hoc Group and Singapore Rig Directors exerted unlawful seizure of Plaintiffs Singapore Rig Owners in filing, on behalf of the Singapore Rig Owners, an action against Perforadora in this Court.

143.    The Ad-Hoc Group and Singapore Rig Directors, via the Singapore Rig Owners, demanded that, as a result of the supposed termination of the Bareboat Charters, Perforadora had to return the Rigs to the Singapore Rig Owners (for the benefit of the Ad-Hoc Group). *See* Complaint, *Oro Negro Decus Pte. Ltd. et al. v. Perforadora Oro Negro, S. de R.L. de C.V.*, No. 1:18-cv-02301, S.D.N.Y. (Mar. 15, 2018), ECF No. 1.

144.    As such, Defendants Ad-Hoc Group and Singapore Rig Directors availed themselves of the jurisdiction of this Court in connection with unlawfully demanding possession of the Rigs from Perforadora.

145.    On October 12, 2018, before Perforadora even made an appearance in the case, the Ad-Hoc Group and Singapore Rig Directors, via the Singapore Rig Owners, voluntarily dismissed the lawsuit. *See* Stipulation of Voluntary Dismissal Without Prejudice, *Oro Negro Decus Pte. Ltd. et al. v. Perforadora Oro Negro, S. de R.L. de C.V.*, No. 1:18-cv-02301, S.D.N.Y. (Oct. 12, 2018), ECF No. 13.

146.    Because the dismissal was subsequent to the Debtors' filing of a Chapter 15 petition in this Court and seeking discovery against Defendants in this Court in the Chapter 15 Proceeding, upon information and belief, Defendants Ad-Hoc Group and Singapore Rig Directors dismissed the lawsuit in an effort to avoid the jurisdiction of this Court.

### B.    Criminal Cases

147.    Starting in 2018, Defendants colluded to use the Singapore Rig Owners, over which they exerted unlawful control, to initiate numerous baseless criminal complaints in México against Oro Negro and its shareholders and employees.

148.    On information and belief, much of the strategizing, coordination, planning, and execution of the criminal complaints occurred under the direction of Defendant AMA, in its offices in New York, through in-person meetings in New York, and through communications to and from AMA in New York.

149.    Defendants Hancock and Bartlett, due to their serving as directors of the Singapore Rig Owners, owed the Singapore Rig Owners fiduciary duties, which included acting in good faith and in the best interests of the Singapore Rig Owners.

150.    However, Defendants Hancock and Bartlett breached their fiduciary duties to the Singapore Rig Owners by issuing powers of attorney to the Ad-Hoc Group's Mexican criminal counsel, García González y Barradas Abogados ("GGB").  As such, they authorized GGB to act on behalf of the Singapore Rig Owners in these criminal proceedings, which they knew would serve to the Singapore Rig Owners' detriment as they would deprive them of their sole and valuable possessions—the Rigs.

151.    On the basis of the meritless criminal complaints, the Ad-Hoc Group obtained court orders from local Mexican judges freezing Oro Negro's funds, leaving Oro Negro unable to continue to maintain its Rigs and operate.  Also on the basis of the meritless criminal complaints, the Ad-Hoc Group obtained a court order from a local Mexican judge permitting it, via its agents, to board the Rigs and attempt to abscond with them (as described in Section IV.B *supra*, the Ad-Hoc Group was ultimately stopped from trying to abscond with the Rigs by this Court).  Finally, on the basis of the meritless criminal complaints, México issued arrest warrants against Oro

Negro's shareholders and employees, causing them to live in fear of being captured and wrongfully imprisoned.

152.    The February 22 Decision has rendered these actions taken by Defendants via their unlawful control of the Singapore Rig Owners invalid.

   1.    <u>Mismanagement of Funds Complaint</u>

153.    On June 18, 2018, GGB, on behalf of Plaintiffs Singapore Rig Owners, over which the Ad-Hoc Group and Singapore Rig Directors exercised unlawful control, filed a criminal complaint before the *Procuraduría General de la República* (the "PGR"), México's federal prosecutors' office, against the Debtors, their CEO, Gonzalo Gil-White ("Gil"), and three other Oro Negro employees, falsely accusing them of mismanaging funds in the trust (the "Mexican Trust") into which Pemex made payments pursuant to the Oro Negro Contracts (the "Mismanagement of Funds Complaint").

154.    The Mexican Trust requires that Perforadora disburse to the Singapore Rig Owners the funds that Pemex paid to Perforadora under the Oro Negro Contracts, after accounting for Perforadora's operational and administrative expenses ("Charter Hire").  From January to August 2017, Pemex paid approximately $138 million into the Mexican Trust, and Perforadora paid approximately $89 million to the Singapore Rig Owners for Charter Hire.  During that same period, Perforadora publicly reported approximately $33 million as its operational and administrative expenses.

155.    As such, the Mismanagement of Funds Complaint falsely alleged that Perforadora stole $16 million from the Mexican Trust (because it reported $16 million less than the difference between the $138 million that it received from Pemex and the $89 million that it paid for Charter Hire).

156.    This allegation is false, because Pemex disburses funds to Perforadora based on expenses that Perforadora incurs in connection with its services to Pemex, which are not necessarily the same expenses that Perforadora incurred during the same time that Pemex paid Perforadora.  That is, the funds that Pemex disbursed into the Mexican Trust in 2017 were for expenses that Perforadora incurred in 2016, not in 2017.  As such, the expenses that Perforadora reported in 2017 did not match the payments that Pemex made during that same time period.  In order to determine what expenses Pemex was paying, Defendants would have had to review the actual invoices, which they did not do, as they never requested any information from Oro Negro to determine which invoices Pemex paid in 2017.

157.    Indeed, on September 18, 2018, a Mexican federal judge concluded that Oro Negro's funds, including those in the Mexican Trust, were not related to any criminal conduct.

2.    Procedural Fraud Complaint

158.    On June 18, 2018, the Ad-Hoc Group, via its unlawful control of Plaintiffs Singapore Rig Owners, filed a criminal complaint before the *Procuraduría General de Justicia de la Ciudad de México* (the "PGJ"), México City's local prosecutor's office, against Del Val, the then-Foreign Representative of the Debtors (the "Procedural Fraud Complaint").

159.    The Procedural Fraud Complaint alleged that Del Val misled the *Concurso* Court, because he signed shareholder resolutions on behalf of the Singapore Rig Owners and Oro Negro Drilling, in connection with their *concurso* petitions, even though the Singapore Rig Owners and Oro Negro Drilling were under the control of the Ad-Hoc Group.  As such, the Complaint alleged that Del Val committed the crime of procedural fraud, which is to mislead a public official.

160.    However, because the February 22 Decision held that the Ad-Hoc Group's control of Plaintiffs Singapore Rig Owners and Oro Negro Drilling is void, there is no question that Del Val had the proper authority to sign the shareholder resolutions on behalf of Plaintiffs in

connection with their *concurso* petitions.  As such, Defendants' accusations against Del Val in the Procedural Fraud Complaint are without merit.

### 3.   Sham Invoices Complaint

161.   On September 14, 2018, the Ad-Hoc Group, via its unlawful control of Plaintiffs Singapore Rig Owners, filed a criminal complaint before the PGJ against Perforadora accusing it of fraudulent administration for allegedly issuing sham invoices to 16 Mexican companies that are blacklisted for being notorious for facilitating tax evasion (the "Sham Invoices Complaint").

162.   The Sham Invoices Complaint was based on a single Excel spreadsheet that the Ad-Hoc Group's attorneys, GGB, allegedly "found" in response to a broad request that the PGR sent to the *Servicio de Administración* (the "SAT"), México's tax agency.  The Excel spreadsheet allegedly showed that from 2015 to 2017, Perforadora issued invoices to 16 blacklisted companies totaling approximately $500,000.00.

163.   The accusations in the Sham Invoices Complaint are false, as the SAT itself has confirmed.  On March 2019, the SAT issued two decisions stating that it has no record of Perforadora ever issuing the invoices to the blacklisted companies.  In addition, the Mexican government has admitted that Oro Negro never had any relationship with the blacklisted companies.

164.   Nevertheless, as discussed in Sections VI.E and VI.F *infra*, Defendants used the Sham Invoices Complaint to obtain an order freezing funds belonging to Oro Negro in the Mexican Trust (the "Seizure Order"), as well as an order permitting the Ad-Hoc Group to physically board and abscond with the Rigs (the "Rigs Takeover Order").

### 4.   Contempt Complaint

165.   On October 21, 2018, the Ad-Hoc Group, via its unlawful control of Plaintiffs Singapore Rig Owners, filed a criminal complaint against Perforadora, as well as certain of its

employees who were on board the Rigs, before the PGR's office, alleging that they refused to allow the Ad-Hoc Group and its agents to physically board the Rigs (the "Contempt Complaint"). As such, the Contempt Complaint alleged that the employees and Perforadora were in contempt of the Rigs Takeover Order, described in Section VI.F *infra*, that had permitted the Ad-Hoc Group to physically take over the Rigs.

166.    As discussed in Section VI.F *infra*, the Rigs Takeover Order was issued in violation of injunctions that the *Concurso* Court issued.   In addition, in response to the Rigs Takeover Complaint and accompanying motion for a temporarily restraining order that the Debtors filed on October 22, 2018 in this Court, on October 23, 2018, this Court issued the Temporary Restraining Order, prohibiting the Ad-Hoc Group from continuing to try to take physical possession of the Rigs.  *See* Section IV.B *supra*.

167.    Nevertheless, in January 2019, the PGR filed charges against three Perforadora employees who were on board the Rigs during the week when the Ad-Hoc Group attempted to take physical possession of them.

168.    A federal judge dismissed the PGR's charges on the ground that he does not have jurisdiction over the investigation.

### 5.    May 3 Complaint

169.    On May 3 2019, the Ad-Hoc Group, via its unlawful control of Plaintiffs Singapore Rig Owners, filed a criminal complaint before the PGJ against Oro Negro employees Gil and Del Val, as well as against Jose Antonio Cañedo-White ("Cañedo"), Oro Negro's shareholder and Chairman of the Board, Carlos Williamson-Nasi ("Williamson"), Oro Negro's shareholder and former director, and Miguel Angel Villegas-Vargas ("Villegas"), Oro Negro's Chief Financial Officer (the "May 3 Complaint").

170.    *First*, the May 3 Complaint alleges that Gil and Del Val committed the crime of fraudulent administration, which is to knowingly mismanage the finances and assets of a company. Allegedly in violation of the Bareboat Charters, in 2014 and 2015, four of the Singapore Rig Owners (all but ON Impetus) wired a total of $50,124,399.32 to Perforadora to reimburse Perforadora for the payment of capital expenditures on the Singapore Rig Owners' behalf.

171.    According to the allegations in the Complaint, the Singapore Rig Owners were required to pay their capital expenditures directly, rather than Perforadora paying them on behalf of the Singapore Rig Owners and then seeking reimbursement from the Singapore Rig Owners.

172.    *Second*, the May 3 Complaint alleges that Gil, Cañedo, Williamson, and Villegas committed the crime of abuse of trust, which is where an individual transfers property that belongs to a third party, while acting as a custodian of that property, that causes an injury to the owner of the property.    Specifically, the May 3 Complaint alleges that in January and September 2015, Perforadora made two wire transfers totaling $13.5 million to Integradora that were in violation of the Mexican Trust because the Mexican Trust does not permit Perforadora to transfer funds to Integradora, to the supposed detriment of the Singapore Rig Owners.

173.    However, the funds Perforadora wired to Integradora had nothing to do with the Mexican Trust, but were a return of unused capital that Integradora contributed to Perforadora for future stock issuances, as is commonly done by Mexican holding companies to their subsidiaries.

174.    In addition, with respect to both the fraudulent administration and the abuse of trust claims, Oro Negro disclosed all of the transfers publicly.

175.    Moreover, Oro Negro had disclosed each of the transfers to the Bondholders, including Defendant Ad-Hoc Group.    In 2016, in connection with negotiating amendments to the Bond Agreement, the Bondholders conducted a detailed analysis and audit of Oro Negro's finances

and operations.    The Bondholders' audit included an in-depth review of inter-company cash transfers, including between the Singapore Rig Owners and Perforadora and between Perforadora and Integradora.    The audit included a review of the transfers that the Ad-Hoc Group now alleges are criminal in the May 3 Complaint.    At the time of its review, the Bondholders did not raise any concerns about the transfers.

176.    Furthermore, after completing the audit and being satisfied with it, each of the Bondholders, including the Ad-Hoc Group members, provided broad releases to Oro Negro and its employees, releasing them of any and all claims, causes of action, and liabilities whatsoever existing prior to April 2016 (the "2016 Releases").    Accordingly, as discussed in Section VIII.B *infra*, in bringing the May 3 Complaint, the Ad-Hoc Group breached the 2016 Releases.

177.    Despite the lack of any merit to the May 3 Complaint, Defendants used the allegations to successfully obtain arrest warrants against the accused individuals, as discussed in Section VI.C *infra*.

178.    Moreover, in August 2020, the Ad-Hoc Group used the May 3 Complaint as a basis to make new allegations against Gil, Williamson, and Villegas, as well as Cynthia DeLong ("DeLong"), Oro Negro's former head of human resources.    The new allegations claim that these individuals committed abuse of trust in connection with the transfer of approximately $19 million from Oro Negro Drilling to Perforadora in October 2017.

179.    According to the allegations, the transfer of the money was illegal because the Ad-Hoc Group allegedly controlled Oro Negro Drilling at the time the transfer was made, so the accused individuals had no authority to execute the transfer.

180.    As the February 22 Decision makes clear, the transfer was legitimate, because the Ad-Hoc Group's seizure of Oro Negro Drilling was unauthorized, so the accused individuals had valid control over Oro Negro Drilling when the transfer was made.

181.    Nevertheless, Defendants used the allegations to successfully obtain arrest warrants against the accused individuals, as discussed in Section VI.C *infra*.

### 6.    Abuse of Trust Complaint

182.    In September 2019, the Ad-Hoc Group, via its unlawful control of Plaintiffs Singapore Rig Owners, filed a criminal complaint before the PGJ against Gil, Villegas, and DeLong, alleging abuse of trust (the "Abuse of Trust Complaint").

183.    The Abuse of Trust Complaint accuses Gil, Villegas, and DeLong of failing to properly disburse approximately $8 million of $13 million of funds that the Mexican Trust released to Perforadora for the purpose of paying its value-added tax in September 2018.

184.    In fact, Perforadora had paid its value-added tax in full, and so it used the $8 million remaining to fund working capital for the benefit of the estate.  Nevertheless, Defendants used the Abuse of Trust Complaint to successfully obtain additional arrest warrants against the accused individuals, as discussed in Section VI.C *infra*.

185.    All of the aforementioned complaints were filed via the Ad-Hoc Group's and the Singapore Rig Directors' unlawful seizure of the Singapore Rig Owners, and were coordinated, planned, and executed by Defendant AMA in New York.

186.    Pursuant to the February 22 Decision, which rendered the Ad-Hoc Group's control of Plaintiffs void, the Ad-Hoc Group and Singapore Rig Directors did not have the authorization to act on behalf of Plaintiffs Singapore Rig Owners in filing these criminal complaints against Oro Negro and its shareholders and employees.

### C.    Arrest Warrants

187.    In July 2019, based on the meritless allegations in the May 3 Complaint, México issued arrest warrants against Gil, Cañedo, Williamson, Villegas, and Del Val.

188.    On November 28, 2019, based on the meritless allegations in the Abuse of Trust Complaint, México issued a second set of arrest warrants, against Gil, Villegas, and Delong.

189.    In August 2020, México issued a third set of arrest warrants, against Gil, Williamson, Villegas, and DeLong, on account of additional meritless allegations in the May 3 Complaint.

### D.    Red Notices and INTERPOL Decision

190.    The May 3 Complaint did not just lead to México's issuance of arrest warrants against Oro Negro's shareholders and employees.    In September 2019, México sought and obtained international arrest warrants (as defined above, "Red Notices") against Oro Negro employees/shareholders Gil, Villegas, Williamson, and Cañedo from the International Criminal Police Organization (as defined above, "INTERPOL").    INTERPOL is an international organization that facilitates worldwide crime control by connecting its member countries to each other as well as to INTERPOL's databases, in an effort to assist countries in locating fugitives around the world.

191.    In early September 2019, every major Mexican media outlet reported on the Red Notices, accusing the individuals of being fugitives and high-profile, wanted criminals.[4]    The arrest

---

[4]    *See, e.g.*, Interpol issues a red notice against Gonzalo Gil White, at the request of the PGJ-CdMx: Reform, Sinembargo (Sept. 2, 2019), https://www.sinembargo.mx/02-09-2019/3639109; PGJCDMX asks FGR to request a red notice against former directors and founders of the Oro Negro company, Aristegui Noticias (Sept. 3, 2019), https://aristeguinoticias.com/0309/mexico/pgjcdmx-pide-a-fgr-solicitar-ficha-roja-contra-ex-directores-y-fundadores-de-la-empresa-oro-negro/?jwsource=cl; They ask Interpol for a red notice against former directors and founders of Oro Negro, La Razón (Sept. 3, 2019), https://www.razon.com.mx/mexico/interpol-ficha-roja-gonzalo-gil-white-francisco-gil-diaz-jose-antonio-canedo-white-exdirectores-fundadores-oro-negro/; FGR requests red notice against founders of Oro Negro, El Sol de México (Sept. 3, 2019),

warrants and Red Notices have caused substantial harm to the individuals' reputations, businesses, and livelihoods.  The individuals have been unable to obtain work, were unable to travel, and have been living in fear of being captured and wrongfully imprisoned in México.

192.    In December 2019, the individuals filed a petition with INTERPOL requesting the cancellation of the Red Notices, in which they described the actions of the Ad-Hoc Group, and argued that the Red Notices were a violation of the INTERPOL Constitution and Data Rules because, among other things, they were premised on false and legally unsubstantiated allegations and were a violation of their human rights.

193.    In October 2020, in an extraordinary and unprecedented decision, INTERPOL withdrew the Red Notices against the accused individuals (though the arrest warrants in México remain outstanding).  INTERPOL's withdrawal of the Red Notices further substantiates the claims in the Tortious Interference Actions and Releases Action, discussed in Section VIII *infra*, that the allegations in the May 3 Complaint are meritless, and that Defendants' filings of the various criminal actions on behalf of the Singapore Rig Owners were with an ulterior motive—to seize Plaintiffs' valuable Rigs.

**E.    Seizure Order**

194.    Defendants used the Sham Invoices Complaint to obtain an order from a local Mexican judge freezing all of Oro Negro's assets in the Mexican Trust (as defined above, the "Seizure Order").

---

https://www.elsoldemexico.com.mx/mexico/justicia/fgr-solicita-ficha-roja-contra-fundadores-de-oro-negro-gonzalo-gil-white-y-jose-antonio-canedo-white-4129043.html; PGJCDMX asks FGR to request a red notice against the son of a former Secretary of the Treasury, Milenio (Sept. 3, 2019), https://www.milenio.com/policia/pgjcdmx-pide-fgr-solicitar-ficha-roja-hijo-secretario-hacienda; Executives of Oro Negro are wanted by Interpol; they defrauded employees with afores, Vanguardia (Sept. 8, 2019), https://vanguardia.com.mx/articulo/directivos-de-oro-negro-son-buscados-por-interpol-defraudaron-empleados-con-afores.

195.    By October 2018, after numerous injunctions that the *Concurso* Court issued against Pemex requiring that it pay the Debtors past due daily rates owed under the Oro Negro Contracts, Pemex finally complied and paid $96 million into the Mexican Trust on September 4 and 6, 2018.

196.    However, before Oro Negro was able to access the funds, Defendants used the Sham Invoices Complaint as a pretext to obtain an order freezing them.

197.    As a result of the Seizure Order, Oro Negro eventually ran out of money to maintain its operations, including the Rigs.  On May 15 and May 16, 2019, the *Concurso* Court ordered that Perforadora return the Rigs to the Singapore Rig Owners (whom the Ad-Hoc Group unlawfully controlled), because Perforadora was no longer able to maintain them.  On June 13, 2019, the *Concurso* Court declared the Debtors in liquidation.

198.    In September 2019, the Ad-Hoc Group transported the Rigs out of Mexican waters, and then sold them back to the Nordic Trustee in a sham auction in the Bahamas for substantially less than what they are collectively worth.

199.    The Seizure Order has also prevented Oro Negro from being able to pay attorneys' fees in order to defend the numerous criminal allegations against it and its shareholders and former employees.

### F.    Rigs Takeover Order

200.    The Sham Invoices Complaint was also used as a pretext by the Ad-Hoc Group, working together with AMA and the Singapore Rig Directors, to attempt to physically seize the Rigs.

201.    Despite being prohibited to physically seize the Rigs by injunctions that the *Concurso* Court issued and this Court's Comity Order, after seeing the success of being able to seize Oro Negro's assets, on October 18, 2018, the Singapore Rig Owners, as authorized by the

Singapore Rig Directors, sought and obtained an order from the same local Mexican judge permitting the Ad-Hoc Group to take over the Rigs by force (as defined above, the "Rigs Takeover Order").

202.    On the weekend of October 20-21, 2018, AMA and the Ad-Hoc Group coordinated with their agents to charter and land helicopters on the Rigs by force.  One of the helicopters almost killed a crewmember of one of the Rigs.

203.    As described in Section IV.B *supra*, upon the Debtors' emergency motion, on October 23, 2018, this Court issued the Temporary Restraining Order prohibiting the Ad-Hoc Group and its agents from continuing to attempt to take over the Rigs, forcing the Ad-Hoc Group's agents to eventually comply.

## VII.    The Chapter 15 Discovery

204.    In the Chapter 15 Proceeding, certain of the Defendants produced documents and testimony to the Foreign Representative (the "Chapter 15 Discovery").  The Chapter 15 Discovery shows that Defendants Ad-Hoc Group, AMA, and the Singapore Rig Directors colluded with each other, as well as with the two owners of Oro Negro's main competitor SeaMex Limited, Seadrill Limited and Fintech Advisory, Inc., and with Pemex, to destroy Oro Negro.

205.    The actions of Defendants, the owners of SeaMex, and Pemex included forcing Oro Negro into bankruptcy, taking unlawful control of the Plaintiffs, and filing baseless criminal actions against Oro Negro and its shareholders and employees, which resulted in the freezing of Oro Negro's assets and the issuance of arrest warrants against the individual targets of the criminal complaints.

## VIII.    The February 22 Decision Vindicates Claims in the Existing Adversary Proceedings

206.    In June and September 2019, on the basis of the Chapter 15 Discovery, the Foreign Representative of the Debtors, together with certain shareholders and former employees of Oro

Negro, filed complaints in the Chapter 15 Proceeding (as defined above, the "Adversary Proceedings") against, among others, the Defendants herein. *See* Complaint, *Gil-White v. Ercil*, No. 19-01294, Bankr. S.D.N.Y. (June 6, 2019), ECF No. 1; Complaint, *Gil-White v. Contrarian Capital Management, LLC*, No. 19-01301, Bankr. S.D.N.Y. (June 24, 2019), ECF No. 1, at 84-85; Complaint, *Perez-Correa v. Asia Research and Capital Management Ltd.*, No. 19-01360, Bankr. S.D.N.Y. (Sept. 26, 2019), ECF No. 1. The February 22 Decision corroborates the claims alleged in the Adversary Proceedings.

### A. Tortious Interference Actions

207. On June 6, 2019 and June 24, 2019, Gil, in his capacity as the Foreign Representative of the Debtors at the time, as well as in his personal capacity, filed two complaints, against the Ad-Hoc Group, AMA, and the Singapore Rig Directors, as well as certain of their agents and the owners of SeaMex, and against the Singapore Rig Owners, who were being unlawfully controlled by the Ad-Hoc Group and Singapore Rig Directors (the "Tortious Interference Actions").

208. The Tortious Interference Actions allege that the Ad-Hoc Group conspired with Pemex and the owners of SeaMex to destroy Oro Negro, by forcing Oro Negro into liquidation so that the Ad-Hoc Group could seize the Rigs.

209. The Tortious Interference Actions allege causes of action under New York and Mexican laws, including, among other things, that Defendants wrongfully and intentionally interfered with the Oro Negro Contracts, Bareboat Charters, and Perforadora's business relationships with the Singapore Rig Owners and Pemex.

210. The Actions also allege that the Singapore Rig Owners, under the unlawful control of the Ad-Hoc Group, unlawfully terminated the Bareboat Charters, and breached the Bareboat Charters by failing to pay certain expenses owed to Perforadora pursuant to the Bareboat Charters.

In addition, the Actions allege that Defendants wrongfully and with an ulterior motive filed baseless criminal complaints against Oro Negro and Gil, and that they violated this Court's Comity Order by depriving Perforadora of its right to full possession of the Rigs under the Bareboat Charters.

211.    The February 22 Decision corroborates Gil's claims, on behalf of himself and the Debtors, in the Tortious Interference Actions.    Throughout the complaints in the Tortious Interference Actions, Gil alleged that Defendants' seizure of the Singapore Rig Owners was illegal. Specifically, the Tortious Interference Actions allege that the Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group:

(a)    Improperly terminated the Bareboat Charters, through which they leased the Rigs to Perforadora, thereby depriving Perforadora of its right to possession of the Rigs under the Bareboat Charters;

(b)    Filed numerous criminal complaints against Oro Negro and its shareholders and former employees, which resulted in (i) the freezing of Oro Negro's accounts in the Mexican Trust; (ii) an attempt by the Ad-Hoc Group to seize the Rigs by force; and (iii) the issuance of arrest warrants in México, as well as Red Notices, against Oro Negro's shareholders and employees;

(c)    Filed dozens of motions and challenges in the *Concurso* Court as well as in México City local courts seeking orders that Deutsche Bank México, S.A. ("Deutsche México"), the administrator of the Mexican Trust, refrain from disbursing any funds to Perforadora, which deprived Perforadora of cash it needed to operate the Rigs and pay necessary expenses in connection thereto;

(d)     Refused to reimburse Perforadora in connection with expenses that are associated with the Rigs, including for salaries, maintenance, fuel, and personnel training, totaling $7,795,205.17;

(e)     Misappropriated funds held by the Singapore Rig Owners to pay the Ad-Hoc Group's lawyers and advisors; and

(f)     Refused to reimburse Perforadora in connection with expenses that the Singapore Rig Owners must pay in order for the Rigs to remain "in class" with respect to inspections and certifications, pursuant to Article 7.1 of the Bareboat Charters, totaling $274,925.29.

212.    The February 22 Decision confirms that all of these actions were unlawful.

213.    Because the February 22 Decision holds that the Ad-Hoc Group's control of the Singapore Rig Owners is invalid, and that as a consequence, all actions taken by the Singapore Rig Owners on behalf of the Ad-Hoc Group are invalid, the Ad-Hoc Group and the other named defendants in the Tortious Interference Actions are liable to Oro Negro and Gil for damages.

214.    Specifically, they are liable for the expenses incurred by the Singapore Rig Owners that Perforadora paid but for which it was not reimbursed, damages resulting from the misappropriation of funds in the Singapore Rig Owners' accounts, damages resulting from Deutsche México's refusal to disburse to Perforadora funds from the Mexican Trust, and damages resulting from the Singapore Rig Owners' unauthorized filing of the criminal complaints against Oro Negro and Gil, including the incurrence of unnecessary legal fees and costs in defending against the criminal complaints, damages that Oro Negro sustained due to having its accounts frozen and as a result of the issuance of the Rigs Takeover Order, and damages that Gil personally suffered, including damages to his reputation and businesses, and mental anguish.

## B.    The Releases Action

215.    On September 26, 2019, Fernando Perez-Correa, the then-Foreign Representative of the Debtors, on behalf of the Debtors, and Oro Negro shareholders/employees Cañedo, Williamson, Villegas, and Gil, in their individual capacities, filed a complaint against Defendants ARCM, GHL, and SFIL, as well as against Plaintiffs Singapore Rig Owners, who were under the unlawful control of the Ad-Hoc Group (the "Releases Action").

216.    The Releases Action alleges that these members of the Ad-Hoc Group, as well as the Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group, breached releases that they provided to Oro Negro and its employees, in which they released them of all claims, causes of action, and liabilities, in connection with an investigation and audit that the Ad-Hoc Group conducted when amending the Bond Agreement in 2016 (as defined above, the "2016 Releases").

217.    The Ad-Hoc Group and Singapore Rig Owners, acting under the unlawful control of the Ad-Hoc Group, breached the 2016 Releases by filing the May 3 Complaint, in which they alleged that Cañedo, Williamson, Villegas, and Gil committed abuse of trust and fraudulent administration by facilitating inter-company transfers in 2014 and 2015—the very conduct that the Ad-Hoc Group had released.  Moreover, as described in Section VI.B.5 *supra*, these allegations are absolutely baseless.

218.    Nevertheless, the Ad-Hoc Group was able to use the May 3 Complaint to successfully request that a local Mexican judge extend a freeze of Oro Negro's assets, thus continuing to block Oro Negro's access to any funds.  In addition, as a result of the May 3 Complaint, a local Mexican judge issued arrest warrants against Cañedo, Williamson, Villegas,

and Gil, which also led to the issuance of Red Notices by INTERPOL, as described in Sections VI.C and VI.D *supra*.[5]

219.    Because the February 22 Decision holds that the Ad-Hoc Group's control of the Singapore Rig Owners is invalid, and that as a consequence, all actions taken by the Singapore Rig Owners on behalf of the Ad-Hoc Group are invalid, the Ad-Hoc Group is liable to the plaintiffs in the Releases Action for damages.    Specifically, the Ad-Hoc Group is liable for damages resulting from the Singapore Rig Owners' unauthorized filing of the May 3 Complaint, including damages that Oro Negro sustained on account of the extension of the Seizure Order, and damages that the individual plaintiffs sustained on account of México's issuance of arrest warrants and successful request for Red Notices against them.    These include damages to the individuals' reputations and businesses, and for mental anguish.

220.    The decision by INTERPOL cancelling the Red Notices against Gil, Cañedo, Williamson, and Villegas further vindicates these individuals of the criminal actions that the Ad-Hoc Group asserted against them.    Moreover, it corroborates their claims in the Releases Action, showing that the Ad-Hoc Group had no legitimate purpose in filing the May 3 Complaint other than to harass and extort them.

## IX.    Defendants Have Avoided U.S. Litigation For Over a Year

221.    In October 2019, Nordic Trustee and NT Refectio XX AS ("NT Refectio"), a related company established to secure the Bondholders' interests in enforcement proceedings, submitted an offer to the *Concurso* Court, pursuant to which they sought to purchase substantially all of the Debtors' assets, including the claims that the Foreign Representative asserted on behalf

---

[5]    As discussed in Section VI.D *supra*, INTERPOL ultimately cancelled the Red Notices.

of Debtors in the Adversary Proceedings, in exchange for $15 million and the Nordic Trustee's claims against the Debtors' estate in the *Concurso* Proceeding.

222.    The Nordic Trustee's claims against the Debtors' estate consist of a claim against Integradora as joint obligor under the Bond Agreement in connection with Oro Negro Drilling's purported breach of the Bond Agreement, and a claim against Perforadora in connection with Charter Hire that Perforadora purportedly owes to the Singapore Rig Owners, which claim the Singapore Rig Owners, under the unlawful control of the Ad-Hoc Group and Singapore Rig Directors, assigned to the Nordic Trustee.

223.    The Debtors and several creditors filed oppositions and objections to the offer in the *Concurso* Proceeding on the grounds that, among other things, a credit bid (which the Nordic Trustee's claims against the Debtors' estate constitute) is not allowed under Mexican law, the amounts of the Nordic Trustee's claims are unknown because they are subject to an appeal, the Debtors' liquidator had not appraised the assets, the bid's inclusion of the Foreign Representative's claim in the Adversary Proceedings violates public policy because it would allow the defendants in the Adversary Proceedings to acquire the claims against them for much less than the value of those claims, and the bid offers a single price for both Debtors' assets, instead of separating the offer between Integradora and Perforadora, since the two Debtors have different creditors.

224.    On November 21, 2019, the *Concurso* Court rejected the offer on the grounds that none of the unsecured creditors would receive payment and that the Nordic Trustee's claim amounts were not determined yet because they were subject to a pending appeal.

225.    On February 21, 2020, Nordic Trustee and NT Refectio submitted a second offer to the *Concurso* Court nearly identical to the first: they offered to purchase substantially all of the Debtors' assets, including the claims that the Foreign Representative asserted on behalf of Debtors

in the Adversary Proceedings, for $19,224,850 and the Nordic Trustee's claims against the Debtors' estate. On information and belief, because the offer again included the Nordic Trustee's claims, Nordic Trustee and NT Refectio knew that the *Concurso* Court would also reject this offer because the claim amounts are subject to a pending appeal, but made the offer anyway as a means to delay the litigation of the Adversary Proceedings.

226.    As a result of the offer, on March 6, 2020, the Foreign Representative and defendants to the Adversary Proceedings, including the Defendants herein, filed a stipulation with this Court seeking an extension of a temporary stay that had already been in place in order for the newly appointed Foreign Representative to familiarize himself with the Chapter 15 Proceeding. The Foreign Representative and the defendants in the Adversary Proceedings requested a stay for a period of 90 days to allow for the bidding process to take place, which this Court granted. *See* Stipulation to Extend Stay of Deadlines, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (Mar. 6, 2020), ECF No. 278; So Ordered Stipulation, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (Mar. 9, 2020), ECF No. 280.

227.    As with the first offer, the Debtors and several creditors filed oppositions and objections to the second offer, asserting similar grounds as they did to the first offer. On June 1, 2020, the Foreign Representative and the defendants in the Adversary Proceedings filed a second stipulation seeking a further extension of the stay for another period of 90 days, which this Court again granted. *See* Second Stipulation to Extend Stay of Deadlines, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (June 1, 2020), ECF No. 282; Second So Ordered Stipulation, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (June 4, 2020), ECF No. 283.

228.    On August 4, 2020, the *Concurso* Court requested the Federal Institute of Insolvency Specialists (in Spanish, *Instituto Federal de Especialistas en Concursos Mercantiles*, or "IFECOM"), an independent agency that, among other things, makes recommendations to México's bankruptcy courts, to review the bid and provide its opinion regarding the bid's viability. On August 31, 2020, the Foreign Representative and defendants in the Adversary Proceedings sought a third extension of the stay in order to allow for IFECOM to review the bid, which this Court granted. *See* Third Stipulation to Extend Stay of Deadlines, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (Aug. 31, 2020), ECF No. 287; Third So Ordered Stipulation, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (Aug. 31, 2020), ECF No. 288.

229.    Shortly thereafter, on September 15, 2020, IFECOM recommended rejection of the bid, and subsequently, on September 24, 2020, the *Concurso* Court adopted IFECOM's opinion and also rejected the bid.  As expected, the *Concurso* Court held that the Nordic Trustee's claim amounts were not determined yet due to the fact that they were still subject to a pending appeal. The *Concurso* Court also rejected the bid on account that it offered a single price for both Debtors' assets, instead of separating the offer between Integradora and Perforadora, since the two Debtors have different creditors.

230.    Nevertheless, instead of proceeding forward with the Adversary Proceedings, on November 26, 2020, shortly before the expiration of the stay, Defendant AMA submitted an offer for the Debtors' assets.  The Foreign Representative and the defendants in the Adversary Proceedings sought the entry of a fourth stipulation extending the stay until February 26, 2021. *See* Fourth Stipulation to Extend Stay of Deadlines, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (Nov. 28, 2020), ECF No. 280; Fourth So Ordered

Stipulation, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (Nov. 30, 2020), ECF No. 290.

231.    Specifically, AMA offered to purchase substantially all of the Debtors' assets, including the Foreign Representative's claims in the Adversary Proceedings, for $5 million—approximately $14 million less than Nordic Trustee's and NT Refectio's second bid.  In addition, despite the *Concurso* Court already rejecting Nordic Trustee's and NT Refectio's second bid because it did not separate the price between Integradora and Perforadora, AMA also did not separate the price between the two Debtors.

232.    Because AMA's bid was substantially less than Nordic Trustee's and NT Refectio's second bid, and had the same defect as their bid of not separating the price between the Debtors, on information and belief, AMA submitted the offer solely to further delay the litigation of the Adversary Proceedings.

233.    As a result, the defendants to the Adversary Proceedings, including the Defendants herein, have successfully stayed the litigation of the claims in the Adversary Proceedings for an entire year, precluding the plaintiffs in the Adversary Proceedings to proceed with their claims against Defendants.[6]

---

[6]  On February 24, 2021, as the stay was again set to expire, the Foreign Representative and the defendants in the Adversary Proceedings filed a fifth stipulation requesting another 90-day extension of the stay.  Fifth Stipulation of Extend Stay of Deadlines, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (Feb. 24, 2021), ECF No. 292.  The individual plaintiffs to the Releases Action indicated that they intended to object to the extension request.  Accordingly, this Court extended the stay for an additional 30 days, and is scheduled to hear the objection on March 18, 2021.  *See* Fifth Stipulation and Order, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (Mar. 1, 2021), ECF No. 295.

On March 5, 2021, The individual plaintiffs filed their objection to the stay extension request, in which they argued that the stay is prejudicing their ability to prosecute their claims, and that some of the parties seeking the extension—namely the parties acting on behalf of the Singapore Rig Owners—do not have the authority to do so as a result of the February 22 Decision.  *See* Objection to Request for Extension of Stay of Adversary Proceedings, *In re Perforadora Oro Negro S. de R.L. de C.V.*, No. 18-11094, Bankr. S.D.N.Y. (Mar. 5, 2021), ECF No. 296.

## X.    Damages

234.    Defendants Ad-Hoc Group and Singapore Rig Directors' unlawful seizure of Plaintiffs, with which Defendant AMA assisted, was in violation of the *Concurso* Court injunctions, this Court's Comity Order, and Mexican law and public policy.  It resulted in the Ad-Hoc Group's illegal physical procurement of the Rigs, misappropriation of the funds in the accounts of the Singapore Rig Owners, and a total loss of equity to Plaintiffs, whose sole and valuable possessions were the Rigs.

235.    In addition, the unlawful control of Plaintiffs by Defendants Ad-Hoc Group and Singapore Rig Directors, working together with AMA, has caused Plaintiffs to incur tens of millions of dollars in unnecessary legal fees and costs.

## CAUSES OF ACTION

### COUNT ONE
**(Conversion against Ad-Hoc Group and Singapore Rig Directors)**

236.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

237.    Plaintiffs Singapore Rig Owners held valid ownership interests in the Rigs.

238.    Plaintiff Oro Negro Drilling held a valid ownership interest in the Rigs through its ownership of the Singapore Rig Owners.

239.    Defendants Ad-Hoc Group and Singapore Rig Directors procured the Rigs via their unlawful seizure of Plaintiffs.

240.    Defendants Ad-Hoc Group and Singapore Rig Directors knew that their procurement of the Rigs was unlawful because it was prohibited by injunctions by the *Concurso* Court and this Court's Comity Order and it was contrary to Article 87 of the LCM and Mexican public policy.

241.    Defendants Ad-Hoc Group and Singapore Rig Directors used their unauthorized seizure of the Singapore Rig Owners and Oro Negro Drilling to illegally transport the Rigs out of Mexican waters and sell the Rigs to themselves for substantially less than their value.

242.    The Ad-Hoc Group's and Singapore Rig Directors' actions were egregious, including their collusion with AMA to take unlawful control and possession of the Rigs, their filing of baseless complaints against Oro Negro and its shareholders and employees via their unlawful control of the Singapore Rig Owners, and their intentional violation of the *Concurso* Court's injunctions, Court's Comity Order, and Mexican law and public policy.

243.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

## COUNT TWO
### (Aiding and Abetting Conversion against AMA)

244.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

245.    Plaintiffs Singapore Rig Owners held valid ownership interests in the Rigs.

246.    Plaintiff Oro Negro Drilling held a valid ownership interest in the Rigs through its ownership of the Singapore Rig Owners.

247.    Defendants Ad-Hoc Group and Singapore Rig Directors procured the Rigs via their unlawful seizure of Plaintiffs.  AMA was central to Defendants Ad-Hoc Group's and Singapore Rig Directors' efforts by, *inter alia*, (a) strategizing, coordinating, and executing plans with the Ad-Hoc Group and Singapore Rig Directors to obtain unlawful seizure of Plaintiffs; (b) recruiting and paying Defendants Singapore Rig Directors to take unlawful control of Plaintiffs; and (c) strategizing, coordinating, and executing plans with Defendant Ad-Hoc Group and its agents, including Mexican criminal counsel, GGB, to file baseless criminal complaints against Oro Negro

and its shareholders and employees.  On information and belief, AMA's strategizing, coordination, and execution of these plans, including its discussions with Defendants Ad-Hoc Group and Singapore Rig Directors in furtherance thereof, took place in New York.

248.    Defendant AMA knew about and substantially assisted the Ad-Hoc Group and Singapore Rig Directors to illegally transport the Rigs out of Mexican waters.

249.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

**COUNT THREE**
**(Unjust Enrichment against Ad-Hoc Group and Singapore Rig Directors)**

250.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

251.    Defendants Ad-Hoc Group and Singapore Rig Directors, through their unlawful control of Plaintiffs, ultimately physically seized the Rigs, wrongfully enriching themselves of valuable assets at the Plaintiffs' expense.

252.    It is against equity and good conscience to permit the Ad-Hoc Group and the Singapore Rig Directors to retain the value they received from seizing and selling the Rigs because their conduct was unlawful, and caused Plaintiffs to lose their sole valuable possessions.

253.    Defendants Ad-Hoc Group and Singapore Rig Directors procured the Rigs via their unlawful seizure of Plaintiffs.

254.    Defendants Ad-Hoc Group and Singapore Rig Directors knew that their procurement of the Rigs was unlawful because it was prohibited by injunctions by the *Concurso* Court and this Court's Comity Order, and was contrary to Article 87 of the LCM and Mexican public policy.

255.    The Ad-Hoc Group's and Singapore Rig Directors' actions were egregious, including their collusion with AMA to take unlawful control and possession of the Rigs, their filing of baseless criminal complaints against Oro Negro and its shareholders and employees via their unlawful control of the Singapore Rig Owners, and their intentional violation of the *Concurso* Court's injunctions and this Court's Comity Order, as well as of Mexican law and public policy.

256.    The Ad-Hoc Group and the Singapore Rig Directors had no justification in injuring Plaintiffs.  They acted with the intention of destroying Oro Negro and with the objective of taking over the Rigs because the Rigs were more valuable than the Bonds in Oro Negro.

257.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

### COUNT FOUR
### (Aiding and Abetting Unjust Enrichment against AMA)

258.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

259.    Defendants Ad-Hoc Group and Singapore Rig Directors, through their unlawful control of Plaintiffs, ultimately took over the Rigs, wrongfully enriching themselves of valuable assets at the Plaintiffs' expense.

260.    AMA was central to Defendants Ad-Hoc Group's and Singapore Rig Directors' efforts by, *inter alia*, (a) strategizing, coordinating, and executing plans with the Ad-Hoc Group and Singapore Rig Directors to obtain unlawful seizure of Plaintiffs; (b) recruiting and paying Defendants Singapore Rig Directors to take unlawful control of Plaintiffs; and (c) strategizing, coordinating, and executing plans with Defendant Ad-Hoc Group and its agents, including Mexican criminal counsel, GGB, to file baseless criminal complaints against Oro Negro and its shareholders and employees.  On information and belief, AMA's strategizing, coordination, and

execution of these plans, including its discussions with Defendants Ad-Hoc Group and Singapore Rig Directors in furtherance thereof, took place in New York.

261.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

## COUNT FIVE
**(Tortious Interference with Bareboat Charters against Ad-Hoc Group and AMA)**

262.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

263.    The Bareboat Charters were valid contracts between Perforadora and Plaintiffs Singapore Rig Owners.

264.    Defendants Ad-Hoc Group and AMA knew that the Bareboat Charters existed and that they were valid.  The Ad-Hoc Group and AMA were prohibited from interfering with the Bareboat Charters by orders from the *Concurso* Court and this Court.

265.    By replacing the directors of Plaintiffs Singapore Rig Owners with the Singapore Rig Directors, and then by wrongfully terminating the Bareboat Charters, in contravention of court orders and Mexican law and public policy, Defendants Ad-Hoc Group and AMA made Plaintiffs Singapore Rig Owners' performance under the Bareboat Charters impossible.

266.    Defendant Ad-Hoc Group strategized, coordinated, and executed plans with AMA through meetings and communications that took place in New York, in furtherance of their actions to terminate the Bareboat Charters.

267.    Defendant Ad-Hoc Group, through its unlawful control of Plaintiffs Singapore Rig Owners, filed an action in New York against Perforadora pursuant to its illegal termination of the Bareboat Charters, wherein it demanded that Perforadora relinquish the Rigs to it.

268.    Defendants Ad-Hoc Group and AMA had no justification for interfering with the Bareboat Charters because they did not have rights under the Bareboat Charters and no right to disturb Perforadora's use and possession of the Rigs.  Defendants acted with the intention of destroying Oro Negro and seizing Plaintiffs' sole and valuable possessions.

269.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

### COUNT SIX
### (Tortious Interference with Business Relations against Ad-Hoc Group and AMA)

270.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

271.    Perforadora and Plaintiffs Singapore Rig Owners had a business relationship.

272.    Defendants Ad-Hoc Group and AMA knew that Perforadora and Plaintiffs Singapore Rig Owners had a business relationship.

273.    Defendants Ad-Hoc Group and AMA intentionally interfered with Plaintiff Singapore Rig Owners' business relationship with Perforadora by replacing the directors of Plaintiffs Singapore Rig Owners with the Singapore Rig Directors, and then by wrongfully terminating the Bareboat Charters, in contravention of court orders and Mexican law and public policy.

274.    Defendant Ad-Hoc Group strategized, coordinated, and executed plans with AMA through meetings and communications that took place in New York, in furtherance of their actions to terminate the Bareboat Charters.

275.    Defendant Ad-Hoc Group, through its unlawful control of Plaintiffs Singapore Rig Owners, filed an action in New York against Perforadora based on its illegal termination of the Bareboat Charters, wherein it demanded that Perforadora relinquish the Rigs to it.

276.    Defendants Ad-Hoc Group and AMA had no justification for interfering with Perforadora's and Plaintiffs Singapore Rig Owners' business relationship because they did not have rights under the Bareboat Charters and no right to disturb Perforadora's use and possession of the Rigs.  Defendants acted with the intention of destroying Oro Negro and seizing Plaintiffs' sole and valuable possessions.

277.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

## COUNT SEVEN
### (Breach of Fiduciary Duty against Singapore Rig Directors)

278.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

279.    As directors of Plaintiffs Oro Negro Drilling and Singapore Rig Owners, Defendants Singapore Rig Directors exercised discretionary authority on matters of significance and participated in the management of the Plaintiffs.  The Singapore Rig Directors owed a fiduciary duty to Plaintiffs, which included acting in good faith and in the best interests of Plaintiffs.

280.    Defendants Singapore Rig Directors breached their fiduciary duty to Plaintiffs by acting contrary to Plaintiffs' best interests.  The Singapore Rig Directors took actions that deprived the Plaintiffs of their sole and valuable possessions, the Rigs.  The actions included authorizing GGB to file numerous criminal actions on behalf of Plaintiffs Singapore Rig Owners that resulted in the Ad-Hoc Group's seizure of the Rigs.  The actions were taken in coordination with AMA and the Ad-Hoc Group through discussions that took place with AMA principals in New York.

281.    The actions also included precluding Plaintiffs' *concurso* petitions from being admitted into the *Concurso* Proceeding, thus depriving Plaintiffs' ability to successfully reorganize.

282.    Defendants Singapore Rig Owners also caused Plaintiffs to violate the *Concurso* Court's injunctions and this Court's Comity Order, as well as Mexican law and public policy.

283.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

## COUNT EIGHT
### (Aiding and Abetting Breach of Fiduciary Duty against Ad-Hoc Group and AMA)

284.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

285.    As directors of Plaintiffs Oro Negro Drilling and Singapore Rig Owners, Defendants Singapore Rig Directors exercised discretionary authority on matters of significance and participated in the management of the Plaintiffs, the Singapore Rig Directors, and owed a fiduciary duty to Plaintiffs, which included acting in good faith and in the best interests of Plaintiffs.

286.    Defendants Singapore Rig Directors breached their fiduciary duty to Plaintiffs by depriving the Plaintiffs of their sole and valuable possessions, the Rigs.

287.    The Ad-Hoc Group and AMA aided and abetted Defendants Singapore Rig Directors' breach of fiduciary duty by recruiting Defendants Singapore Rig Directors to take unlawful control of Plaintiffs and paying them to do so. The Ad-Hoc Group and AMA discussed the recruitment of the Singapore Rig Directors through communications that took place in New York.

288.    The Ad-Hoc Group and AMA also coordinated, strategized, and executed plans to file baseless criminal complaints against Oro Negro, its shareholders, and its employees, on behalf of the Singapore Rig Owners who were unlawfully controlled by Defendants Singapore Rig Directors.  The strategy was developed by AMA principals in New York, and the coordination and execution of the strategy took place in AMA's offices in New York.  On information and belief, meetings between the Ad-Hoc Group and AMA discussing the criminal complaints took place in New York.

289.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

## COUNT NINE
### (Civil Conspiracy against all Defendants)

290.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

291.    Defendants entered into a corrupt agreement in order to obtain unlawful seizure of Plaintiffs.  Defendant AMA was engaged by Defendant Ad-Hoc Group to assist with the takeover of the Rigs, and was compensated for its assistance.  Defendants Singapore Rig Directors were engaged by Defendants AMA and Ad-Hoc Group to replace the previous directors of Plaintiffs and take unlawful control of Plaintiffs, and were compensated for their assistance.

292.    In furtherance of the agreements, Defendants (a) had meetings where they discussed plans to obtain unlawful seizure of Plaintiffs; (b) recruited Defendants Singapore Rig Directors to take unlawful control of Plaintiffs; and (c) strategized, coordinated, and executed plans with Defendant Ad-Hoc Group's Mexican criminal counsel, GGB, to file baseless criminal complaints against Oro Negro, through which actions they committed the torts alleged herein.  On information and belief, AMA's coordination, strategizing, and execution of the plan, as well as

discussions in furtherance thereof with Defendants Ad-Hoc Group and Singapore Rig Directors, took place in New York.

293.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

### COUNT TEN
### (Alternative to Counts One, Two, Five, and Six)
### (Breach of Article 1910 of the Mexican Civil Code against all Defendants)

294.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

295.    Plaintiffs hereby give notice of their intention to rely on Mexican law.

296.    Under Article 1910 of the Mexican Federal Civil Code and under Article 1910 of the México City Civil Code, a party is liable for any damages that it willfully causes to another party.

297.    Plaintiffs Singapore Rig Owners held valid ownership interests in the Rigs.

298.    Plaintiff Oro Negro Drilling held a valid ownership interest in the Rigs through its ownership of the Singapore Rig Owners.

299.    Defendants Ad-Hoc Group and Singapore Rig Directors procured the Rigs via their unlawful seizure of Plaintiffs.

300.    AMA was central to Defendants Ad-Hoc Group's and Singapore Rig Directors' efforts by, *inter alia*, (a) strategizing, coordinating, and executing plans with the Ad-Hoc Group and Singapore Rig Directors to obtain unlawful seizure of Plaintiffs; (b) recruiting and paying Defendants Singapore Rig Directors to take unlawful control of Plaintiffs; and (c) strategizing, coordinating, and executing plans with Defendant Ad-Hoc Group and its agents, including

Mexican criminal counsel, GGB, to file baseless criminal complaints against Oro Negro and its shareholders and employees.

301.    Defendants knew that the procurement of the Rigs was unlawful because it was prohibited by injunctions by the *Concurso* Court and this Court's Comity Order and it was contrary to Article 87 of the LCM and Mexican public policy.

302.    Defendants Ad-Hoc Group and Singapore Rig Directors, with Defendant AMA's assistance, used their unauthorized seizure of the Singapore Rig Owners and Oro Negro Drilling to illegally transport the Rigs out of Mexican waters and sell the Rigs to themselves for substantially less than their value.

303.    Defendants also knew that the Perforadora and Plaintiffs Singapore Rig Owners had a business relationship, including through valid contracts—the Bareboat Charters.

304.    Defendants Ad-Hoc Group and AMA were prohibited from interfering with the Bareboat Charters by orders from the *Concurso* Court and this Court.

305.    Defendants Ad-Hoc Group and AMA intentionally interfered with Plaintiff Singapore Rig Owners' business relationship with Perforadora and with the Bareboat Charters by replacing the directors of Plaintiffs Singapore Rig Owners with the Singapore Rig Directors, and then by wrongfully terminating the Bareboat Charters, in contravention of court orders and Mexican law and public policy.

306.    Defendants Ad-Hoc Group and AMA had no justification for interfering with Perforadora's business relationship with Plaintiffs Singapore Rig Owners or with the Bareboat Charters because they did not have rights under the Bareboat Charters and no right to disturb Perforadora's use and possession of the Rigs.  Defendants acted with the intention of destroying Oro Negro and seizing Plaintiffs' sole and valuable possessions.

307.   Defendants' actions were egregious, including their collusion to take unlawful control and possession of the Rigs, the filing of baseless complaints against Oro Negro and its shareholders and employees via Defendant Ad-Hoc Group's and Singapore Rig Directors' unlawful control of the Singapore Rig Owners, and Defendants' intentional violation of the *Concurso* Court's injunctions, Court's Comity Order, and Mexican law and public policy.

308.   As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

### COUNT ELEVEN
### (Alternative to Count Three)
### (Breach of Article 1882 of the Mexican Federal Civil Code against Ad-Hoc Group and Singapore Rig Directors)

309.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

310.   Plaintiffs hereby give notice of their intention to rely on Mexican law.

311.   Under Article 1882 of the Mexican Federal Civil Code, a party who without cause is enriched to the detriment of another is obliged to compensate such person to the extent of the enrichment.

312.   Defendants Ad-Hoc Group and Singapore Rig Directors, through their unlawful control of Plaintiffs, ultimately physically seized the Rigs, wrongfully enriching themselves of valuable assets at the Plaintiffs' expense.

313.   It is against equity and good conscience to permit the Ad-Hoc Group and the Singapore Rig Directors to retain the value they received from seizing and selling the Rigs because their conduct was unlawful, and caused Plaintiffs to lose their sole valuable possessions.

314.   Defendants Ad-Hoc Group and Singapore Rig Directors procured the Rigs via their unlawful seizure of Plaintiffs.

315.    Defendants Ad-Hoc Group and Singapore Rig Directors knew that their procurement of the Rigs was unlawful because it was prohibited by injunctions by the *Concurso* Court and this Court's Comity Order, and was contrary to Article 87 of the LCM and Mexican public policy.

316.    The Ad-Hoc Group's and Singapore Rig Directors' actions were in bad faith and egregious, including their collusion with AMA to take unlawful control and possession of the Rigs, their filing of baseless criminal complaints against Oro Negro and its shareholders and employees via their unlawful control of the Singapore Rig Owners, and their intentional violation of the *Concurso* Court's injunctions and this Court's Comity Order, as well as of Mexican law and public policy.

317.    The Ad-Hoc Group and the Singapore Rig Directors had no justification in injuring Plaintiffs.  They acted with the intention of destroying Oro Negro and with the objective of taking over the Rigs because the Rigs were more valuable than the Bonds in Oro Negro.

318.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

## COUNT TWELVE
### (Alternative to Count Seven)
### (Breach of Fiduciary Duty under Mexican Insolvency Law and Mexican Federal Civil Code against Singapore Rig Directors)

319.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

320.    Plaintiffs hereby give notice of their intention to rely on Mexican law.

321.    As directors of Plaintiffs Oro Negro Drilling and Singapore Rig Owners, Defendants Singapore Rig Directors exercised discretionary authority on matters of significance and participated in the management of the Plaintiffs.  The Singapore Rig Directors owed a

fiduciary duty to Plaintiffs, which included acting in good faith and in the best interests of Plaintiffs.

322.    Defendants Singapore Rig Directors breached their fiduciary duty to Plaintiffs by acting contrary to Plaintiffs' best interests.  The Singapore Rig Directors took actions that deprived the Plaintiffs of their sole and valuable possessions, the Rigs.  The actions included authorizing GGB to file numerous criminal actions on behalf of Plaintiffs Singapore Rig Owners that resulted in the Ad-Hoc Group's seizure of the Rigs.  The actions were taken in coordination with AMA and the Ad-Hoc Group through discussions that took place with AMA principals in New York.

323.    The actions also included precluding Plaintiffs' *concurso* petitions from being admitted into the *Concurso* Proceeding, thus depriving Plaintiffs' ability to successfully reorganize.

324.    Defendants Singapore Rig Owners also caused Plaintiffs to violate the *Concurso* Court's injunctions and this Court's Comity Order, as well as Mexican law and public policy.

325.    As a result of the foregoing, Plaintiffs were damaged by an amount to be determined at trial, including costs and attorneys' fees and punitive damages.

**WHEREFORE**, for the reasons set forth above, Plaintiffs respectfully request judgment be entered in their favor as follows:

(a)    Awarding damages to Plaintiffs, including punitive damages, in an amount to be determined at trial;

(b)    Awarding Plaintiffs' fees and expenses in bringing this action;

(c)    Awarding pre-judgment interest at the maximum legal rate applicable to a judgment issued by the Court entering such judgment; and

(d)    Granting any such additional as the Court deems just and proper.

65

Plaintiffs reserve the right to seek all remedies available at law and equity.

Dated:  March 9, 2021

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

_____

Juan P. Morillo (*pro hac vice*)
Serafina Concannon
1300 I Street, NW, Suite 900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Facsimile:  (202) 538-8100
Email:  juanmorillo@quinnemanuel.com
Email:  serafinaconcannon@quinnemanuel.com

Eric D. Winston (*pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, California  90017
Telephone:  (213) 443-3000
Facsimile:  (212) 443-3100
Email:  ericwinston@quinnemanuel.com

*Attorneys for Oro Negro Primus Pte., Ltd.; Oro
Negro Laurus Pte., Ltd.; Oro Negro Fortius Pte.,
Ltd.; Oro Negro Decus Pte., Ltd.; Oro Negro Impetus
Pte., Ltd.; and Oro Negro Drilling Pte. Ltd.*